1
2
3
4
5

Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

6

*Counsel for Plaintiff*

7
8

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

9
10
11
12
13
14
15

WAYNE CHAN, Individually and on behalf of all others similarly situated,

     Plaintiff,

     v.

EQUINIX, INC., CHARLES MEYERS, and KEITH D. TAYLOR,

     Defendants.

**Case No:**

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

16
17
18
19
20
21
22
23
24
25
26
27
28

     Plaintiff Wayne Chan ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding EQUINIX, INC. ("Equinix" or the "Company"), analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired publicly traded Equinix securities between May 3, 2019 and March 24, 2024, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

**JURISDICTION AND VENUE**

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Further, the Company maintains an office within this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

Class Action Complaint for Violation of the Federal Securities Laws

7.      Defendant Equinix describes itself as "the world's digital infrastructure company." Equinix operates as a real estate investment trust ("REIT") for tax purposes. Equinix owns data centers in most parts of the world. As of February 2016, Equinix owned 260 data centers around the world. Other organizations lease space within these data centers to house their software.

8.      As a REIT, one of Equinix's key metrics is AFFO, which stands for Adjusted Funds From Operations. As discussed in this complaint, AFFO was a key metric used to determine executive compensation at Equinix throughout the Class Period. AFFO is a company's funds from operations, minus costs such as maintenance CapEx and other spending to maintain the company's existing revenue bases.

9.      This action also focuses on recurring CapEx and Maintenance CapEx, which are costs used to maintain the Company's facilities and to be able to continue operating in its current form, respectively, and non-recurring CapEx (also called "Growth CapEx"), which consists of investments in new facilities or other initiatives which are intended to generate new revenue. In pertinent part, this action alleges that the Company artificially inflated its AFFO by misclassifying recurring CapEx and Maintenance CapEx expenditures as Growth CapEx.

10.     The Company is incorporated in Delaware, and its principal executive offices are located One Lagoon Drive, Redwood City, California. The Company's common stock trades on the NASDAQ Exchange under the ticker symbol "EQIX".

11.     Defendant Charles Meyers ("Meyers") has served as the Company's Chief Executive Officer ("CEO") and President since the beginning of the Class Period.

12.     Defendant Keith D. Taylor ("Taylor") has served as the Company's Chief Financial Officer ("CFO") since the beginning of the Class Period.

13.     Defendants Meyers and Taylor are sometimes referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

(a)      directly participated in the management of the Company;

- 3 -

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

### SUBSTANTIVE ALLEGATIONS

### False and Misleading Statements

18.     On May 3, 2019, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2019 (the "1Q19 Report"). Attached to the 1Q19 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

19.     The 1Q19 Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

(Emphasis added),

20.     The statement in ¶ 19 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

21.     The 1Q19 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected***.

(Emphasis added).

Class Action Complaint for Violation of the Federal Securities Laws

22.     The statement in ¶ 21 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

23.     The 1Q19 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.
>
> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, acquisition costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures and adjustments for unconsolidated joint ventures' and noncontrolling interests' share of these items and net income (loss) from discontinued operations, net of tax. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

24.     The statement in  ¶ 23 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

25.     The 1Q19 Report included the following statement on stock-based compensation:

For the three months ended March 31, 2019, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 647,243 shares of restricted stock units to certain employees, including executive officers, pursuant to the 2000 Equity Incentive Plan. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $429.03 and a weighted-average requisite service period of 3.67 years. The valuation of restricted stock units with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. ***The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the three months ended March 31, 2019***.

(Emphasis added).

26.     The statement in ¶ 25 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

27.     The 1Q19 Report contained the following disclosure regarding infrastructure risk:

***Our business depends on providing customers with highly reliable solutions***. We must safehouse our customers' infrastructure and equipment located in our IBX data centers ***and ensure our IBX data centers and non-IBX offices remain operational***. [. . .]

Our office buildings and IBX data centers are subject to failure resulting from, and infrastructure within such IBX data centers is at risk from, numerous factors, including:
- human error;
- equipment failure;
  [. . .]
- power loss;
  [. . .]

***Problems at one or more of our IBX data centers, whether or not within our control, could result in service interruptions or significant equipment damage. We have service level commitment obligations to certain customers***. As a result, service interruptions or significant equipment damage in our IBX data centers ***could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP").

***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results***.
(Emphasis added).

28.     The statement in ¶ 27 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

29.     On August 2, 2019, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2019 (the "2Q19 Report"). Attached to the 2Q19 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

30.     The 2Q19 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

(Emphasis added).

31.     The statement in ¶ 30 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

32.     The 2Q19 Report contained the following statement regarding the "limitations on the effectiveness of controls":

***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits

of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected***.

(Emphasis added).

33.     The statement in ¶ 32 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

34.     The 2Q19 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, acquisition costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures and adjustments for unconsolidated joint ventures' and noncontrolling interests' share of these items and net income (loss) from discontinued operations, net of tax. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce

future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

35.     The statement in ¶ 34 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

36.     The 2Q19 Report included the following statement on stock-based compensation:

*For the six months ended June 30, 2019, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 697,174 shares of restricted stock units to certain employees*, including executive officers, pursuant to the 2000 Equity Incentive Plan. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $434.17 and a weighted-average requisite service period of 3.66 years. The valuation of restricted stock units with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. *The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the six months ended June 30, 2019*.

(Emphasis added).

37.     The statement in ¶ 36 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

38.     The 2Q19 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers *and ensure our IBX data centers and non-IBX offices remain operational*. [. . .]

Our office buildings and IBX data centers are subject to failure resulting from, and infrastructure within such IBX data centers is at risk from, numerous factors, including:

- human error;
- *equipment failure*;
  [. . .]

- 10 -

- ***power loss***;
  [. . .]

***Problems at one or more of our IBX data centers, whether or not within our control, could result in service interruptions or significant equipment damage. We have service level commitment obligations to certain customers***. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers ***could also result in lost profits or other indirect or consequential damages to our customers***. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results***.

(Emphasis added).

39.     The statement in ¶ 38 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

40.     On November 1, 2019, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2019 (the "3Q19 Report"). Attached to the 3Q19 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

41.     The 3Q19 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

(Emphasis added).

42.     The statement in ¶ 41 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

43.     The 3Q19 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected***.

(Emphasis added).

44.     The statement in ¶ 43 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

45.     The 3Q19 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures and adjustments for unconsolidated joint ventures' and noncontrolling interests' share of these items and net income (loss) from discontinued operations, net of tax. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

46.     The statement in ¶ 45 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

47.     The 3Q19 Report included the following statement on stock-based compensation:

**For the nine months ended September 30, 2019, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 736,303 shares of restricted stock units to certain employees**, including executive officers, pursuant to the 2000 Equity Incentive Plan. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $440.61 and a weighted-average requisite service period of 3.65 years. The valuation of restricted stock units with only a service condition or a service and performance condition requires no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. **The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the nine months ended September 30, 2019**.

(Emphasis added).

48.     The statement in ¶ 47 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

49.     The 3Q19 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers ***and ensure our IBX data centers and non-IBX offices remain operational***. [. . .]

Our office buildings and IBX data centers are subject to failure resulting from, and infrastructure within such IBX data centers is at risk from, numerous factors, including:
- human error;
- ***equipment failure***;
  [. . .]
- ***power loss***;
  [. . .]

***Problems at one or more of our IBX data centers, whether or not within our control, could result in service interruptions or significant equipment damage. We have service level commitment obligations to certain customers***. As a result, service interruptions or significant equipment damage in our IBX data centers ***could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results***.

(Emphasis added).

50.     The statement in ¶ 49 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

51.     On February 21, 2020, Equinix filed with the SEC its annual report on Form 10-K for the period ended December 31, 2019 (the "2019 Annual Report"). Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

52.     The 2019 Annual Report contained the following statement about the Company's internal controls:

> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). *Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2019*.

(Emphasis added).

53.     The statement in ¶ 52 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

54.     The 2019 Annual Report further provided the following management report on internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). *Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements*. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.
>
> Based on our evaluation under the framework in *Internal Control – Integrated Framework* (2013), *our management concluded that our internal control over financial reporting was effective as of December 31, 2019*.

(Emphasis added).

55.     The statement in ¶ 54 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

56.     The 2019 Annual Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected.

(Emphasis added).

57.     The statement in ¶ 56 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

58.     The 2019 Annual Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

59.     The statement in ¶ 58 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

60.     The 2019 Annual Report contained the following disclosure regarding infrastructure risk:

> ***Our business depends on providing customers with highly reliable solutions***. We must safehouse our customers' infrastructure and equipment located in our IBX data centers ***and ensure our IBX data centers and non-IBX offices remain operational at all times***. [. . .]
>
> ***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including:
> - human error;
> - ***equipment failure***;
> [. . .]
> - ***power loss***;
> [. . .]

*We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers *could also result in lost profits or other indirect or consequential damages to our customers*. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results.*

(Emphasis added).

61.     The statement in ¶ 60 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

62.     On May 7, 2020, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2020 (the "1Q20 Report"). Attached to the 1Q20 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

63.     The 1Q20 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

(Emphasis added).

64.     The statement in ¶ 63 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

65.     The 1Q20 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

(Emphasis added).

66.     The statement in ¶ 65 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

67.     The 1Q20 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

Class Action Complaint for Violation of the Federal Securities Laws

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

68.    The statement in ¶ 67 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

69.    The 1Q20 Report included the following statement on stock-based compensation:

*For the three months ended March 31, 2020, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 653,281 shares of restricted stock units to certain employees*, including executive officers, pursuant to the 2000 Equity Incentive Plan. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $579.24 and a weighted-average requisite service period of 3.31 years. The valuation of restricted stock units with only a service condition or a service and performance condition requires no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. *The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the three months ended March 31, 2020*.

(Emphasis added).

70.     The statement in ¶ 69 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

71.     The 1Q20 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers *and ensure our IBX data centers and non-IBX offices remain operational at all times*. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including:
- human error;
- *equipment failure*;
  [. . .]
- *power loss*;
  [. . .]

We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers *could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results*.

(Emphasis added).

72.     The statement in ¶ 71 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

73.     On July 31, 2020, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2020 (the "2Q20 Report"). Attached to the 2Q20 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

74.     The 2Q20 Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

(Emphasis added).

75.     The statement in ¶ 74 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

76.     The 2Q20 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected***.

(Emphasis added).

Class Action Complaint for Violation of the Federal Securities Laws

77.     The statement in ¶ 76 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

78.     The 2Q20 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the23mortizdated statement of operations. We exclude the 23mortizeation of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

79.     The statement in ¶ 78 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

80.     The 2Q20 Report included the following statement on stock-based compensation:

*For the six months ended June 30, 2020, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 680,543 shares of restricted stock units to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $583.99 per share and a weighted-average requisite service period of 3.33 years. The valuation of restricted stock units with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. *The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the six months ended June 30, 2020*.

81.     The statement in ¶ 80 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

82.     The 2Q20 Report contained the following disclosure regarding infrastructure risk:
*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including:
- human error;
- *equipment failure*;
  [. . .]
- *power loss*;
  [. . .]

*We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers *could also result in lost profits or other indirect or consequential damages to our customers*. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and*

*could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results*.

(Emphasis added).

83.     The statement in ¶ 82 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

84.     On October 30, 2020, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2020 (the "3Q20 Report"). Attached to the 3Q20 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

85.     The 3Q20 Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

(Emphasis added).

86.     The statement in ¶ 85 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

87.     The 3Q20 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> *Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of

controls must be considered relative to their costs. **Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected**. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. **Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls**. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. **Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected**.

(Emphasis added).

88.     The statement in ¶ 87 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

89.     The 3Q20 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce

- 26 -

future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

90.     The statement in ¶ 89 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

91.     The 3Q20 Report included the following statement on stock-based compensation:

*For the nine months ended September 30, 2020, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 709,450 shares of restricted stock units to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $593.74 per share and a weighted-average requisite service period of 3.30 years. The valuation of restricted stock units with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. *The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the nine months ended September 30, 2020*.

(Emphasis added).

92.     The statement in ¶ 91 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

93.     The 3Q20 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including:
- human error;
- *equipment failure*;
  [. . .]

- ***power loss***;
  [. . .]

***We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers ***could also result in lost profits or other indirect or consequential damages to our customers***. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results***.

(Emphasis added).

94.     The statement in ¶ 93 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

95.     On February 19, 2021, Equinix filed with the SEC its annual report on Form 10-K for the period ended December 31, 2020 (the "2020 Annual Report"). Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

96.     The 2020 Annual Report contained the following statement about the Company's internal controls:

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). ***Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2020***.

(Emphasis added).

Class Action Complaint for Violation of the Federal Securities Laws

97.     The statement in ¶ 96 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

98.     The 2020 Annual Report further provided the following management report on internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). ***Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements***. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

> Based on our evaluation under the framework in *Internal Control – Integrated Framework* (2013), ***our management concluded that our internal control over financial reporting was effective as of December 31, 2020***.

(Emphasis added).

99.     The statement in ¶ 98 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

100.    The 2020 Annual Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management***

*override of the controls*. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected***.

(Emphasis added).

101.    The statement in ¶ 100 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

102.    The 2020 Annual Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income

(loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

103.    The statement in  ¶ 102 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

104.    The 2020 Annual Report contained the following disclosure regarding infrastructure risk:

> ***Our business depends on providing customers with highly reliable solutions***. We must safehouse our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]
>
> ***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including:
> - human error;
> - ***equipment failure***;
> - [. . .]
> - ***power loss***;
> - [. . .]
>
> ***We have service level commitment obligations to certain customers***. As a result, service interruptions or significant equipment damage in our IBX data centers ***could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations***.

(Emphasis added).

105.    The statement in ¶ 104 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

106.    On April 30, 2021, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 Report"). Attached to the 1Q21 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

107.    The 1Q21 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

(Emphasis added).

108.    The statement in ¶ 107 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

109.    The 1Q21 Report contained the following statement regarding the "limitations on the effectiveness of controls":

***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree

of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected***.

(Emphasis added).

110.    The statement in ¶ 109 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

111.    The 1Q21 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.
>
> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

112.     The statement in  ¶ 111 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

113.     The 1Q21 Report included the following statement on stock-based compensation:

*For the three months ended March 31, 2021, the Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, approved the issuance of an aggregate of 646,388 shares of restricted stock units ("RSUs") to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $650.40 per share and a weighted-average requisite service period of 3.52 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the RSUs with both service and performance conditions that were granted in the three months ended March 31, 2021*.

(Emphasis added).

114.     The statement in ¶ 113 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

115.     The 1Q21 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including but not limited to:
- human error;
- *equipment failure*;
  [. . .]
- *power loss;*

*We have service level commitment obligations to certain customers*. As a result, service interruptions or significant equipment damage in our IBX data centers *could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at

one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations***.

(Emphasis added).

116.   The statement in ¶ 115 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

117.   On July 30, 2021, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

118.   The 2Q21 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

(Emphasis added).

119.   The statement in ¶ 118 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

120.   The 2Q21 Report contained the following statement regarding the "limitations on the effectiveness of controls":

***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or

our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected*.

(Emphasis added.)

121.    The statement in ¶ 120 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

122.    The 2Q21 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing

costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

123.    The statement in ¶ 122 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

124.    The 2Q21 Report included the following statement on stock-based compensation:
*For the six months ended June 30, 2021, the Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, approved the issuance of an aggregate of 689,992 shares of restricted stock units ("RSUs") to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $661.05 per share and a weighted-average requisite service period of 3.59 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the RSUs with both service and performance conditions that were granted in the six months ended June 30, 2021*.

(Emphasis added).

125.    The statement in ¶ 124 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

126.    The 2Q21 Report contained the following disclosure regarding infrastructure risk:
*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including but not limited to:

- human error;
- *equipment failure*;
  [. . .]
- *power loss*;
  [. . .]

*We have service level commitment obligations to certain customers*. As a result, service interruptions or significant equipment damage in our IBX data centers *could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

(Emphasis added).

127.    The statement in ¶ 126 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

128.    On November 4, 2021, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report"). Attached to the 3Q21 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

129.    The 3Q21 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

- 38 -

(Emphasis added).

130. The statement in ¶ 129 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

131. The 3Q21 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> *Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level.* However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud.* A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met.* Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.* These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls.* The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.*

(Emphasis added).

132. The statement in ¶ 131 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

133. The 3Q21 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

134.    The statement in ¶ 133 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

135.    The 3Q21 Report included the following statement on stock-based compensation:

> *For the six months ended June 30, 2021, the Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, approved the issuance of an aggregate of 689,992 shares of restricted stock units ("RSUs") to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $661.05 per share and a weighted-average requisite service period of 3.59 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the RSUs with both service and performance conditions that were granted in the six months ended June 30, 2021*.

(Emphasis added).

136.    The statement in ¶ 135 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

137.    The 3Q21 Report contained the following disclosure regarding infrastructure risk:

***Our business depends on providing customers with highly reliable solutions***. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including but not limited to:
- human error
- ***equipment failure***;
  [. . .]
- ***power loss***;
  [. . .]

***We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations***.

(Emphasis added).

138.    The statement in ¶ 137 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

139.    On February 18, 2022, Equinix filed with the SEC its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to

the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

140.     The 2021 Annual Report contained the following statement about the Company's internal controls:

> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). ***Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2021***.

(Emphasis added).

141.     The statement in ¶ 140 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

142.     The 2021 Annual Report further provided the following management report on internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). ***Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements***. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

> Based on our evaluation under the framework in *Internal Control – Integrated Framework* (2013), ***our management concluded that our internal control over financial reporting was effective as of December 31, 2021***.

(Emphasis added).

143.     The statement in ¶ 142 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

- 42 -

144.   The 2021 Annual Report contained the following statement regarding the "limitations on the effectiveness of controls":

> *Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level.* However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud.* A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met.* Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.* These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls.* The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected.*

(Emphasis added).

145.   The statement in ¶ 144 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

146.   The 2021 Annual Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.
>
> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue

- 43 -

adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

147.     The statement in ¶ 146 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

148.     The 2021 Annual Report contained the following disclosure regarding infrastructure risk:

> ***Our business depends on providing customers with highly reliable solutions***. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]
>
> ***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including but not limited to:
> * human error;
> * ***equipment failure***;
>   [. . .]
> * ***power loss***;
>   [. . .]
> ***We have service level commitment obligations to certain customers***. As a result, service interruptions or significant equipment damage in our IBX data centers ***could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers

could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

(Emphasis added).

149.    The statement in ¶ 148 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

150.    On April 29, 2022, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2022 (the "1Q22 Report"). Attached to the 1Q22 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

151.    The 1Q22 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

(Emphasis added).

152.    The statement in ¶ 151 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

153.    The 1Q22 Report contained the following statement regarding the "limitations on the effectiveness of controls":

*Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level.* However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected*.

(Emphasis added).

154.    The statement in ¶ 153 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

155.    The 1Q22 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net

income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items.

The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

156.   The statement in ¶ 155 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

157.   The 1Q22 Report included the following statement on stock-based compensation:

**For the three months ended March 31, 2022, the Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 750,583 restricted stock units ("RSUs") to certain employees**, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $665.53 per share and a weighted-average requisite service period of 3.50 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. **We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs with both service and performance conditions that were granted in the three months ended March 31, 2022**.

(Emphasis added).

158.   The statement in ¶ 157 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

159.   The 1Q22 Report contained the following disclosure regarding infrastructure risk:

***Our business depends on providing customers with highly reliable solutions***. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including but not limited to:

- human error;
- ***equipment failure***;
  [. . .]
- ***power loss***;
  [. . .]

***We have service level commitment obligations to certain customers***. As a result, service interruptions or significant equipment damage in our IBX data centers ***could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations***.

(Emphasis added).

160.    The statement in ¶ 159 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

161.    On July 29, 2022, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2022 (the "2Q22 Report"). Attached to the 2Q22 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

162.    The 2Q22 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

(Emphasis added).

163.    The statement in ¶ 162 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

164.    The 2Q22 Report contained the following statement regarding the "limitations on the effectiveness of controls":

***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected***.

(Emphasis added).

165.    The statement in ¶ 164 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

166.    The 2Q22 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.
>
> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

167.    The statement in  ¶ 166 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

168.    The 2Q22 Report included the following statement on stock-based compensation:

> **For the six months ended June 30, 2022, the Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 794,013 restricted stock units ("RSUs") to certain employees**, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $663.94 per share and a weighted-average requisite service period

of 3.51 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs with both service and performance conditions that were granted in the six months ended June 30, 2022*.

(Emphasis added).

169.   The statement in ¶ 168 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

170.   The 2Q22 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage. These could result from numerous factors, including but not limited to:

- human error;
- *equipment failure*;
  [. . .]
- *power loss*;
  [. . .]

*We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

(Emphasis added).

Class Action Complaint for Violation of the Federal Securities Laws

171.    The statement in ¶ 170 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

172.    On November 4, 2022, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2022 (the "3Q22 Report"). Attached to the 3Q22 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

173.    The 3Q22 Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

(Emphasis added).

174.    The statement in ¶ 173 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

175.    The 3Q22 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the***

***individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected***.

(Emphasis added).

176.    The statement in ¶ 175 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

177.    The 3Q22 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers

or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

178.    The statement in ¶ 177 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

179.    The 3Q22 Report included the following statement on stock-based compensation:

**For the nine months ended September 30, 2022, the Talent, Culture and Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 856,959 restricted stock units ("RSUs") to certain employees**, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $661.64 per share and a weighted-average requisite service period of 3.52 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. **We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs with both service and performance conditions that were granted in the nine months ended September 30, 2022**.

(Emphasis added).

180.    The statement in ¶ 179 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

181.    The 3Q22 Report contained the following disclosure regarding infrastructure risk:

**Our business depends on providing customers with highly reliable solutions**. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

**Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage**. These could result from numerous factors, including but not limited to:
- human error;
- equipment failure;
  [. . .]
- power loss;
  [. . .]

**We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims**

*related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

(Emphasis added).

182.    The statement in ¶ 181 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

183.    On February 17, 2023, Equinix filed with the SEC its annual report on Form 10-K for the period ended December 31, 2022 (the "2022 Annual Report").[1] Attached to the 2022 Annual Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

184.    The 2022 Annual Report contained the following statement about the Company's internal controls:

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). *Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2022*.

(Emphasis added).

185.    The statement in ¶ 184 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

---

[1] The amended 2022 10-K, filed on form 10-K/A on February 27, 2023, did not change the statements discussed herein.

186.    The 2022 Annual Report further provided the following management report on internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). ***Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements***. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.
>
> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.
>
> Based on our evaluation under the framework in *Internal Control – Integrated Framework* (2013), ***our management concluded that our internal control over financial reporting was effective as of December 31, 2022***.

(Emphasis added).

187.    The statement in ¶ 186 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

188.    The 2022 Annual Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that

any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected***.

(Emphasis added).

189.    The statement in ¶ 188 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

190.    The 2022 Annual Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

191.    The statement in ¶ 190 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

192.    The 2022 Annual Report contained the following disclosure regarding infrastructure risk:

> *Our business depends on providing customers with highly reliable solutions*. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]
> *Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including but not limited to:
> - human error;
> - *equipment failure*;
>   [. . .]
> - *power loss*;
>   [. . .]
> *We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

(Emphasis added).

193.    The statement in ¶ 192 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

194.    On May 5, 2023, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2023 (the "1Q23 Report"). Attached to the 1Q23 Report were

certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

195.    The 1Q23 Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

(Emphasis added).

196.    The statement in ¶ 195 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

197.    The 1Q23 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected***.

- 59 -

Class Action Complaint for Violation of the Federal Securities Laws

(Emphasis added).

198.    The statement in ¶ 197 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

199.    The 1Q23 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.
>
> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

200.   The statement in ¶ 199 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

201.   The 1Q23 Report included the following statement on stock-based compensation:

**For the three months ended March 31, 2023, the Talent, Culture and Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 845,473 restricted stock units ("RSUs") to certain employees**, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $685.99 per share and a weighted-average requisite service period of 3.48 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. **We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs with both service and performance conditions that were granted in the three months ended March 31, 2023**.

(Emphasis added).

202.   The statement in ¶ 201 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

203.   The 1Q23 Report contained the following disclosure regarding infrastructure risk:

**Our business depends on providing customers with highly reliable solutions**. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX business operations remain operational at all times. [. . .]

**Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage**. These could result from numerous factors, including but not limited to:
- human error;
- equipment failure;
  [. . .]
- power loss;
  [. . .]

**We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures**. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers.

We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations.*

(Emphasis added).

204. The statement in ¶ 203 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

205. On August 4, 2023, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2023 (the "2Q23 Report"). Attached to the 2Q23 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

206. The 2Q23 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report.*

(Emphasis added).

207. The statement in ¶ 206 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

208. The 2Q23 Report contained the following statement regarding the "limitations on the effectiveness of controls":

*Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial*

- 62 -

Class Action Complaint for Violation of the Federal Securities Laws

*reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected*.

(Emphasis added).

209.    The statement in ¶ 208 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

210.    The 2Q23 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and non-controlling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract

costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

211.   The statement in ¶ 210 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

212.   The 2Q23 Report included the following statement on stock-based compensation:

*For the six months ended June 30, 2023, the Talent, Culture and Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 891,561 restricted stock units ("RSUs") to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $690.63 per share and a weighted-average requisite service period of 3.45 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs with both service and performance conditions that were granted in the six months ended June 30, 2023*.

(Emphasis added).

213.   The statement in ¶ 212 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

214.   The 2Q23 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX business operations remain operational at all times. [. . .]

***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including but not limited to:

- human error;
- equipment failure;
  [. . .]
- power loss;
  [. . .]

***We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations***.

(Emphasis added).

215.    The statement in ¶ 214 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

216.    On October 27, 2023, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2023 (the "3Q23 Report"). Attached to the 3Q23 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

217.    The 3Q23 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly

report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

(Emphasis added).

218.    The statement in ¶ 217 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

219.    The 3Q23 Report contained the following statement regarding the "limitations on the effectiveness of controls":

*Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected*.

(Emphasis added).

220.    The statement in ¶ 219 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

221.    The 3Q23 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss),

excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and non-controlling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

222.    The statement in ¶ 221 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

223.    The 3Q23 Report included the following statement on stock-based compensation:

*For the nine months ended September 30, 2023, the Talent, Culture and Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 943,224 restricted stock units ("RSUs") to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $694.34 per share and a weighted-average requisite service period of 3.52 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs with both service*

***and performance conditions that were granted in the nine months ended September 30, 2023***.

(Emphasis added).

224.   The statement in ¶ 223 was materially false and misleading because it omitted that employees were pressured by management to misclassify operational expenses to boost AFFO, resulting in increased bonuses.

225.   The 3Q23 Report contained the following disclosure regarding infrastructure risk:

***Our business depends on providing customers with highly reliable solutions***. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX business operations remain operational at all times. [. . .]

Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage. These could result from numerous factors, including but not limited to:

- human error;
- ***equipment failure***;
  [. . .]
- ***power loss***;
  [. . .]

***We have service level commitment obligations to certain customers***. As a result, service interruptions or significant equipment damage in our IBX data centers ***could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations***.

(Emphasis added).

226.   The statement in ¶ 225 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

- 68 -

227.     On February 16, 2024, Equinix filed with the SEC its annual report on Form 10-K for the period ended December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

228.     The 2023 Annual Report contained the following statement about the Company's internal controls:

> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). **_Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2023_**.

(Emphasis added).

229.     The statement in ¶ 228 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

230.     The 2023 Annual Report further provided the following management report on internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). **_Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements_**. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.
>
> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in _Internal Control – Integrated Framework_ (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.
>
> Based on our evaluation under the framework in _Internal Control – Integrated Framework_ (2013), **_our management concluded that our internal control over financial reporting was effective as of December 31, 2023_**.

(Emphasis added).

231.    The statement in ¶ 230 was materially false and misleading at the time it was made because the Company manipulated its financials to boost AFFO.

232.    The 2023 Annual Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected***.

(Emphasis added).

233.    The statement in ¶ 232 was materially false and misleading at the time it was made because it couched internal control failures in hypothetical terms. In reality, the Company manipulated its financials to boost AFFO at the time the statement was made.

234.    The 2023 Annual Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to the current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current or future operating performance.

235.    The statement in  ¶ 234 was materially false and misleading at the time it was made because the Company improperly boosted AFFO by misclassifying operational expenditures as Growth CapEx, which artificially inflated AFFO.

236.    The 2023 Annual Report contained the following disclosure regarding infrastructure risk:

> ***Our business depends on providing customers with highly reliable solutions***. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX business operations remain operational at all times. [. . .]
>
> ***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including but not limited to:
> - human error;
> - ***equipment failure***;
>   [. . .]
> - ***power loss***;
>   [. . .]

*We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

(Emphasis added).

237.   The statement in ¶ 236 was materially false and misleading because it omitted that the Company systematically oversold power capacity to its customers, raising the risk of infrastructure failure, as well as the risk of the Company not fulfilling its contractual obligations.

238.   The statements referenced in ¶¶ 19, 21, 23, 25, 27, 30, 32, 34, 36, 38, 41, 43, 45, 47, 49, 52, 54, 56, 58, 60, 63, 65, 67, 69, 71, 74, 76, 78, 80, 82, 85, 87, 89, 91, 93, 96, 98, 100, 102, 104, 107, 109, 111, 113, 115, 118, 120, 122, 124, 126, 129, 131, 133, 135, 137, 140, 142, 144, 146, 148, 151, 153, 155, 157, 159, 162, 164, 166, 168, 170, 173, 175, 177, 179, 181, 184, 186, 188, 190, 192, 195, 197, 199, 201, 203, 206, 208, 210, 212, 214, 217, 219, 221, 223, 225, 228, and 230 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Equinix manipulated its financials to reduce operational expenses and boost Adjusted Funds From Operations ("AFFO"); (2) Equinix oversold power capacity and did not warn of the risks associated with this practice; (3); Equinix lacked adequate internal controls; and (4) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**The Truth Begins to Emerge**

Class Action Complaint for Violation of the Federal Securities Laws

239.   On March 20, 2024, before the market opened, *Hindenburg Research* ("Hindenburg") released a report on Equinix entitled "Equinix Exposed: Major Accounting Manipulation, Core Business Decay And Selling an AI Pipe Dream As Insiders Cashed Out Hundreds of Millions" (the "Hindenburg Report" or the "Report").

240.   The Hindenburg Report contained a slew of allegations against the Company, which can be broadly summarized as follows:

- Equinix manipulates its profit margin and its AFFO by misclassifying typical operational expenses (such as replacing lightbulbs and batteries), or maintenance CapEx, as growth CapEx;
- Equinix has relied on an undisclosed and highly risky approach to grow its revenue—overselling power capacity in the hope that the customer will not use all of the power, which could result in facility outages and a failure to fulfill contractual obligations.

241.   The Hindenburg provided the following background information on the Company:

In 2015, Equinix converted [. . .] to a REIT, a tax-advantaged structure that must distribute most of its income to its investors. Immediately following this change, the company reported a spike in reported growth CapEx (called 'non-recurring CapEx') on the company's balance sheet and a withering of reported spending on maintenance CapEx (called 'recurring CapEx'). ***That shift has sustained Equinix's stellar non-GAAP AFFO metric and enriched its top executives.***

For 10 years, investors have been either unaware of or have given Equinix the benefit of the doubt regarding this shift, convinced that the company has transformed much of its routine maintenance spending into an activity that simultaneously generates more capacity to expand its business.

(Emphasis added).

242.   Hindenburg further stated that "[in 2015], Equinix's executive incentive plan and long-term performance compensation plan replaced adjusted EBITDA as a key metric with AFFO[.]"

243.   Hindenburg stated the following regarding its findings into how Equinix has raised its reported AFFO over a multi-year period:

Our research, however, found that this sustained rise in reported AFFO, driven by shrinking reported maintenance CapEx, is more financial engineering than *actual* engineering.

Our investigation involved interviewing 37 former Equinix employees, industry experts and competitors, along with reviewing financial statements and litigation records.

Our investigation found that Equinix (i) bases its executive bonus compensation on the company's AFFO metric (ii) then manipulates its accounting for maintenance CapEx to overstate this AFFO figure, resulting in the illusion of vastly higher AFFO, higher executive bonus compensation and an inflated stock price.

244.    The Hindenburg Report then noted that "[s]ince one of Equinix's main costs is maintaining and repairing its data centers, maintenance CapEx [. . .] is a critical factor in determining the company's AFFO. ***In short, the lower maintenance CapEx Equinix reports, the higher its AFFO will be***." (Emphasis added).

245.    The Report stated the following on how REIT investors, as part of the investment process, depend on a REIT to accurately distinguish between maintenance CapEx and growth CapEx:

REIT investors rely on companies to accurately account for the split between maintenance CapEx and growth CapEx to assess the profitability of a company's current operations and its financial commitment to future growth initiatives. ***If a REIT were to inappropriately shift maintenance CapEx into growth CapEx, it would inflate reported current profitability while giving investors the false impression that it is heavily investing into anticipated growth***.

(Emphasis added).

246.    After the 2015 switch from adjusted EBITDA to AFFO as the key metric to determine executive compensation, Hindenburg noted that the Company's reported maintenance CapEx (which would need to be lower to boost AFFO) "plummeted by 47% to $120.3 million, or 4.4% of total revenue, according to the company's annual report." Maintenance CapEx as a percentage of revenue has been low ever since.

247.    Hindenburg then demonstrated that maintenance CapEx has been lower in the years since the Company's 2015 conversion to a REIT, and the corresponding switch to AFFO as the key metric to determine executive compensation and the Company's overall health.

248.    The Hindenburg Report then discussed maintenance costs at Equinix. Specifically, it stated that "[g]enerally, as physical assets like data centers get older, maintenance costs increase." Further, Hindenburg quoted an engineer who worked at Equinix's Secaucus, New Jersey data center

1   (built in 2006) as saying "you would be amazed at the amount of equipment that goes offline, needs
2   to be repaired."

3       249.    The Report then stated that "[c]ontrary to this basic physical reality, Equinix's
4   maintenance CapEx significantly *declined* as a percentage of revenue over the past decade, from
5   9.3% in 2014 to 2.7% in 2023, despite its facilities aging."

6       250.    Next, Hindenburg discussed how top-down pressure is placed on Equinix employees
7   to classify expense items as growth CapEx, and not maintenance CapEx. The Report stated that "[a]
8   former executive we interviewed explained that accounting teams headed by the Chief Accounting
9   Officer were pressured by management to classify as much CapEx as expansion (growth CapEx) as
10  possible[.]"

11      251.    Next, the Hindenburg Report provided examples of how maintenance CapEx is
12  shifted to growth CapEx.

13      252.    First, the Report discussed chillers, which were described as a "key piece of data
14  center equipment that helps regulate temperature." The Report discussed how a "former Equinix
15  director" revealed how "the company would obtain new serial numbers for refurbished chillers so it
16  could then be accounted for as a 'new' item post-repair, and sometimes recognized as growth
17  CapEx." That employee was quoted as saying the following:

18
19      Chillers are touch ...Chillers stay in place. You don't replace chillers. All you do is rebuild
        them. There's been some debate on this. What happens and what you work towards is you
        do a chiller overhaul. And you'd work with your chiller vendor to give you a new serial
20      number on the unit.

21      253.    The same former employee said that "[a] new serial number with the unit, for all
22  intents and purposes, looks, talks, walks like a brand new installation." The same individual said
23  that the practice was "really on the edge" of growth CapEx classification, that on occasion,
24  accounting teams didn't review the descriptions of the chiller expenditures, in order to lump the
25  expenses into growth CapEx spending, in order to boost AFFO.

26      254.    Next, the Report discussed how Equinix would improperly classify routine
27  replacements in its data centers as growth CapEx spending, in order to boost its AFFO.

28

255.     The Report first focused on how the Company categorized routine battery replacements as growth CapEx spending. The Report first explained that "[i]n data centers, batteries are essential [. . .] to the uninterruptible power supply (UPS), an automated back-up system that can be switched to instantly in case of power issues. UPS batteries are a major replacement cost in any data center, former employees explained to us."

256.     The Report quoted a former operations manager, who managed multiple data centers, as saying "[y]ou're always doing batteries. Someplace, somehow, some way, you're always doing batteries."  The Report quoted a former executive as saying "[o]ne of the biggest ones [maintenance costs], obviously, is the batteries. You've got millions of batteries sitting there."

257.     Another former executive was quoted as saying the following about the costs of batteries:

> This is the largest expense in a data center. Battery replacement. That sucks. That is just money leaving your pocket…It sat there, hopefully did nothing for its lifetime, just sat there getting charged. You never had to use them and then you just replace them.

258.     The Report then said the "former operations director told us that Equinix would classify routine battery replacements as growth CapEx by characterizing this activity as replacing a 'battery *system*'", which had the effect of boosting the Company's AFFO metric. The former operations director specifically said the following:

> So replacing a battery system is a capital improvement. Non-recurring…As long as it's part of that, as long as you replace the entire battery system, **All you do is replace the batteries within the cabinets. And that's considered the system**."

(Emphasis added).

259.     The Hindenburg Report then discussed lightbulbs. It stated that "[m]ost companies **wouldn't view an activity as mundane as changing light bulbs to be a catalyst for growth. The created accounting minds at Equinix apparently see things differently**." (Emphasis added). The Report quoted a "former senior Equinix operations manager", who described changing lightbulbs as a routine, daily operation. This former employee stated the following:

> You would be surprised how quick these light bulbs blow on this. Thousands of them. Right. So part of the daily inspections is to look at areas where the light bulbs are blown.

260.     Even in this situation, the Report noted, the Company "found 'creative' ways to book things like basic lightbulb replacements as growth CapEx. It quoted a former operations director as saying "[s]ay you changed out fluorescents to LED light bulbs, that's a capital improvement. *You're not replacing lightbulbs, you're enhancing*." (Emphasis added).

261.     The Report then included the following exchange between a former Company employee and a Hindenburg researcher:

> **Former Employee**: Say you have a facility. You need to change light bulbs…Or you had to change all the ballasts in your light fixtures because they were just at age. Which is costly. You need an electrician to come in to take it down. You need to unwire it and rewire it. *Now, if you were to go back in and now convert those fl[u]orescent bulbs or systems with the ballast and the bulbs to an LED light, now you're performing an 'energy efficiency project*.'"
>
> **Hindenburg Researcher**: And that can be a non-recurring capital expenditure?
>
> **Former Employee**: Correct. Absolutely.
>
> (Emphasis added).

262.     The Report then noted that a former Equinix finance director had "expressed surprised" that Hindenburg had found out about the Company's practices regarding classifying lightbulbs, but then acknowledged that "[t]his is *one of the tricks* that the operations teams use *to say, well, this is not ongoing. This is non-recurring CapEx.*" (Emphasis added).

263.     Hindenburg further discussed Equinix's operating margins compared to its peers. It noted the following:

> In 2023, Equinix reported [. . .] a 17.6% operating margin, almost double the 9.5% margin reported [. . .] by its closest peer, Digital Realty. The margins imply that Equinix is vastly more profitable [. . .], therefore justifying a higher stock multiple.
>
> Former employees told us that those abnormally high operating margins were engineered with more accounting trickery. In addition to misclassifying CapEx between maintenance and growth, management pressured employees to **push operating expenses ("OpEx") into CapEx, sometimes regardless of the nature of the spend**.

264.     The Report noted that "[r]eclassifying operating expenses as CapEx to boost profitability metrics *is a notorious accounting trick and was at the center of the WorldCom scandal* [. . .] in the early 2000s, in perhaps the best-known example." (Emphasis added).

265.    The Report discussed how the accounting department at Equinix would, in many cases, pressure employees from other parts of the Company to reclassify operating expenses as CapEx. The Report quoted a former data center manager as saying that the accounting department viewed operational expenses as "dirty spend", and would pressure teams to book expenses as CapEx.

266.    On this issue, the Report said that "[o]ther former employees also described pressure to push operating expenses into CapEx from different teams within Equinix." It then listed the following employees:

- "One former data center manager said they felt squeezed by 'operationally focused accountants". The Report quoted this former employee as saying "[t]hey would assess all our expenses versus our recurring CapEx... [They were] always trying to squeeze your expenses, your OpEx, because it was 'dirty spend.'"
- "A finance director told us teams were overseen by 'accounting watchdogs', the accounting team who tried to curtail operating expenses". The Report quoted this former employee as saying "[y]ou know, you have these accounting watchdogs there to basically try to keep the floodgates tight." This individual also said "[t]hey [operating teams] have a lot of pressure on the operating budget. So, the operating cost and then they try to squeeze stuff that is kind of gray into the CapEx area and move it out of the OpEx area."
- The Report quoted a former M&A manager, who reportedly directly interacted with a finance lead on projects, as saying that "[t]hey [the project's experts] asked me to do every machination to try to make a CapEx versus OpEx."

267.    The Report further stated that, according to a former director, "Equinix would press vendors to create unique SKUs ["stock keeping unit"] to lump basic operating costs into larger purchases, then record it as CapEx[.]" This former director stated, "[s]o you can look for, even as far as buying tool sets. So one might not qualify. *But if you go over a certain threshold and you buy a set of them, maybe five of them… that'll count towards your CapEx*." (Emphasis added).

268.    This former director further disclosed that Equinix would ask vendors to create new SKUs:

You can also work with your vendors, your suppliers and create unique SKUs. So if I was going to buy a tool set that was say $500, right. Hand a single SKU… Initially that would be considered OpEx. But if you went to your vendor and you said, 'hey, why don't you create a SKU with a five pack of those tool kits and get me a $2,500?' Now it's CapEx."

269. That former director further stated "it's very easy to talk to your vendors and say, 'hey, can you create a new SKU?' Who's going to turn down business for that? It's just as easy for them to turn that around."

270. The Company would also "use the wording of the project to make it sound like a capital improvement." A former director said that "[t]he other way, what happens is basically wording in such a way that it sounds like a capital improvement. You can get very creative with language."

271. Further, Equinix lumps smaller expenses together in order to book them as CapEx. The Report quoted a former executive as saying "[o]ftentimes, people or groups would try to bundle things to make sure that they were capitalized." In addition, a "senior leader" stated "[i]f it was over a certain dollar amount, which it typically was, it would have been treated as a non-recurring CapEx… It tended to change. I believe ours was in the $10,000 range. Which that wasn't actually a very big check."

272. The Report included the following exchange:

**Hindenburg Researcher**: Was it written up as a threshold of everything below was operating expense and therefore above you could capitalize?

**Former Executive**: Yes. Oftentimes, people or groups would try to bundle things to make sure that they were capitalized."

273. The Report quoted two former employees as saying that $2,500 and $3,000 were their respective minimums to categorize expenses as CapEx.

274. One of these former employees confirmed that expense items could be capitalized merely by bundling them together, saying "[i]f you just buy one of them it has to be expensed then immediately…So and sometimes you can actually capitalize these things if they are purchased in bulk, life if you buy, for instance, 20 cabinets in one go, then you can capitalize them."

275. The Hindenburg Report stated that the accounting manipulations used to boost AFFO "result in reported metrics that defy logic." It specifically referred to recurring capital expenditures of $14.5 million in Q1 2020, and projected recurring CapEx of $14-34 million for the first quarter of 2024, despite the fact that Equinix now operates 260 data centers and had 51 data centers in Q1 2010.

Class Action Complaint for Violation of the Federal Securities Laws

276.    The Hindenburg Report questioned Equinix's reported growth CapEx, given that its billed cabinet growth slowed in 2023. The Report stated the following:

Another widely-watched metric that *should* have some relation to growth CapEx **is the growth of cabinets**, the [physical enclosed areas] that data centers offer to clients. In its Q3 2023 investor call, the CEO mentioned [. . .] **the importance of the metric, saying it would "have to be a part of the growth story over time"**.

**Given this, one might expect that with Equinix's massive claimed growth CapEx, billed physical cabinet metrics would be growing quickly along with it**.

However, while reported growth CapEx stood at all-time highs in 2023, **year-on-year billed cabinet growth fell from 14.8% in 2018 to 1.7% in 2023**.

(Emphasis added).

277.    Next, the Report discussed how "Equinix's questionable AFFO accounting has substantially contributed to $295.8 million in stock award grants to top executives." Hindenburg quoted a "former executive" as stating that "[t]here's every incentive to categorize as much as you can as expansion [growth] CapEx."

278.    It then stated that "[a]s noted earlier, in 2015, Equinix changed [. . .] its executive compensation plan to specifically reward AFFO growth, **with 50% of annual incentive pay weighted toward AFFO** and 50% to revenue[.]" (Emphasis added). Further, the Report stated that "AFFO has been a key metric in executive performance awards in every year since then." In 2022, the Report stated that "AFFO per share still remained **one of the key metrics considered in Annual Incentive and Long Term Performance Incentives**." (Emphasis added).

279.    The Report stated that "[a]s a result, since 2015, senior executives have been awarded ~ $295.8 million in cumulative stock awards, with stock awards rising almost every year."

280.    Hindenburg stated that "[a] former executive told us this compensation policy incentivized executives to push the boundaries on CapEx classification", and quoted that former executive as saying "[y]ou're being valued off and you know your executive comp[ensation] is tied to AFFO per share. ***There's every incentive to categorize as much as you can as expansion [growth] CapEx…they're making that case for every questionable piece of CapEx***". (Emphasis added).

281.    In summary, the Report stated, "by *reducing reported maintenance CapEx and inflating accounting metrics like AFFO*, Equinix executives *have ensured they personally benefit* from their accounting manipulations." (Emphasis added).

282.    The Report then detailed how the Company oversells power capacity, a risky strategy, in order to boost revenue growth:

> As Equinix's accounting has worked to classify operating expenses and maintenance CapEx as growth CapEx, our research shows the company has perennially underinvested in actual growth infrastructure.
>
> *Instead, it has quietly relied on a risky approach to growing revenue: overselling power capacity in the hope that customers won't increase their usage up to the power they've contracted for*.

(Emphasis added).

283.    The Report said that "[t]he *idea is that Equinix can oversell power in the hope that customers don't grow into their contracted levels*, a balancing act that can work if customer power usage rates don't increase." The Report stated that, as per former employees, "*Equinix doesn't have enough power at some of its facilities to satisfy its current customer contracts*[.]" (Emphasis added).

284.    The Report quoted a former executive as saying that "[m]ost Equinix data centers are what they call over-utilized anywhere from 120 to 175% of power" and that "[t]hey're double selling the power as well. The whole thing is like a little bit of a shell game."

285.    This strategy is risky. The Report stated that "[a] former executive confirmed the risks of overselling power *include facility outages and a failure to fulfil contractual obligations*." This former executive further stated that "*it would be a very significant reputational challenge to mend I think in order to explain why suddenly you sold capacity you didn't have*." (Emphasis added).

286.    The Report then highlighted a litigation matter where Equinix failed to provide the customer the power that it was contractually obligated to provide:

> Taking these risks [in reference to overselling capacity] hasn't always worked out. *Equinix's failure to provide sufficient power was the subject of at least one customer lawsuit*. In December 2021, Blade Global alleged that it paid over $1 million to Equinix to

secure space and power, but when it came to use the space, Equinix acknowledged that its "servers would require more CFM [(which Hindenburg stated meant "cubic feet per meter")] of cooling than its New York facility could provide.

(Emphasis added).

287.    The Report then stated that this issue presents an increasingly serious risk to the Company, given that data center power demand usage is projected to go up over time, as a result of the increasing use of machine learning and artificial intelligence.

288.    On this news, the price of Equinix stock fell by $19.70 a share, or 2.33%, on March 20, 2024, to close at $824.88. The next day, it fell a further $13.24, or 1.6%, to close at $811.64.

289.    Then, on March 25, 2020, before the market opened, the Company filed with the SEC a current report on Form 8-K. Attached to this current report was a press release which stated the following, in pertinent part:

[T]he Audit Committee of the company's Board of Directors **has commenced an independent investigation to review the matters referenced in a recent short seller report**. Shortly after the release of the report, **the company received a subpoena from the U.S. Attorney's Office for the Northern District of California**. Receipt of these types of inquiries is not unusual in these circumstances, and Equinix intends to fully cooperate in this matter. The company does not expect to comment further on such matters until appropriate to do so.

(Emphasis added).

290.    On this news, the price of Equinix stock fell by $8.45 per share, or 1.05%, to close at $792.52 on March 25, 2024.

291.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

292.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of the Company during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

293.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

294.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

295.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

296.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- •    whether the federal securities laws were violated by Defendants' acts as alleged herein;

- •    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

- •    whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

Class Action Complaint for Violation of the Federal Securities Laws

1       •       whether the Individual Defendants caused the Company to issue false and misleading

2               SEC filings and public statements during the Class Period;

3       •       whether Defendants acted knowingly or recklessly in issuing false and misleading

4               SEC filings and public statements during the Class Period;

5       •       whether the prices of the Company's securities during the Class Period were

6               artificially inflated because of the Defendants' conduct complained of herein; and

7       •       whether the members of the Class have sustained damages and, if so, what is the

8               proper measure of damages.

9       297.    A class action is superior to all other available methods for the fair and efficient

10   adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

11   damages suffered by individual Class members may be relatively small, the expense and burden of

12   individual litigation make it impossible for members of the Class to individually redress the wrongs

13   done to them. There will be no difficulty in the management of this action as a class action.

14       298.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-

15   on-the-market doctrine in that:

16       •       Defendants made public misrepresentations or failed to disclose material facts during

17               the Class Period;

18       •       the omissions and misrepresentations were material;

19       •       the Company's securities are traded in efficient markets;

20       •       the Company's securities were liquid and traded with moderate to heavy volume

21               during the Class Period;

22       •       the Company traded on the NASDAQ, and was covered by multiple analysts;

23       •       the misrepresentations and omissions alleged would tend to induce a reasonable

24               investor to misjudge the value of the Company's securities; and

25       •       Plaintiff and members of the Class purchased and/or sold the Company's securities

26               between the time the Defendants failed to disclose or misrepresented material facts

27               and the time the true facts were disclosed, without knowledge of the omitted or

28               misrepresented facts.

Class Action Complaint for Violation of the Federal Securities Laws

299.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

300.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

301.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

302.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

303.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

304.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

Class Action Complaint for Violation of the Federal Securities Laws

305.   The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

306.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

307.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

308.   Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

309.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

310.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act
Against The Individual Defendants**

311.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

312.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

313.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

314.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

315.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company,

each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

316.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Date: May 2, 2024                    Respectfully submitted,
                                     /s/ Laurence M. Rosen
                                     **THE ROSEN LAW FIRM, P.A.**
                                     Laurence M. Rosen, Esq. (SBN 219683)
                                     355 S. Grand Avenue, Suite 2450
                                     Los Angeles, CA 90071
                                     Telephone: (213) 785-2610
                                     Facsimile: (213) 226-4684
                                     Email: lrosen@rosenlegal.com

                                     *Counsel for Plaintiff*

Class Action Complaint for Violation of the Federal Securities Laws