ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
DANIEL J. PFEFFERBAUM (248631)
ALAINA L. GILCHRIST (335807)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
agilchrist@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAYNE CHAN, Individually and on Behalf of All Others Similarly Situated, ) ) ) Plaintiff, ) ) ) vs. ) ) EQUINIX, INC., et al., ) ) ) Defendants. ) ) | Case No. 3:24-cv-02656-VC <br><br> <u>CLASS ACTION</u> <br><br> AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ....................................................................................1

II.    BACKGROUND AND SUMMARY OF THE ACTION ................................1

III.   JURISDICTION AND VENUE ...............................................................8

IV.   PARTIES ............................................................................................8

V.     SOURCES OF INFORMATION ...............................................................10

VI.   CONTROL PERSONS ...........................................................................11

VII.   BACKGROUND TO THE CLASS PERIOD ..............................................12

        A.    In 2015, Equinix Becomes a REIT and Begins Reporting AFFO to Investors....................................................................................14

        B.    Prior to the Class Period, Equinix Issues FY19 Financial Guidance and Adopts Executive Compensation Plan...............................17

VIII.   DEFENDANTS' FRAUDULENT SCHEME AND MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...............................18

        A.    Equinix's SEC Filings Falsely Define AFFO and Identify It as Key Metric for Investors to Evaluate the Company .........................18

        B.    Equinix Reports False and Misleading Quarterly and Annual FY19 Financial Results...................................................................21

        C.    Equinix Reports False and Misleading Quarterly and Annual FY20 Financial Results...................................................................24

        D.    Equinix Reports False and Misleading Quarterly and Annual FY21 Financial Results...................................................................28

        E.    Equinix Reports False and Misleading Quarterly and Annual FY22 Financial Results; Barclays Raises Concerns Over CapEx Accounting.................................................................................32

        F.    Equinix Reports False and Misleading Quarterly and Annual FY23 Financial Results as Market Questions Power Capacity......................37

        G.    Meyers Abruptly Announces Resignation of CEO Position; Chairman of the Board Also Announces Departure ..................................50

IX.   The Truth is Revealed: The Hindenburg Report Discloses Accounting Manipulations and Overselling of Power; Analysts Corroborate .....................51

        A.    Equinix Reveals Audit Committee Investigation and DOJ Subpoena; Revises Accounting Methodology for Non-Recurring CapEx...................................................................................58

**Page**

X.      VIOLATIONS OF SEC RULES AND REGULATIONS................................................61

XI.     DEFENDANTS CERTIFY THEIR FINANCIAL REPORTING, INTERNAL
        CONTROLS AND DISCLOSURE CONTROLS ............................................................65

XII.    DEFENDANTS' INCENTIVE COMPENSATION ......................................................70

XIII.   INSIDER TRADING...................................................................................................71

XIV.    EQUINIX'S SALES OF COMMON STOCK ..............................................................72

XV.     APPLICABILITY OF THE CORE OPERATIONS INFERENCE ................................73

XVI.    INSUFFICIENT RISK WARNINGS .........................................................................73

XVII.   LOSS CAUSATION AND ECONOMIC LOSS ...........................................................75

XVIII.  CLASS ACTION ALLEGATIONS .............................................................................77

XIX.    APPLICABILITY OF THE FRAUD-ON–THE-MARKET AND *AFFILIATED
        UTE* PRESUMPTIONS OF RELIANCE .........................................................................79

XX.     NO SAFE HARBOR ...................................................................................................79

XXI.    JURY DEMAND ........................................................................................................82

## I.    INTRODUCTION

1.    Lead Plaintiff Uniformed Sanitationmen's Association Compensation Accrual Fund (the "Accrual Fund" or "Plaintiff"), by and through Plaintiff's undersigned attorneys, individually and on behalf of all others similarly situated, alleges the following.  This Amended Complaint is based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters supported by, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Equinix, Inc. ("Equinix" or the "Company"), court filings, analysts' reports, media coverage, and interviews with former employees of Equinix.  Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## II.    BACKGROUND AND SUMMARY OF THE ACTION

2.    This is a securities Class action brought on behalf of all persons who purchased or otherwise acquired Equinix common stock between May 3, 2019 and March 24, 2024, inclusive ("Class Period"), against Equinix and certain of its current and former directors and officers including Charles Meyers ("Meyers"), the Company's former Chief Executive Officer ("CEO") and President, and Keith D. Taylor ("Taylor"), the Company's Chief Financial Officer ("CFO"), for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3.    Founded in 1998 and based in Redwood City, California, Equinix describes itself as a vendor-neutral multitenant data center provider where leading networks come together to securely connect networks and share data traffic.  Equinix owns and operates 260 data centers in 71 markets around the globe.  Data centers are physical locations that house large-scale computer systems.  Equinix supplies power, cooling, internet bandwidth, and physical security to many customers in a particular data center, while Equinix's various customers provide their own servers and other computing hardware installed in that facility.  Data centers utilize significant quantities of electrical power both for computing activity and to operate cooling systems to handle the heat

they generate.  Data centers have a maximum amount of power they can provide, typically listed in megawatts.

4.      Equinix derives about 70% of its revenues from "colocation", which is the leasing of space to house customers' computer hardware.  Equinix derives approximately 17% of its revenue from "interconnection," which is the direct connection between customers seeking to exchange data in the same data center, among other Equinix facilities, or externally.  Equinix has more than 10,000 customers, ranging from small businesses to large cloud "hyperscaler" providers, like Amazon, Microsoft and Google.  The hyperscalers can be both customers and competitors of Equinix depending on the service offered.

5.      When offering its colocation services, Equinix's clients typically lease "cabinet" or rack space, as well as electrical circuits supporting these cabinets, and clients install their own hardware.  These electrical circuits have maximum power capacity and customers pay for the full capacity of the circuit whether or not they used the power.  The Defendants likened selling power to a hotel reservation: "whether you show up and sleep in bed or not, you're still going to pay for it."

6.      In 2015, Equinix converted into a real estate investment trust ("REIT").  Becoming a REIT brought certain operating requirements – like paying out most of its income as a dividend to shareholders – but also federal tax benefits.[1]  Like many REITs, Equinix reports various non-GAAP[2] measures to its investors.  One of Equinix's primary non-GAAP measures is adjusted funds from operations ("AFFO").  AFFO is intended to measure the net amount of cash that flows into a REIT from regular, ongoing business activities and be an indicator of operating performance.

7.      Capital expenses ("CapEx") play a crucial role in determining AFFO.  Recurring CapEx, also referred to as "maintenance" CapEx, reduces AFFO.  Recurring CapEx typically

---

[1]      A REIT is a company that owns and typically operates income-producing real estate or related assets.  Among other things, to qualify as a REIT under IRS guidelines, the company must: (i) invest at least 75% of total assets in real estate, cash, or U.S. Treasuries; (ii) derive at least 75% of gross income from rent, interest on mortgages that finance real estate, or real estate sales; and (iii) pay a minimum of 90% of their taxable income to their shareholders through dividends.

[2]      Generally Accepted Accounting Principles ("GAAP").

refs to capital expenditures made on a regular basis to support ongoing revenue, for example replacing the roof of a data center. Non-recurring CapEx, also referred to as "expansion" or "growth" CapEx, does not reduce AFFO. Non-recurring CapEx applies to "one-off" expenditures, that are unlikely to repeat, such as building a new data center.[3]

8.  The classification of a capital expense (as recurring versus non-recurring) was critical to Defendants as it had a direct impact both on the amount of AFFO reported to the market and on Defendants' bonuses. At the same time that Equinix became a REIT, they changed their executive bonus program to use AFFO (and later AFFO/share) as a key measure of executive performance. For Defendants Meyers and Taylor, a significant portion of their bonus was contingent on Equinix meeting or beating its AFFO target.

9.  Prior to and during the Class Period, Equinix and the Individual Defendants violated the federal securities laws by engaging in a fraudulent scheme and course of conduct to mislead its investors, as well as its customers, regarding the Company's ability to deliver contracted services, its financial results, and its future prospects.

10.  Defendants carried out the scheme through two primary means: First, by overselling Equinix's power capacity at its data centers. Because some customers did not utilize all the power they paid for, Defendants would oversell the available power supply, banking on customers simply not using their entire allocation. While this boosted financial results, it left the Company exposed to the risk of being unable to deliver paid-for power and limited the Company's future growth – especially into power-intensive artificial intelligence ("AI") computing. And second, by mischaracterizing recurring CapEx as non-recurring CapEx, Defendants inflated reported AFFO and AFFO/share, allowing Equinix to beat its financial guidance given to investors.

11.  In support of the scheme, Defendants made false and misleading statements and omissions to investors throughout the Class Period. For example, Defendants falsely stated that they were not limited by their power capacity and were poised to capitalize on the AI computing

---

[3]  Defendants referred to recurring CapEx as "maintenance CapEx" and non-recurring CapEx as "growth CapEx." This complaint uses recurring CapEx and maintenance CapEx interchangeably and non-recurring and growth CapEx interchangeably.

boom.  They reported a "cabinet utilization" metric (which represented how much of their data centers were occupied) which failed to account for power limitations and falsely conveyed to investors that the Company had ample runway for growth.  Indeed, Defendants told investors that their "power utilization is actually ***meaningfully lower*** than our cabinet utilization," when, in fact, the exact opposite was true:  Reported cabinet utilization was approximately 80% while Defendants oversold power capacity by 150%.

12.    In addition, quarter over quarter and year over year, Defendants overstated AFFO and AFFO/share– what they called their "lighthouse metric" – and falsely attributed those positive results to factors like Defendants' operation of the business, and not their accounting manipulations.

13.    Year over year, Defendants reported to the investing public that the Company was meeting or exceeding its annual AFFO guidance which it would not have done without manipulating CapEx accounting:

| Adjusted AFFO Results | | | | | |
|---|---|---|---|---|---|
| (amounts in millions) | 2019 | 2020 | 2021 | 2022 | 2023 |
| Reported AFFO | $1,931.1 | $2,189.1 | $2,451.2 | $2,713.8 | $3,018.5 |
| Actual AFFO without Inflated CapEx | $1,839.0 | $2,049.9 | $2,318.5 | $2,539.6 | $2,827.4 |
| AFFO $ Overstatement | $92.1 | $139.2 | $132.7 | $174.2 | $191.1 |
| AFFO Guidance | $1,913.0 | $2,157.0 | $2,444.0 | $2,676.0 | $2,996.0 |
| AFFO Guidance without Inflated Capex | $1,820.9 | $2,017.7 | $2,311.3 | $2,501.7 | $2,804.8 |
| Guidance Miss | 4.8% | 6.5% | 5.4% | 6.5% | 6.4% |
| **Meet or Beat?** | **No** | **No** | **No** | **No** | **No** |

14.    Defendants' statements throughout the Class Period concerning, among other things: (i) the Company's reported financial results, including AFFO, AFFO/share, and recurring CapEx, and the purported drivers of those results; (ii) the Company's access to, and sale of, power; and (iii) the Company's current capacity and growth potential, were materially false and misleading when made because Defendants knew or deliberately disregarded and failed to disclose that:

(a)    Equinix overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC Rules and Regulations;

(b)    Equinix would not have met or beat annual AFFO guidance but for its improper classifying of CapEx;

(c)    Equinix deliberately oversold its power capacity at its data centers by 150% which presented a current and ongoing risk that Equinix could not deliver contracted for services to its customers;

(d)    Equinix's reported financial results, including AFFO and revenue, were achieved by the overselling of power;

(e)    Equinix's ability to utilize its existing cabinets was currently limited by its overselling of power capacity and its usage of power far exceeded its cabinet utilization rate;

(f)    Overselling power capacity limited Equinix's potential for growth – in particular with respect to capitalizing on AI's power-intensive computing needs;

(g)    Equinix lacked adequate disclosure controls and internal controls; and

(h)    that, as a result of (a)-(g) above, Equinix's business, operations, financial results, and performance were overstated, and its growth and outlook were less optimistic than the Company represented to investors during the Class Period.

15.    Defendants' scheme fueled enormous gains in Equinix's stock price as it traded at artificially inflated prices throughout the Class Period.  On the first day of the Class Period, May 3, 2019, Equinix was trading at $477 per share; by the end of 2021, it was trading at $846.  After a dip in 2022, the stock rebounded to a Class Period high of $913 on March 4, 2024.  Throughout the Class Period, Equinix capitalized on the inflated stock price by offering more than 6.8 million shares of stock to the public, raising net proceeds in excess of $4.5 billion.

16.    This scheme made Defendants Meyers and Taylor wildly rich as they collectively received nearly $150 million dollars in bonus compensation directly tied to the Company's AFFO/share.  In four out of five years during the Class Period, but for Defendants' scheme, they would have missed the AFFO/share target necessary for their bonuses:

| (shown AFFO/share) | Target | Reported Results | Adjusted Results | Actual Results | Meet or Beat Target |
|---|---|---|---|---|---|
| **2019** | $22.23 | $22.81 | $22.69 | $21.72 | **No** |
| **2020** | $24.60 | $24.76 | $24.93 | $23.19 | **No** |
| **2021** | $25.56 | $27.11 | $26.97 | $25.65 | **Yes** |
| **2022** | $29.44 | $29.55 | $30.65 | $27.66 | **No** |
| **2023** | $30.38 | $32.25 | $30.97 | $30.08 | **No** |

17.     In total, during the Class Period, Meyers received bonus stock compensation worth more than $106 million and sold more than $107 million in stock at inflated prices; Taylor received bonus stock compensation worth more than $42 million and sold more than $39 million in stock at inflated prices.

18.     On multiple occasions during the Class Period, elements of the truth did reach the market in partial corrective disclosures. For example, on September 23, 2022, Barclays issued an analyst report downgrading Equinix based on trends in their financials and flagged CapEx as potentially being manipulated to boost AFFO; but Barclays lacked any internal confirmation from the Company about the accuracy of its suspicions. And, on June 21, 2023, the Company revealed in an analyst day presentation that they viewed AI as a long term (*i.e.*, 25 years) opportunity, as opposed to an immediate driver of growth, but did not reveal that this was a function of their overselling of power. Then, on March 12, 2024, just as Hindenburg Research was about to release a critical analysis of the Company based on interviews with multiple former executives, Equinix announced that Defendant Meyers would be leaving the CEO position and that Peter Van Camp, the Chairman of Equinix's Board of Directors, would step down, as well.

19.     On March 20, 2024, Hindenburg Research published a report that revealed, among other things, that the Company had been manipulating AFFO by improperly classifying recurring CapEx as non-recurring CapEx and overselling power by as much as 175%. According to the Hindenberg Report, top management directed employees to mis-categorize recurring capital expenditures as non-recurring, including two of the Company's largest maintenance expenses: chillers and batteries. For example, chillers (which are large air conditioners for the data centers) are rebuilt but not replaced; however, Equinix instructed vendors to give the old devices new serial numbers, and then Equinix improperly classified this recurring CapEx as non-recurring CapEx.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:24-cv-02656-VC
4872-2023-5491.v2

Similarly, with respect to the batteries that comprised the Company's uninterruptible power supplies, Equinix would mischaracterize regular replacements as "system" upgrades and improperly record these expenses as non-recurring CapEx. Upon release of the Hindenburg Report, Equinix's stock price declined from a close of $845 on March 19, 2024, to a close of $825 on March 20, 2024, on massive volume of 2.3 million shares.

20. On March 21, 2024, an analyst report from TD Cowen indicated that it had engaged in conversations with individuals at Equinix and confirmed that "[t]he overselling of power is a ***'dirty little secret'*** for the data center industry," as had been reported in the Hindenburg Report. On this news, the stock continued to slide to a close of $812 on March 21, 2024, and then to $801 on March 22, 2024, on elevated volumes.

21. On March 24, 2024, the last day of the Class Period, Equinix announced that the Audit Committee was launching an investigation into the Hindenburg Research report and that the Company had received a subpoena from the Department of Justice ("DOJ"). The stock price declined again on March 25, 2024, to $793, on increased volume.

22. Additional disclosures after the Class Period continued: On May 8, 2024, the Company revealed that it had received a subpoena from the SEC. On May 9, 2024, the Company made an unanticipated change to its CapEx categorization which effectively admitted that it was mischaracterizing recurring CapEx as non-recurring CapEx when replacing equipment that had reached the end-of-life. This violated Equinix's own stated CapEx methodology and SEC rules and regulations. According to one analyst, the accounting change contradicted the market's understanding of recurring versus non-recurring expenses: "[i]f components are at the end of their useful life, spending on replacement components would be best characterized as ***recurring***."

23. While the Defendants profited to the tune of $150 million, Equinix investors have been left holding the bag. Equinix stock price has never recovered its Class Period high and – while the Company has absolved itself of wrongdoing – SEC and DOJ investigations remain ongoing.

24. Members of the putative Class seek to recover their economic loss as a result of Defendants' wrongful acts and omissions alleged herein. Members of the putative Class purchased

Equinix stock at inflated prices during the Class Period due to Defendants' fraudulent conduct during the Class Period.

## III.    JURISDICTION AND VENUE

25.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

26.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

27.    Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material fact, occurred in this District.  The Company's headquarters are located in this District at Redwood City, California.

28.    In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    PARTIES

29.    Lead Plaintiff Uniformed Sanitationmen's Association Compensation Accrual Fund (the "Accrual Fund") purchased or acquired Equinix common stock and suffered damages as a result of the conduct alleged herein.

30.    Defendant Equinix, Inc., which owns and operates data centers and provides related services, is incorporated in Delaware and operates as a REIT for federal income tax purposes. Equinix has its headquarters within this District in Redwood City, California.  Shares of Equinix stock trade on the NASDAQ under the ticker symbol "EQIX."  During the Class Period, Equinix, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.  The Company has established and

regularly publicizes the availability of a website at www.equinix.com, on which it maintains an "Investor Relations" section where SEC filings, press releases, conference call recordings, investor presentations, shareholder letters, financial statements and information, corporate governance policies, descriptions of its business, and other information about the Company is made available to investors.

31.     Defendant Charles Meyers is the Company's former CEO and President. Defendant Meyers served as Equinix's President and CEO from 2018 until June 3, 2024.  On March 12, 2024, Meyers announced that he would be resigning from the CEO role.  Meyers currently serves as Equinix's Executive Chairman.  In his capacity as CEO, Meyers had the power to authorize or approve publicly disseminated information about the Company, regularly spoke on Equinix's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, regularly made live presentations at analyst-sponsored investor conferences, regularly participated in interviews with the media concerning Equinix's financial position, and signed or authorized all of Equinix's SEC filings.  Meyers sold 149,933 shares of Equinix common stock during the Class Period, while in possession of material and nonpublic information for total proceeds of more than $107 million.

32.     Defendant Keith D. Taylor has been the Company's CFO since 2005.  At all relevant times, Taylor had the power to authorize or approve publicly disseminated information about the Company, regularly spoke on Equinix's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, made live presentations at analyst-sponsored investor conferences, and signed or authorized all of Equinix's SEC filings.  Taylor sold 54,287 shares of Equinix common stock during the Class Period while in possession of material and nonpublic information for total proceeds of approximately $39.5 million.

33.     Defendants Meyers and Taylor are collectively referred to herein as the "Individual Defendants."   Equinix and the Individual Defendants are collectively referred to herein as "Defendants."

34.     The Individual Defendants, because of their positions within the Company, individually and collectively possessed the power and authority to control the alleged fraudulent

conduct as well as the contents of Equinix's reports to the SEC, press releases and public presentations to securities analysts, money and portfolio managers, and investors. Each Defendant was provided with copies of the Company's reports, press releases and prepared statements alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations made were thus materially false and/or misleading.

35.    As alleged herein, certain of the Company's SEC filings, press releases, and quarterly reports, contained material misrepresentations and omissions when issued. In addition, throughout the Class Period, the Individual Defendants participated in the Company's quarterly and/or annual earnings conference calls wherein they made material misrepresentations, omitted material information, or failed to correct the material misstatements or omissions of others.

## V.    SOURCES OF INFORMATION

36.    The allegations herein are based in part on information and belief and are further supported by firsthand account of a former Equinix employee, referred to herein as a "former employee" or "FE1." The former Equinix employee witness: (i) worked at Equinix during the Class Period; (ii) held positions within Equinix with responsibilities demonstrating that they had access to the facts on which they reported; and (iii) provided an account that is corroborated by other publicly available information concerning the Company's business, as alleged herein.

37.    FE1, a former Director, Facility Operations, from 2020 to mid-2022, oversaw operations for 10 data centers in the southern United States totaling over 800,000 square feet, including responsibility for the maintenance of uninterruptible power supplies ("UPSs"), cooling capacity, and emergency diesel generators. FE1 had two direct reports who were Senior Managers; one Senior Manager oversaw engineering, which included power and cooling. FE1 reported to a Regional Vice President who oversaw regions of the southern U.S. and South America. Prior to this role, from 2014 to 2020, FE1 was a Manager and then Senior Manager, Facilities Operations, in this role he managed all mechanical and electrical systems for multiple data centers.

38.    FE1 was familiar with the power usage of Equinix's data centers.  According to FE1, Branch Circuit Monitoring reports contained the total current power usage for each data center, as well as trends in power usage over the previous months.  FE1 stated that all employees could view details including power usage by customer or by data center.  FE1 reported that there was a finite amount of power in the data centers and customers ordered a certain number of circuits that could draw a certain amount of power.  FE1 reported that the capacity team met monthly and monitored how much power customers could draw and how much they actually used.  The capacity team determined when Equinix would sell power that customers were not using, even though those customers were still authorized to use it.  FE1 reported that the capacity group determined how much power to oversell, and FE1 was responsible at an operational level for implementing those decisions.  FE1 reported that capacity team meetings were held by region and FE1 attended capacity team meetings that covered portions of the southern U.S. and South America.  FE1 reported that overselling power was a topic specifically discussed during capacity team meetings that FE1 attended and during those meetings the capacity team would refer to the percentage by which power at a datacenter was oversold.

39.    FE1 reported that Equinix was selling approximately 110% of its power capacity when FE1 began working for Equinix in 2014 and this figure increased over time to an average of 150% in the ten data centers that FE1 oversaw.  FE1 stated that a power outage could occur if one or more customers suddenly ramped up their power consumption.  When FE1 raised concerns about the overselling of power with FE1's supervisor, they were informed that Equinix was willing to assume the risks of overselling power.

## VI.    CONTROL PERSONS

40.    As officers and/or directors and controlling persons of a publicly held company whose common stock is traded on the NASDAQ and governed by the provisions of the federal securities laws, the Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects; not to make material misrepresentations with respect thereto or to omit material facts

necessary to make the statements contained therein not misleading; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

41.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein, and is, therefore, primarily liable for the representations contained therein.

42.    Each of the Individual Defendants acted and/or made the statements detailed herein in his capacity as an officer and/or director of Equinix. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, and present and future business prospects. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

## VII.    BACKGROUND TO THE CLASS PERIOD

43.    Equinix owns and operates 260 data centers in 71 markets around the globe. Data centers are physical locations that house large-scale computer systems. Equinix supplies power, cooling, internet bandwidth, and physical security to many customers in a particular data center, while Equinix's various customers provide their own servers and other computing hardware

installed in that facility. Data centers and their computing equipment utilize significant quantities of electrical power and require large cooling systems to handle the heat they generate from computing activity.

44.    Each data center has access to a fixed amount of power from the electrical grid. For example, DC2, a data center in Washington D.C. has access to 4.9 megawatts of total power. Another data center NY4, located in Secaucus, New Jersey, has access to 18.5 megawatts of power. Data centers typically contain backup power, including batteries, generators, or fuel cells, which provide uninterrupted power in the event of a power emergency or outage.

45.    Equinix derives about 70% of its revenues from "colocation," *i.e.*, the leasing of rack space to external parties to house servers and network hardware. The second largest revenue driver is "interconnection" (17%), which is essentially a fast, cheap and secure direct connection between customers seeking to exchange data in the same data center, among other facilities in the Equinix network, or externally. Equinix has more than 10,000 customers, ranging from small businesses to large cloud "hyperscaler" providers, like Amazon, Microsoft, and Google. Equinix currently pays a dividend of approximately 2%.

46.    Typically, Equinix's relationship with its customer is governed by a master services agreement, under which Equinix and the customer enter into individual orders. The orders typically specify any services to be provided by Equinix, the data center involved, the type of equipment the customer is entitled to install, the specific Equinix product description, and a specific allocation of the amount of electricity and cooling to which the customer is entitled. Through this process, customers install and operate their owned or leased servers within specific cabinets or business suites at an Equinix data center.

47.    Equinix sold 90% of its power on a "per circuit" basis to customers, meaning that customers paid for a circuit with a defined amount of power regardless of their actual power usage. At a March 7, 2023, Morgan Stanley Technology, Media & Telecom Conference, Taylor likened the sale of power capacity to a hotel room reservation: "It's like buying a hotel, whether you show up and sleep in bed or not, you're still going to pay for it if you signed up."

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:24-cv-02656-VC
4872-2023-5491.v2                                                                                          - 13 -

A.    **In 2015, Equinix Becomes a REIT and Begins Reporting AFFO to Investors**

48.    Through the end of 2014, Equinix operated as a C Corporation, like most publicly traded companies.  On January 1, 2015, Equinix converted to a REIT for federal income tax purposes.  Like many REITs, Equinix began reporting various non-GAAP measures to its investors, including FFO and AFFO.  FFO is intended to measure the net amount of cash that flows into a REIT from regular, ongoing business activities.  According to Company filings, funds from operations ("FFO") were comprised of net income, excluding: (i) gains (or losses) from disposition of real estate property; (ii) impairment charges related to depreciable real estate fixed assets; plus (i) real estate related depreciation, (ii) amortization expense, and (iii) after adjustments for unconsolidated joint ventures ("JVs"), and non-controlling interests.

49.    To determine AFFO the Company made certain adjustments to FFO, in particular, AFFO represented FFO:

Plus: Amortization of deferred financing costs;

Plus: Stock-based compensation expense;

Plus: Non-real estate depreciation, amortization and accretion expenses;

***Less: Recurring capital expenditures***;

Less/Plus: Straight line revenue/rent expense adjustments;

Less/Plus: Gain/loss on debt extinguishment;

Plus: Restructuring charges and acquisition costs;

Less/Plus: Non-cash portion of income tax expense; and

Less/Plus: Adjustments from discontinued operations, unconsolidated JVs, and non-controlling interests.

50.    Under this definition of AFFO, the determination of capital expenditures as recurring versus non-recurring had a dollar for dollar impact on reported AFFO.  Capital expenditures deemed recurring were subtracted from FFO in calculating AFFO; capital expenditures deemed non-recurring were not.

51.    Prior to its REIT conversion, Equinix utilized an objective definition for classifying

capital expenses: Cost to build or expand new data centers were recorded as "expansion capital expenditures" and was considered non-recurring CapEx.  All other capital expenditures were recorded as "ongoing capital expenditures" and would be considered a recurring CapEx that reduced AFFO.

52.    Defendants changed their methodology for classifying capital expenditures when they became a REIT.  As set forth in a 2Q14 presentation, dated July 30, 2014, under the new methodology only three categories of expenses would be considered recurring: Maintenance & Single Point of Failure ("SPOF"); Reconfiguration Install; and IT/Product/HQ.  In their 2Q14 earnings presentation Equinix represented that recurring CapEx would be approximately 5% of revenue under the new methodology.

53.    In the same 2Q14 presentation, the Company provided examples of each category of recurring CapEx:

> **Maintenance & SPOF:** Replacing roof, ***End-of-life equipment replacement (i.e. chillers, strings of batteries,*** sprinkler system, etc.); Flood mitigation project for IBXs in flood zone

> **Reconfiguration Install:** Adjusting the existing cabinets and re-using them for different customers

> **IT / Product / HQ:** Server/computer purchases; Corp IT/Corp Marketing portal development; Oracle system maintenance

54.    Under the new methodology, six categories of capital expenditures would be considered non-recurring: Initial/Custom Install; Efficiency Improvement; IT/Network Projects; Special Projects; IBX Construction; and Capacity/Product Enhancement.  The Company provided examples of each category:

> **Initial / Custom Install:** PP&E installation in new space for new customer (i.e. cage build-outs, power circuit, cabinets, security system, etc.); Fixed antenna platform; Custom business suites; Non-Equinix standard installation

> **Efficiency Improvement:** Energy efficiency projects to reduce cooling costs and improve system reliability

> **IT / Network Projects:** Metro Connect projects; Virtual Meet Me Room project; Equinix Internet Exchange replacement; Cloud Exchange

> **Special Projects:** REIT transformation, Equinix Customer One; Oracle R12 upgrade

**IBX Construction:** Building out new data center and/or expand new phases

**Capacity / Product Enhancement:** Fiber Cable Plant project; Interior replacements to enable selling the white space; Replacing existing PP&E in order to accommodate additional capacity

55.     Following the implementation of this new methodology, Equinix began reporting materially lower recurring CapEx – even below the approximately 5% estimate they provided in 2Q14.  For example, during its first year operating as a REIT in 2015, Equinix reported a 47% drop in recurring CapEx (from 9.3% of revenue to 4.41%), which, in turn, resulted in a 19% increase to its AFFO.



56.     Since its conversion to a REIT, Equinix's recurring annual CapEx has steadily declined as a percentage of revenue despite its portfolio of data centers increasing in age.  In 2014, recurring CapEx accounted for 9.3% of total revenue, by 2023 it accounted for just 2.7% of total revenue.

57.     At the same time that Equinix's data centers were ageing, and thus becoming more expensive to maintain, their average maintenance cost (*i.e.*, non-recurring CapEx) per data center was declining from an average of $1.07 million per facility per year in 2015 to $0.8 million per facility per year in 2023:

| Average CapEx per Data Center | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| (dollars in millions) | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Data Centers | 112 | 150 | 190 | 200 | 210 | 227 | 240 | 248 | 260 |
| Recurring CapEx | $120.3 | $141.8 | $168.0 | $203.1 | $186.0 | $160.6 | $199.1 | $188.9 | $218.3 |
| Recurring CapEx Per Data Center | $1.074 | $0.945 | $0.884 | $1.015 | $0.886 | $0.708 | $0.830 | $0.762 | $0.840 |
| % change from 2015 | N/A | -12% | -18% | -5% | -18% | -34% | -23% | -29% | -22% |

**B.**   **Prior to the Class Period, Equinix Issues FY19 Financial Guidance and Adopts Executive Compensation Plan**

58.    Each February, prior to and during the Class Period, Equinix provided annual guidance to the market for revenue, AFFO and AFFO/share.  In certain years, this annual guidance would be raised mid-year.  On February 13, 2019, three months prior to the Class Period, Equinix issued FY19 guidance for revenue and AFFO including growth of up to 10% and 13%, respectively, and described AI as a "tailwind" that would drive the Company's growth:

> For the full year of 2019, total revenues are expected to range between $5.520 and $5.570 billion, a 9 - 10% increase over the previous year or a normalized and constant currency increase of 8 - 9%. . . .  AFFO is expected to range between $1.825 and $1.875 billion, an increase of 10 - 13% year-over-year on both an as-reported and a normalized and constant currency basis. . . .  Non-recurring capital expenditures are expected to range between $1.725 and $1.915 billion and recurring capital expenditures are expected to range between $175 and $185 million.

59.    In February 2019, Equinix's Compensation Committee adopted the 2019 annual incentive plan for FY19, which applied to Meyers and Taylor at the outset of the Class Period.  In addition to receiving an annual base salary, Meyers and Taylor could receive incentive compensation if Equinix met or exceeded certain AFFO/share and revenue targets during FY19. As explained in the 2020 Proxy:

> For 2019. . . ***100% of our short-term and 60% of our long-term incentives*** (assuming the target award amounts were earned) for our named executive officers ***were performance-based, dependent on annual revenue and adjusted funds from operations per share of Equinix's common stock ("AFFO/Share") growth***, along with relative total stockholder return ("TSR") achievement against the IWB Russell 1000 Index Fund (the "Russell 1000").

60.    The FY19 annual incentive plan included an annual bonus, which was deemed "100% at risk" and paid only if revenue and AFFO/share targets were met.  Specifically, the Company had to meet at least 95% of the target operating plan budget for revenue and AFFO/share

for any annual bonus to be awarded.  As explained in the 2020 Proxy:

> Under the 2019 annual incentive plan, the Compensation Committee assigned each named executive officer an annual target bonus opportunity based on the achievement of specific goals related to ***revenue and AFFO/Share*** that tied to the 2019 annual operating plan approved by the Board. . . . The AFFO/Share goal set under the 2019 operating plan contemplated delivery of services to customers, ***asset maintenance***, operating leverage, investments in the business, expansions in key markets, capital markets activity and distributions to our stockholders. Because there would be no incentive plan pool if revenue and AFFO/Share were 95% or less than the operating plan target, ***annual incentive compensation was 100% at risk***.

61.    The targets for 2019 for AFFO/share was $22.23 per share and revenue was $5.527 billion.  If the targeted metrics were met in 2019, the Defendants would be awarded annual bonuses of up to $1.3 million for Meyers (or 130% of his base salary), and $748,000 for Taylor (or 110% of his base salary).  These annual bonus awards would be paid in stock.  If the Company missed these targets by more than 5%, Defendants would not receive these bonuses.

62.    The annual incentive plan also contained long-term equity compensation for Meyers and Taylor that also required that the Company meet certain AFFO/share and revenue targets.  The long-term incentive program contained three components: (i) an award based on AFFO/share and revenue (40%); (ii) an award based on three year Total Shareholder Return ("TSR") (20%); and (iii) a time based award (40%).  For 2019, the long-term incentive compensation total for Meyers was 29,335 shares and for Taylor was 12,755 shares.

63.    The Company's incentive plan remained materially similar throughout the Class Period, in particular the Defendants could only receive annual bonuses and certain long term compensation if the Company met certain revenue and AFFO/share metrics.  Defendants' misclassifying recurring CapEx as non-recurring CapEx, as well as overselling power to boost revenue and AFFO, ensured the bonus targets were met.

## VIII.    DEFENDANTS' FRAUDULENT SCHEME AND MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    Equinix's SEC Filings Falsely Define AFFO and Identify It as Key Metric for Investors to Evaluate the Company

64.    In each of the Company's quarterly and annual SEC filings throughout the Class Period, beginning with the May 3, 2019 Form 10-Q, filed on the first day of the Class Period, Equinix made false and misleading statements concerning, among other things, how the Company

computed AFFO, including how it classified recurring versus non-recurring CapEx, and the importance investors should place on AFFO.

65.     The Company's SEC filings stated that GAAP metrics may not provide investors with an accurate picture of the Company and directed investors to non-GAAP metrics, like AFFO. According to the SEC filings, these non-GAAP metrics were what management focused on as the Company's core operations.  The non-GAAP metrics, like AFFO, offered investors a better understanding of the Company's performance than GAAP metrics, and that without these figures investors would lack the information necessary to effectively analyze Equinix.  According to the 1Q19 Form 10-Q:[4]

> [W]e believe that evaluating our ongoing operating results may be difficult if limited to reviewing only GAAP financial measures. Accordingly, ***we use non-GAAP financial measures to evaluate our operations.***
>
> \*       \*       \*
>
> We have presented such non-GAAP financial measures to provide investors with an additional tool to evaluate our operating results in a manner that ***focuses on what management believes to be our core, ongoing business operations.*** We believe that the inclusion of these non-GAAP financial measures provides consistency and comparability with past reports and provides a better understanding of the overall performance of the business and ability to perform in subsequent periods. ***We believe that if we did not provide such non-GAAP financial information, investors would not have all the necessary data to analyze Equinix effectively.***

66.     The Company's SEC Filings also identified AFFO as one of the Company's "primary non-GAAP financial measures" and set forth how the figure was purportedly calculated. Critically, they stated that AFFO was reduced by "recurring capital expenditures" without disclosing that the Company was manipulating this metric to increase reported AFFO.  For example, the 1Q19 Form 10-Q stated:[5]

> ***Our primary non-GAAP financial measures,*** adjusted EBITDA and ***adjusted funds from operations ("AFFO"),*** exclude depreciation expense as these

---

[4]    Substantially identical statements appeared in the Company's Forms 10-Q for 2Q19, 3Q19, 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, 3Q23, and Forms 10-K for FY19, FY20, FY21, FY22 and FY23.

[5]    Substantially identical statements appeared in the Company's Forms 10-Q for 2Q19, 3Q19, 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, 3Q23, and Forms 10-K for FY19, FY20, FY21, FY22 and FY23.

charges primarily relate to the initial construction costs of our IBX data centers and do not reflect our current or future cash spending levels to support our business.

\*        \*        \*

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. ***AFFO represents FFO excluding*** depreciation and amortization expense on non-real estate assets, . . . ***recurring capital expenditures*** and adjustments for unconsolidated joint ventures' and noncontrolling interests' share of these items and net income (loss) from discontinued operations.

67.    The SEC Filings also falsely defined recurring capital expenditures as those which extend the life of its data centers or are necessary to support current revenue when in fact Defendants were classifying this type of expenditure as non-recurring.  For example, the 1Q19 Form 10-Q stated:[6]

We deduct ***recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues.***

68.    Each of the statements from the Company's SEC filings set forth above, and repeated throughout its quarterly and annual filings during the Class Period concerning: (i) the method by which the Company calculated AFFO (¶66); (ii) the value of AFFO as an indicator of the Company's performance to investors (¶65); and (iii) the Company's methodology for classifying capital expenditures (¶67); were false and misleading when made because Defendants knew or deliberately disregarded and failed to disclose the following:

(a)    Equinix overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC Rules and Regulations;

(b)    Equinix would not have met or beat annual AFFO guidance but for its improper classifying of CapEx;

(c)    Equinix's reported financial results, including AFFO and revenue, were achieved by the overselling of power;

---

[6]    Substantially identical statements appeared in the Company's Forms 10-Q for 2Q19, 3Q19, 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, 3Q23, and Forms 10-K for FY19, FY20, FY21, FY22 and FY23.

(d)    Equinix lacked adequate disclosure controls and internal controls; and

(e)    that, as a result of (a)-(d) above, Equinix's business, operations, financial results and performance were overstated, and its growth and outlook were less optimistic than the Company represented to investors during the Class Period.

**B.    Equinix Reports False and Misleading Quarterly and Annual FY19 Financial Results**

69.    On May 1, 2019, July 31, 2019, October 30, 2019, and February 12, 2020, Equinix announced its quarterly and annual results for 1Q19, 2Q19, 3Q19 and 4Q19/FY19, respectively, accompanied by the filing of its quarterly Form 10-Q and annual Form 10-K.  The financial results are shown as follows:

| 2019 | Revenue (millions) | AFFO (millions) | AFFO/share | Recurring CapEx (millions) |
|------|--------------------|-----------------|------------|----------------------------|
| Q1   | $1,363             | $488            | $5.95      | $21                        |
| Q2   | $1,385             | $498            | $5.87      | $37                        |
| Q3   | $1,397             | $473            | $5.52      | $47                        |
| Q4   | $1,417             | $473            | $5.47      | $81                        |
| FY19 | $5,562             | $1,931          | $22.81     | $186                       |

70.    Each of the quarterly 2019 Forms 10-Q, and FY19 Form 10-K also reported Equinix's approximate cabinet utilization in each quarter as: 80%, 81%, 81%, and 79% for 1Q19 through 4Q19, respectively.  According to the Company's Forms 10-K, "The cabinet utilization rate represents the percentage of cabinet space billed versus total cabinet capacity, ***taking into consideration power limitations***."[7]

71.    Each of the quarterly Forms 10-Q, and the FY19 Form 10-K attributed the improvement in AFFO to purported factors including "improved operating results" and the "nature" of the business:

> Our AFFO results have improved due to the ***improved operating results*** discussed earlier in "Results of Operations," as well as due to the ***nature of our business model*** which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

72.    On July 31, 2019, the Company held a 2Q19 earnings conference call attended by

---

[7]    Substantially identical statements appeared in the Company's Forms 10-K before and during the Class Period, including for FY19, FY20, FY21, FY22 and FY23.

Meyers and Taylor during which they stated, among other things, that AFFO and AFFO per share were the Company's "key" metrics and identified the purported drivers of AFFO:

> [Taylor:] [W]e're raising 2019 guidance across the board, including a substantial raise **in our key AFFO and AFFO per share metrics due to better-than-expected revenue performance and improved operating leverage in the business.**

73.    On October 30, 2019, Equinix held an earnings conference call with the Individual Defendants in which they stated, among other things, that the Company's quarterly financial results were driven by lower maintenance costs:

> [Taylor:] Global Q3 adjusted EBITDA was $675 million, up 9% over the same quarter last year despite higher seasonal utility cost and the expansion drag. Q3 adjusted EBITDA was better than expected, **primarily due to lower maintenance costs**.

74.    During the same investor conference call, an analyst asked Taylor to address the Company's growing executive compensation, which increased 34% over the prior year.  Taylor claimed the rise in executive compensation was purportedly driven by the Company's higher stock price and not the Defendants' manipulation of AFFO to meet targets set by the Compensation Committee:

> [Analyst:] But on stock-based compensation, Keith, could you probably just give us a little bit more color on how come stock-based comp grew 34% year-on-year and now makes up about 4.5% of revenues? . . .

> [Taylor:] Yes. That's what a strong stock price does, as you can appreciate. So I mean, think about where the stock was on December of last year and where it is today. . . . But we also look at the burn and how that affects our financial results, and then what I'm more referring to here is the AFFO on a per share basis.

75.    On January 7, 2020, Equinix presented at the Citi Global TMT West Conference. Meyers appeared on behalf of the Company and stated, among other things, that he understood investors were focused on AFFO/share growth and, accordingly, that Defendants applied "laser-focus" to the metric and it functioned as their "guiding light":

> [Meyers:] We know growth is something people are looking for. We know that growth clearly factors into people, how they value the business. I do think that primarily, what people want to say is growth on an AFFO per share basis, right? **And so that's our kind of laser-focus in terms of a guiding light metric.** But revenue growth is obviously a fundamental driver for that as well. And so yes, there's always trade-offs.

76.    On February 12, 2020, Equinix held an earnings conference call with the Individual

Defendants during which they stated that Q4 AFFO was up despite higher recurring CapEx and reaffirmed that AFFO per share was their "lighthouse metric":

> [Taylor:] Global Q4 [A]FFO was $473 million, above our expectations on a constant currency basis, while absorbing the seasonally higher recurring CapEx investments similar to last year.
>
> *       *       *
>
> [Meyers:] We feel like it's our job to maximize long-term value creation . . . driving our own digital transformation are all things that are going to help us sustain ***AFFO per share growth. And frankly, that's our lighthouse metric,*** and we feel like it would be irresponsible not to invest behind the momentum that we have right now.

77.    Each of the statements set forth above during the Company's conference calls, presentations, and SEC filings concerning: (i) the Company's reported financial results, including AFFO, AFFO/share, and recurring CapEx, and the purported drivers of those results (¶¶69, 71-73, 75, 76); (ii) the drivers of the Individual Defendants' bonus compensation (¶74); (iii) the Company's reported cabinet utilization (¶70); and (iv) the repeating statements in the Company's SEC filings as discussed in §§VIII.A. above, were materially false and misleading when made because Defendants knew or deliberately disregarded and failed to disclose the following:

(a)    Equinix overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC Rules and Regulations;

(b)    Equinix would not have met or beat annual AFFO guidance but for its improper classifying of CapEx;

(c)    Equinix deliberately oversold its power capacity at its data centers by 150% which presented a current and ongoing risk that Equinix could not deliver contracted for services to its customers (¶¶37-39);

(d)    Equinix's reported financial results, including AFFO and revenue, were achieved by the overselling of power;

(e)    Equinix's ability to utilize its existing cabinets was currently limited by its overselling of power capacity and its usage of power far exceeded its cabinet utilization rate;

(f)    Overselling power capacity limited Equinix's potential for growth – in

particular with respect to capitalizing on AI's power-intensive computing needs;

(g)    Equinix lacked adequate disclosure controls and internal controls; and

(h)    that, as a result of (a)-(g) above, Equinix's business, operations, financial results, and performance were overstated, and its growth and outlook were less optimistic than the Company represented to investors during the Class Period.

### C.    Equinix Reports False and Misleading Quarterly and Annual FY20 Financial Results

78.    On May 6, 2020, July 29, 2020, October 28, 2020, and February 10, 2021, Equinix announced its quarterly and annual results for 1Q20, 2Q20, 3Q20 and 4Q20/FY20, respectively, accompanied by the filing of its quarterly Form 10-Q and annual Form 10-K. The financial results are shown as follows:

| 2020 | Revenue (millions) | AFFO (millions) | AFFO/share | Recurring CapEx (millions) |
|------|--------|------|------------|-------------------|
| Q1 | $1,445 | $535 | $6.21 | $18 |
| Q2 | $1,470 | $558 | $6.35 | $30 |
| Q3 | $1,520 | $580 | $6.48 | $38 |
| Q4 | $1,564 | $516 | $5.76 | $74 |
| FY20 | $5,999 | $2,189 | $24.76 | $160 |

79.    Each of the quarterly 2020 Forms 10-Q, and FY20 Form 10-K also reported Equinix's approximate cabinet utilization in each quarter as: 79%, 79%, 79%, and 79% for 1Q20 through 4Q20, respectively.

80.    Each of the quarterly Forms 10-Q, and the FY20 Form 10-K attributed the improvement in AFFO to "improved operating results" discussed elsewhere in the filing and the "nature" of the business:

> Our AFFO results have improved due to the ***improved operating results*** discussed earlier in "Results of Operations," as well as due to the ***nature of our business model*** which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

81.    On February 12, 2020, Equinix hosted its 4Q19 earnings conference call where an analyst asked what was giving the Company confidence that it would be able to drive growth. Meyers noted that AI was one of the "underlying industry drivers" fueling demand:

> [Analyst:] Can you dig into what gives you the confidence in the 2021 expansion and development after what looks like a robust 2020 plan as well?

[Meyers:] Yes. . . . I think right now, we have a better multi sort of longer-term view of the customer opportunity in the funnel than we've ever had. . . . I think, underlying industry drivers in terms of the pace of adoption of cloud, you look at what's happening in terms of overall data volumes, you look at the impact and influence of *things like AI* and IoT, I think you start to see the front edge potentially of 5G increasing sort of both traffic and overall sort of data volumes.

*And so I continue to think that the secular forces driving the overall demand for infrastructure are strong.*

82.    On March 2, 2020, Equinix presented at the Morgan Stanley Technology, Media & Telecom Conference.  Representing the Company, Taylor highlighted to investors Equinix's outlier status as it generated more AFFO/share then the "next 6" public companies combined:

[Taylor:] Going back to my comment in AFFO, we threw up an AFFO per share, so it sort of levels the playing field with all the different capital structures. And we had – *we deliver more AFFO per share than the next 6 combined, public companies combined.*

83.    On May 6, 2020, Equinix held a 1Q20 investor conference call.  Meyers and Taylor discussed the Company's strong AFFO results and purported drivers:

[Taylor:] Global Q1 AFFO was $535 million, above our expectations on a constant currency basis *due to strong operating performance and lower-than-planned interest expense and income taxes*.

\*      \*      \*

Capital expenditures were approximately $400 million, *including seasonally low recurring CapEx of $18 million*.

84.    Defendants reiterated that they were keenly focused on AFFO per share and that they ran the business to deliver against their AFFO guidance:

[Meyers:]  As we continue to navigate an uncertain environment, we will remain diligent, flexible, disciplined and prepared across the company . . . all while closely tracking our financial and operating metrics to ensure profitable growth *and maintain a keen focus on AFFO per share as a lighthouse metric for the business.*

\*      \*      \*

[Taylor:] And hence, when you look at the revenue guidance page that we delivered in our earnings deck, you have a pretty good sense of what the scenarios are that we could plan for here. Yet having said all of that, *we're going to run the business to deliver against our AFFO target at the midpoint or better.*

85.    When asked what was driving the lower recurring CapEx during 1Q20, Taylor stated that it was purportedly due to "things slowing down" during the quarter and putting data centers into "more restricted fashion":

> [Analyst:] If I can squeeze 1 in for Keith just on the variability in maintenance CapEx. It was quite significant, and you talked a little bit about that. But what kind of makes up that bucket? . . .
>
> [Taylor:] Sure. Yes. We did see slightly less this quarter than we anticipated, roughly 1.2%. If I go to the same quarter last year, it was 1.5% of revenues. I mean certainly, as we're all aware during the latter part of the quarter, ***things started to slow down a little bit. We also were putting our IBXs into a more restricted fashion***. No surprise as things took root in different parts of the world. But all that said, when you look at our overall guidance, we're still looking at somewhere around $150 million to $160 million of capital that will go into recurring and only a portion of that, of course, is maintenance, ***roughly 2% of our recurring CapEx is maintenance***. And so you'll see it go back to a more traditional level in Q2. That's reflected in the guidance. And then for the year, you'll see it. Roughly -- a little bit lower than we saw last year, but roughly in line with what our expectations would be on a go-forward basis.

86. On May 27, 2020, Equinix presented at the RBC Capital Markets Data Center & Connectivity Conference. Meyers appeared on behalf of the Company. Among other things, Meyers responded to a question regarding Equinix's lower than expected 1Q20 maintenance costs and whether they were attributable to COVID-related operational changes. Meyers stated that COVID was not a factor in lower maintenance costs and attributed it to timing issues:

> [Analyst:] [D]uring COVID, one naturally has to make trade-offs about what to do operationally with respect to maintenance CapEx, maintenance OpEx.
>
> . . . .Has there been any of that kind of give and take at Equinix? And might we revert to kind of higher more normalized levels of maintenance CapEx once they come out the other side of the pandemic?
>
> [Meyers:] Yes. Generally, I wouldn't say that that was really a factor for us in terms of affecting our maintenance costs and maintenance CapEx. Because, again, all of our sites remain fully staffed and operational. . . . I'm sure there were examples of maintenances that were pushed out or -- but not in any meaningful way. ***And Q1 was low for us, but I think it was more an artifact of one pull forward into Q4,*** which is a common thing for us to do at the end of the year is to try to get those things pulled in if we can get them done in Q4 ***and then probably a little bit of things pushing out into Q2.***
>
> But I think we're, for the most part, going to trend towards our more common levels of recurring CapEx, which 3% to 5% annually. But Q1 is a seasonally low. It was 1.2%. I think that's probably at very low end. We'd expect a more normal level in Q2, which is more at the 3% level.

87. On February 10, 2021, Equinix held its 4Q20 earnings conference call where Meyers fielded a question regarding how increased world digitization was impacting deals. In response, Meyers stated that AI was one of the key factors that was fueling Equinix's strong bookings:

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:24-cv-02656-VC
4872-2023-5491.v2

- 26 -

[Analyst:] Charles, you mentioned in the prepared remarks some of the bigger picture changes as the world digitizes. Can you talk about how this is impacting deal flow and deal sizes? Any impact on sales cycles? Are they lengthening in any way as a result?

[Meyers:] Yes. . . . I talked about that we're really seeing digital take off and be a Board-level priority for people, and it's changing the way, as I said, people think about not only electronic commerce and digital interaction with their customers, but how they think about data **and how they're using AI to create competitive advantage,** how they're architecting their networks. **And those last 2 examples are 2 really good ones of – that are central to what we have in our funnel today and what's fueling our strong bookings on a quarter-over-quarter level.**

88.     On February 10, 2021, Equinix held an earnings conference call with Meyers and Taylor in which they stated, among other things, that OpEx and CapEx investments were driving company value:

[Taylor:] Global Q4 AFFO was $517 million, meaningfully above our expectations on a constant currency basis due to strong operating performance **while absorbing seasonally higher recurring CapEx investments**, a similar scenario to prior years.

\*     \*     \*

[Taylor:] And we're optimistic that, that will continue to drive more value to not only the margin line, **but also to our core metric, which is AFFO per share**.

89.     Each of the statements set forth above during the Company's conference calls, presentation, and SEC filings concerning: (i) the Company's reported financial results, including AFFO, AFFO/share, and recurring CapEx, and the purported drivers of those results (¶¶78, 80, 82-86, 88); (ii) the Company's reported cabinet utilization (¶79); (iii) the role of AI in driving customer demand (¶¶81, 87); and (iv) the repeating statements in the Company's SEC filings as discussed in §XIII.A. above, were materially false and misleading when made because Defendants knew or deliberately disregarded and failed to disclose the following:

(a)     Equinix overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC Rules and Regulations;

(b)     Equinix would not have met or beat annual AFFO guidance but for its improper classifying of CapEx;

(c)     Equinix deliberately oversold its power capacity at its data centers by 150%

which presented a current and ongoing risk that Equinix could not deliver contracted for services to its customers (¶¶37-39);

        (d)    Equinix's reported financial results, including AFFO and revenue, were achieved by the overselling of power;

        (e)    Equinix's ability to utilize its existing cabinets was currently limited by its overselling of power capacity and its usage of power far exceeded its cabinet utilization rate;

        (f)    Overselling power capacity limited Equinix's potential for growth – in particular with respect to capitalizing on AI's power-intensive computing needs;

        (g)    Equinix lacked adequate disclosure controls and internal controls; and

        (h)    that, as a result of (a)-(g) above, Equinix's business, operations, financial results, and performance were overstated, and its growth and outlook were less optimistic than the Company represented to investors during the Class Period.

### D.    Equinix Reports False and Misleading Quarterly and Annual FY21 Financial Results

90.    On April 28, 2021, July 28, 2021, November 3, 2021, and February 16, 2022, Equinix announced its quarterly and annual results for 1Q21, 2Q21, 3Q21 and 4Q21/FY21, respectively, accompanied by the filing of its quarterly Form 10-Q and annual Form 10-K. The financial results are shown as follows:

| 2021 | Revenue (millions) | AFFO (millions) | AFFO/share | Recurring CapEx (millions) |
|------|--------------------|-----------------|------------|----------------------------|
| Q1   | $1,596             | $627            | $6.98      | $20                        |
| Q2   | $1,658             | $632            | $7.01      | $45                        |
| Q3   | $1,675             | $628            | $6.94      | $48                        |
| Q4   | $1,706             | $564            | $6.22      | $86                        |
| FY21 | $6,636             | $2,451          | $27.11     | $199                       |

91.    Each of the quarterly 2021 Forms 10-Q, and FY21 Form 10-K also reported Equinix's approximate cabinet utilization in each quarter as: 78%, 79%, 79%, and 79% for 1Q21 through 4Q21, respectively.

92.    Each of the quarterly 2021 Forms 10-Q, and the FY21 Form 10-K attributed the improvement in AFFO to "improved operating results" discussed elsewhere in the filing and the "nature" of the business:

Our AFFO results have improved due to the **improved operating results** discussed earlier in "Results of Operations," as well as due to the **nature of our business model** which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

93. On March 10, 2021, Equinix presented at the Deutsche Bank Virtual Media Internet and Telecom Conference. Karl Strohmeyer, Equinix's Chief Customer & Revenue Officer, appeared on behalf of the Company and described revenue and AFFO/share growth as the things that investors cared about:

[Karl Strohmeyer:] And of course Keith will do his thing at the end [of Analyst Day] and map that out for how that plays out financially around ranges for the next 5 years for the things that **obviously investors really care about, which is revenue growth and AFFO per share growth**.

94. On April 28, 2021, Equinix held an earnings conference call with Meyers and Taylor in which Taylor attributed the Company's strong AFFO results to operating performance and seasonal effects:

[Taylor:] Global Q1 AFFO was $627 million, meaningfully above our expectations **due to strong operating performance and lower seasonal recurring capital expenditures**.

95. On July 28, 2021, Equinix held its 2Q21 earnings conference call with Meyers and Taylor during which Taylor described the factors purportedly responsible for driving strong AFFO results and recurring CapEx:

[Taylor:] Total Q2 AFFO was $632 million, including a $25 million recurring CapEx increase compared to the prior quarter, **above our expectations due to strong operating performance and lower integration costs**.

96. On November 3, 2021, Equinix hosted its 3Q21 earnings conference call where Meyers reported that the Company secured new bookings, including a key "win with Nvidia, IBM, and SVA . . . building an interconnected global network to optimize workloads and speed up AI training." When an analyst asked what was fueling traction for these new customers, Meyers stated that "AI [is] a key driver":

[Analyst:] It sounds like new customer net adds have been up a fair bit this year and the channel partnerships are doing really well. Can you provide some additional color on what you're seeing there, maybe where are you seeing the most traction for new customers and also in the channel from a regional standpoint?

\*        \*        \*

[Meyers:] And it's across a number of verticals and it's across a number of use cases, but real strength in terms of how people are thinking about using corporate data to draw insights, how they therefore want to store that data centrally, act on it from a variety of cloud resources and ***then also AI as a key driver.*** In fact, we had a big win, a big joint win with NVIDIA on that front, as we talked about in the script. And so really great progress there, and I think the range of use cases is really strong. . . . . And so we're seeing some really good momentum.

97.    On November 30, 2021, Equinix presented at the Nasdaq Investor Conference. Taylor spoke on behalf of Equinix and stated, among other things, that power consumption was an issue on their mind:

[Analyst:] And how does this all flow through to your margin? A lot of your energy costs are passed through or hedged? And you certainly talked about margin opportunity at the Analyst Day over the medium to long term.

[Taylor:] Yes. Well, again, the discussions we've had today already and certainly the ones I had post earnings call, ***the discussion around power consumption and utility rates certainly is the forefront of everybody's mind***. So what I would tell you is 1 of 2 things. Number one, we're not veering away from what our commitments are. 3 – sorry, 7% to 10% AFFO per share growth and margins . . .

98.    On January 5, 2022, Equinix presented at the Citi AppsEconomy Conference. Meyers appeared on behalf of Equinix and stated, among other things, that Equinix must deliver on its AFFO per share growth:

[Analyst:]  Is that a way that investors should start thinking about the Equinix financial model in the future?

[Meyers:] Well, I mean, to some degree, that's clearly the way we think about it, right, which is, hey, what do we need to do in terms of delivering margin expansion because ***in the end, we have to deliver the AFFO per share growth, right***? And so – and because we serve – aren't going to get that below the line, then what we have to do is get good solid growth, and then we have to flow that through. And if we want to perform on the AFFO per share line, we have to continue to drive some level of operating leverage in the business.

99.    At this same conference, Meyers stated that demand for Equinix enterprise offerings was strong and driven by clients' need to have centralized data to "generate insights with AI":

[Meyers:] Generally, I think we're finding that people are more inclined to put [their data] somewhere central, that they can act on it with a range of cloud resources that they – that it's not resident in 1 place, they can move it freely in and out without sort of having certain tax on that in terms of egress charges and those kind of things. ***And also that they can act on it with – and generate insights with AI and those kind of things. And so that, I think, is one of the real things that***

*we're seeing that is driving some of the enterprise demand.* But overall, I would say the demand backdrop for enterprise is super strong right now.

100.    On February 16, 2022, Equinix held a 4Q21 earnings conference call.  During the call, Taylor was asked what was driving years of the Company's CapEx being at the low end of its forecasted range.  Taylor responded that it was purportedly a matter of timing:

> [Analyst:] [O]n recurring CapEx, it seems like it's going to be at the very low end of your target range in 2022. And it's been towards the lower end for a few years now. Should we expect that to tick up in coming years or is this kind of a new normal for recurring CapEx?
>
> *    *    *
>
> [Taylor:] And so just the recurring CapEx, we are at . . . sort of the lower end of the range for fiscal year '22, *quite just timing*, Nick. . . .  And so you saw an elevated Q4 number at roughly 5% recurring CapEx relative to revenue. It steps down, of course, in Q1. And then as we look through the year, it is roughly somewhere between 2% and 3%. *But I think the biggest thing is really about timing* and a number of new assets that we're bringing into the portfolio. And as a result, when you think about the level of recurring CapEx that has to be made, the newer the portfolio, the better the position you have on recurring CapEx.

101.    Each of the statements set forth above during the Company's conference calls, presentation, and SEC filings concerning: (i) the Company's reported financial results, including AFFO, AFFO/share, and recurring CapEx, and the purported drivers of those results (¶¶90, 92-95, 98, 100); (ii) the Defendants' purported concern over power consumption at the Company's data centers (¶97); (iii) the Company's reported cabinet utilization (¶91); (iv) the role of AI in driving customer demand (¶¶96, 99); and (v) the repeating statements in the Company's SEC filings as discussed in §XIII.A. above, were materially false and misleading when made because Defendants knew or deliberately disregarded and failed to disclose the following:

(a)    Equinix overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC Rules and Regulations;

(b)    Equinix would not have met or beat annual AFFO guidance but for its improper classifying of CapEx;

(c)    Equinix deliberately oversold its power capacity at its data centers by 150% which presented a current and ongoing risk that Equinix could not deliver contracted for services

to its customers (¶¶37-39);

(d)     Equinix's reported financial results, including AFFO and revenue, were achieved by the overselling of power;

(e)     Equinix's ability to utilize its existing cabinets was currently limited by its overselling of power capacity and its usage of power far exceeded its cabinet utilization rate;

(f)     Overselling power capacity limited Equinix's potential for growth – in particular with respect to capitalizing on AI's power-intensive computing needs;

(g)     Equinix lacked adequate disclosure controls and internal controls; and

(h)     that, as a result of (a)-(g) above, Equinix's business, operations, financial results, and performance were overstated, and its growth and outlook were less optimistic than the Company represented to investors during the Class Period.

### E.    Equinix Reports False and Misleading Quarterly and Annual FY22 Financial Results; Barclays Raises Concerns Over CapEx Accounting

102.    On April 27, 2022, July 27, 2022, November 2, 2022, and February 15, 2023, Equinix announced its quarterly and annual results for 1Q22, 2Q22, 3Q22 and 4Q22/FY22, respectively, accompanied by the filing of its quarterly Form 10-Qs and annual Form 10-K.  The financial results are shown as follows:

| 2022 | Revenue (millions) | AFFO (millions) | AFFO/share | Recurring CapEx (millions) |
|------|--------------------|-----------------|------------|-----------------------------|
| Q1   | $1,734             | $653            | $7.16      | $24                         |
| Q2   | $1,817             | $691            | $7.58      | $35                         |
| Q3   | $1,841             | $712            | $7.73      | $50                         |
| Q4   | $1,871             | $658            | $7.09      | $80                         |
| FY22 | $7,263             | $2,714          | $29.55     | $189                        |

103.    Each of the quarterly 2022 Forms 10-Q and FY22 Form 10-K also reported Equinix's approximate cabinet utilization in each quarter as: 80%, 80%, 81%, and 82% for 1Q22 through 4Q22, respectively.

104.    Each of the quarterly 2022 Forms 10-Q, and FY22 Form 10-K attributed the improvement in AFFO to "improved operating results" discussed elsewhere in the filing and the "nature" of the business:

Our AFFO results have improved due to the ***improved operating results***

discussed earlier in "Results of Operations," as well as due to the **nature of our business model** which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

105.    On April 27, 2022, Equinix held its 1Q22 earnings conference call.  Meyers and Taylor spoke on behalf of Equinix where they attributed strong AFFO results to "strong operating performance" and seasonal impacts driving down recurring CapEx and assured investors they would meet their AFFO guidance through top line growth and operating leverage:

> [Taylor:] For the quarter, capital expenditures were approximately $413 million, including seasonally lower recurring CapEx of $24 million.
>
> *        *        *
>
> [Meyers:] [W]e really remain confident that we can deliver against the Analyst Day AFFO per share growth targets through some combination of top line growth and appropriate operating leverage. **And at the end of the day, that's really our lighthouse metric is driving that AFFO per share growth.**

106.    On May 23, 2022, Equinix presented at the JPMorgan Global Technology, Media & Communications Conference.  Meyers appeared on behalf of Equinix where he emphasized Defendants' focus on AFFO over margins:

> [Meyers:] But then there's other areas of reinvestment in the business. And as we've always said, **our focus is on long-term value creation, and that primarily is in the form of AFFO per share growth. And so that's really our lighthouse metric**. . . . But operating leverage and top line growth translating to AFFO per share is what we're really focused on.

107.    On July 27, 2022, Equinix held its 2Q22 earnings conference call.  Meyers and Taylor appeared on behalf of the Company and fielded questions from analysts regarding power availability.  In response to a question about power supply, Meyers assured investors that Equinix did not have issues with power supply and that they were managing issues of power availability well:

> [Analyst:] First, just on power. If you can give a little bit more detail of what you're seeing in terms of not just power cost in Europe and other markets where there could be issues, but also power availability. And how should investors frame the risk of the supply side of the equation?
>
> *        *        *
>
> [Meyers:] Yes, obviously, we're super tuned-in to the overall energy situation globally, with a particular focus on Europe, given the uncertainty created by the war in Ukraine.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:24-cv-02656-VC
4872-2023-5491.v2

- 33 -

*      *      *

***The question of availability is a little bit of a different one, and we know that that's on people's minds. And although we don't want to minimize the issues there***, and there's clearly some level of risk that certain trade-offs really need to be made in some countries relative to how power will be allocated, ***we continue to feel really confident in our ability to maintain availability of our services to our customers***.

*      *      *

So that's a lot, but . . . as you might imagine, it is a topic of significant energy and discussion and focus for us. And all in all, we feel, while it is a less than ideal situation in terms of rising costs and potential risk around availability, is one that ***we feel very well-positioned to manage***.

108.    On September 23, 2022, Barclays issued a report titled "Mounting Risks: Downgrading EQIX to Equal Weight. . . ."  In a partial disclosure of the truth, the analyst report raised a potential "Accounting Issue" in which it deduced from trends in Equinix's publicly reported financial results that the Company was likely overstating AFFO.  The analyst report noted that before Equinix transitioned into a REIT, the Company's recurring CapEx averaged 8.7% of revenue but dropped to just 3.6% of revenue afterward.  Barclays accurately speculated that Equinix was manipulating its CapEx classification but lacked any confirmation from inside the Company.

EQIX - downgrade to (EW from OW): We evaluate rising energy prices, evolving cloud offerings, and accounting practices, among other factors that may lead to a lower earnings trajectory and valuation through 2024.

*      *      *

Accounting issue #1 - Recurring vs. non-recurring capex

Investor attention has recently focused on earnings quality, and specifically how maintenance and and [sic] growth capex are allocated. As AFFO is a non-GAAP number, our sense is management teams have a fair amount of discretion in how the spending is characterized. This is particularly relevant because REITs deduct maintenance capex from FFO when calculating AFFO, but not growth capex. (EQIX specifically uses the labels "recurring vs. non-recurring" capex, instead of "maintenance vs. growth" but we see no material difference in the definitions). In the three years prior to becoming a REIT (2012-2014), EQIX's recurring capex averaged 8.7% of revenue (during this period EQIX used the term "ongoing" capex, but again no material difference in definition). Since 2015 when the company filed as a REIT, recurring capex as averaged 3.6%.



FIGURE 3. Recurring capex as % of total revenue

FIGURE 4. Recurring capex as % of depreciation

Note: From 2012-2014 EQIX reported "ongoing" capex, and switched to "recurring" capex in 2015. Based on 10K filings, we do not see a functional difference in the definitions.
Source: Company documents, Barclays Research

Note: From 2012-2014 EQIX reported "ongoing" capex, and switched to "recurring" capex in 2015. Based on 10K filings, we do not see a functional difference in the definitions.
Source: Company documents, Barclays Research

109.    In support of its concern over potential accounting manipulation, the Barclays analyst report pointed out that cabinet equivalents were increasing at 15% while non-recurring CapEx was increasing at 29%.  According the report, these numbers should have been reversed because the cost of building cabinets declined between 2014 and 2021:

> Further emphasizing this point, cabinet equivalents (*i.e.*, CabE) have increased at 15% CAGR since the metric was first introduced in 2014. Meanwhile, non-recurring capex increased at a 29% CAGR. All else equal, the cost to build new data centers has trended down between 2014- 2021, so cabinet growth should have exceeded non-recurring (i.e. growth) capex. The large differential in CAGRs suggests some non-recurring growth capex would be better classified as recurring.

110.    The Barclays analyst report also noted that there was no "plausible reason" for Equinix's change in the methodology for classifying CapEx after 2014 other than to inflate AFFO. The analyst report stated that AFFO may be inflated by 15%:

> We acknowledge the capex growth and CabE CAGR comparison is complicated by the net purchase of assets since 2014, but that would also increase the cabinet total, all else equal. Management suggests it is expensing ~3% of revenue on maintenance, in addition to the ~3% of revenue accounted for as maintenance capex in AFFO. ***Still, we do not see a plausible reason why capex accounting changed after 2014, other than to reflect higher AFFO***. . . .
>
> Normalizing recurring capex as a percentage of revenue based on the pre-REIT 2013-2015 average of 8.7%, reduces AFFO/ps by an average of 15% in each year. EQIX forward multiple of AFFO has contracted from a high of ~30x to ~20x now. Absent clarity on the evolution of this accounting metric, we struggle to see how the stock can recapture its previous trading multiple.



FIGURE 5. Cabinet growth trails non-recurring capex, suggesting some capital spending is recurring

Source: Company documents, Barclays Research



FIGURE 6. Reported AFFO vs. AFFO normalized with recurring capex reflecting 8.7% of revenue

Note: Normalized recurring capex reflects 8.7% of total revenue, the average from 2013-2015 prior to REIT conversion
Source: Company documents, Barclays Research

111.    In response to this partial disclosure of the truth by Barclays concerning the potential for manipulation in Equinix's CapEx accounting, the Company's stock price declined from $609.26 on September 22, 2022, to $593.13 on September 23, 2022, a decline of $16.13 on elevated volume, but continued trading at artificially inflated prices.

112.    On November 2, 2022, Equinix held its 3Q22 earnings conference call.  Meyers and Taylor appeared on behalf of the Company and addressed the purported drivers of strong AFFO results:

> [Meyers:] [R]evenues for Q3 were $1.84 billion, up 11% over the same quarter last year, driven by strong recurring revenue growth. Adjusted EBITDA was up 11% year-over-year with ***AFFO meaningfully ahead of our expectations due to strong operating performance.***

113.    On January 4, 2023, Equinix presented at the Citi Communications, Media & Entertainment Conference.  Meyers appeared on behalf of the Company where he again directed investors' attention away from the Company's margins and told them to focus on the Company's AFFO.   According to Meyers, AFFO was the best indicator as to how the Company was performing.

> [Meyers:] I will say this in terms of giving you a little more concrete answer on that, ***we clearly see operating leverage as one fundamental element of driving AFFO per share growth, which we view as the lighthouse metric for our business.*** Because at the end, I think investors see it and say, "Look, what do I get in terms of dividend yield and what are you going to give me on AFFO per share", right? And so that's fundamentally our people. ***And we very – we have that very deeply ingrained into our thinking about how we run the business.***

114.    Each of the statements set forth above during the Company's conference calls,

presentation, and SEC filings concerning: (i) the Company's reported financial results, including AFFO, AFFO/share, and recurring CapEx, and the purported drivers of those results (¶¶102, 104, 105, 106, 112, 113); (ii) the Company's access to, and sale of, power (¶¶105, 107); (iii) the Company's reported cabinet utilization (¶103); and (iv) the repeating statements in the Company's SEC filings as discussed in §XIII.A. above, were materially false and misleading when made because Defendants knew or deliberately disregarded and failed to disclose the following:

(a)    Equinix overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC Rules and Regulations;

(b)    Equinix would not have met or beat annual AFFO guidance but for its improper classifying of CapEx;

(c)    Equinix deliberately oversold its power capacity at its data centers by 150% which presented a current and ongoing risk that Equinix could not deliver contracted for services to its customers (¶¶37-39);

(d)    Equinix's reported financial results, including AFFO and revenue, were achieved by the overselling of power;

(e)    Equinix's ability to utilize its existing cabinets was currently limited by its overselling of power capacity and its usage of power far exceeded its cabinet utilization rate;

(f)    Overselling power capacity limited Equinix's potential for growth – in particular with respect to capitalizing on AI's power-intensive computing needs;

(g)    Equinix lacked adequate disclosure controls and internal controls; and

(h)    that, as a result of (a)-(g) above, Equinix's business, operations, financial results, and performance were overstated, and its growth and outlook were less optimistic than the Company represented to investors during the Class Period.

**F.    Equinix Reports False and Misleading Quarterly and Annual FY23 Financial Results as Market Questions Power Capacity**

115.    On May 3, 2023, August 2, 2023, October 25, 2023, and February 14, 2024, Equinix announced its quarterly and annual results for 1Q23, 2Q23, 3Q23 and 4Q23/FY23,

respectively, accompanied by the filing of its quarterly Form 10-Qs and annual Form 10-K.  The

financial results are shown as follows:

| 2023 | Revenue (millions) | AFFO (millions) | AFFO/share | Recurring CapEx (millions) |
|------|--------------------|-----------------|------------|----------------------------|
| Q1 | $1,998 | $802 | $8.59 | $22 |
| Q2 | $2,018 | $754 | $8.04 | $40 |
| Q3 | $2,061 | $772 | $8.19 | $52 |
| Q4 | $2,110 | $691 | $7.30 | $105 |
| FY23 | $8,188 | $3,019 | $32.11 | $219 |

116.    Each of the quarterly 2023 Forms 10-Q, and FY23 Form 10-K also reported

Equinix's cabinet utilization in each quarter as: 82%, 82%, 80%, and 79% for Q1 through Q4,

respectively.

117.    Each of the quarterly 2023 Forms 10-Q, and the FY23 Form 10-K attributed the

improvement in AFFO to "improved operating results" discussed elsewhere in the filing and the

"nature" of the business:

> Our AFFO results have improved due to the ***improved operating results*** discussed earlier in "Results of Operations," as well as due to the ***nature of our business model*** which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

118.    On March 6, 2023, Equinix attended the Citi Miami Global Property CEO

Conference.  Meyers appeared on behalf of the Company and once again directed analysts away

from focusing on Equinix's margins, and told them to focus on the Company's AFFO instead:

> [Analyst:] If you can share with us how investors should think about the margin progression for your business. You've had long-term margin goals outlined in the past. But what's the right way, given the growth and opportunities for investment that you see, that investors should think about that margin progression over time?
>
> [Meyers:] Yes. I'll start with the same statement that I've made sort of many times and that is that we view, ***our lighthouse metric for us is AFFO per share.*** That combined with dividend yield is what we think is the value creation engine for investors. ***And so that's what we're really focused on***. And margin is an important metric and one over time that we believe will be central to achieving sustained AFFO per share growth.

119.    At a March 7, 2023, Morgan Stanley Technology, Media & Telecom Conference,

Taylor likened the way customers paid for power to paying for a hotel room – the customer pays

whether they sleep in the hotel bed or not – without disclosing that Equinix then sought to re-sell

power not being used by customers:

[Taylor:] 90% of our power is on a per circuit basis. We're going to sell you that circuit, and you got to decide how you want to use it and to use or lose it. So in the sense, we're going to still bill you for it. I shouldn't have said lose it because ***you're going to pay whether you use it or not. That's what it really means. It's like buying a hotel, whether you show up and sleep in bed or not, you're still going to pay for it if you signed up.***

120.     On March 15, 2023, Credit Suisse issued a report titled "ChatGPT: Understanding the AI Impact on the Data Center Industry; Initially a Benefit, But Longer-term a Much Bigger Debate" stating that analysts believed Equinix was in a unique position to capitalize on the AI boom:

While we expect generative AI to be a rising tide that lifts all data centers to some extent, ***we believe Equinix (EQIX) is uniquely positioned to be a beneficiary from AI growth*** given it is the global leader in interconnection services. EQIX is already a leading brand that commands a premium for its services due to the enterprise ecosystem it has cultivated, and we believe that gap may actually widen as AI spurs more emphasis on intra-data center connections. EQIX's ECX, Metal, and Edge Services may only grow in importance over time with increasing AI app relevance.

121.     On May 3, 2023, the Company held its 1Q23 earnings conference call.  Meyers and Taylor appeared on behalf of the Company and discussed the purported drivers of the Company's strong AFFO performance:

[Taylor:] Global Q1 AFFO was $802 million, above our expectations ***due to strong business performance,*** including lower net interest expense and income taxes. As expected, we had seasonally lower recurring CapEx spend, consistent with prior years.

122.     On May 25, 2023, Evercore issued an analyst report titled "Initial Thoughts on NVDA Results and the AI Opportunity", which highlighted key takeaways from Equinix's 1Q23 earnings call, including the emphasis that AI was creating "a growing pipeline" and that further information was expected at the Company's June 21, 2023 Analyst Day:

During EQIX's Q1 earnings call earlier this month, EQIX called out several wins and noted that ***they see a growing pipeline of AI opportunities*** directly and partners for both training and inference use cases (more details to come during upcoming June 21 Analyst Day). AI has caused customers to consider where to place their data and have that data accessible to multiple clouds (should drive demand for colo/interconnection). EQIX highlighted both model training opportunities (on dedicated hardware) and inference use cases driving the need for interconnection (latency sensitive, reliant on dynamic data sets across multiple sources).

123.    On June 8, 2023, Deutsche Bank issued an analyst report titled "N'AI'REIT wrap: AI in focus (DLR/EQIX), 5G driving tower/small cell (CCI)" indicating that, according to their conversation with Equinix executives, the Company was well poised to capitalize on the demand from AI:

> Relative to other recent secular technology shifts (ie: 5G, edge data centers/compute), AI appears more ubiquitous (hyperscalers enhancing offerings with AI, enterprises leveraging is for either internal use or to improve their own offerings for customers).
>
> While the "training" side of AI/LLM models may be more heavy computing/storage likely to drive more demand at xScale (hyperscale JV), "inference" oriented solutions which require lower latency and proximity to other data/customers in the EQIX ecosystem should be a greater demand driver for EQIX's traditional business.

124.    On June 21, 2023, Equinix held its Analyst Day.  Meyers and Taylor fielded questions regarding potential power constraints.  In response, Meyers stated that Equinix was in position to navigate the "screwed up" power market in part because it had superior knowledge and expertise:

> [Analyst:] You covered some of it, but any additional comments on supply chain inflation or long-term energy constraints.
>
> [Meyers:] Yes. Let me take the very last part of that because **it's the 1 that maybe I worry about most in terms of I think energy is going to continue to be part of this complex and dynamic environment**. That's code for it's all screwed up out there. . . . I do think that, that is going to be an area that we have to continue to watch. . . .
>
> But I think we're going to have to continue to watch that in terms of both the availability of power at the utility level and the availability of power at a permitting level in terms of being able to permit that power for our use. And so those are areas of real focus for us. And I think we tried to highlight the fact that we are in a business that requires a level of expertise in these areas that is simply hard to come by. It's hard to fund and hard to come by. **And I think we were ahead of the pack on that and I think are going to continue to stay there.** But it is something that I think will continue to potentially impact the supply side of our business, which, again, affect sort of volumes, supply demand and balance and potentially eventually pricing.

125.    In a partial disclosure of the truth concerning the Company's limited growth potential due to the overselling of its existing power capacity, Meyers revealed during his remarks on Analyst Day that the Company viewed AI as a long term opportunity over the next 25 years, as opposed to an immediate opportunity to capitalize upon:

[Meyers:] And I think our platform and the breadth of our platform, retail data centers, xScale data centers, digital services and fabric **represent a powerful sort of value proposition for AI as an opportunity to scale the business. And this, I think, is going to be a major driver in our next quarter century as we look ahead.**

126.    On June 22, 2023, the day following the Company's Analyst Day, Oppenheimer issued an analyst report titled "Equinix Inc. Downgrade to Perform on Valuation as Guidance Points to Deceleration from Current Elevated Levels" which stated that investors were expecting to hear at the Analyst Day that AI would be a current growth driver, not a long term opportunity that was "still too early to forecast":

We're downgrading EQIX from Outperform to Perform rating on valuation and guidance that missed expectations. **Investors entered EQIX's well-attended analyst day hoping to hear confirmation that AI would mark a new growth inflection point, but management tamped down expectations, saying "it's still too early to forecast,"** while simultaneously cautioning that opex/capex would remain high. Positively, long-term fundamentals remain healthy, and EQIX's guided 8–10% per year revenue growth to ~$12B by 2027 would normally be viewed as stellar in isolation, but low vs. 1Q23's +16% CC and '23E's 14–15% CC, admittedly boosted by energy pass-throughs. We reduce '24E EBITDA by 3%, AFFO/share by 5%, and move to the sidelines for fundamentals to catch up to record valuation vs. 10-year treasuries and peers (Exhibit 1 and 2).

127.    In response to the new negative information concerning the Company's inability to capitalize in the near term on the AI boom (due to the Company's undisclosed practice of overselling power capacity), and subsequent downgrading by Oppenheimer, Equinix stock declined from $780.24 on June 20, 2023, to $768.00 on June 21, 2023, and $746.99 on June 22, 2023, a two day decline of over 4% on elevated trading volume, but continued trading at artificially inflated prices.

128.    On August 2, 2023, Equinix held its 2Q23 earnings conference call.  Meyers and Taylor appeared on behalf of Equinix and once again described AFFO as their "lighthouse metric" and discussed the purported drivers of quarterly results:

[Taylor:] **Global Q2 AFFO was $754 million, above our expectation due to strong business performance and lower net interest expense**. Q2 AFFO included a $1 million FX headwind when compared to our prior guidance rates.

*       *       *

[Meyers:] In this context, we believe Equinix remains uniquely positioned and highly differentiated and will continue to drive disciplined execution of our strategy with a focus on extending our market leadership, driving operating leverage, expanding our platform capabilities to fuel sustained growth and

delivering superior returns on capital, all of which we are confident will translate to distinctive and durable value for our customers, and sustained performance for you, our investors, **with a keen focus on AFFO per share as our lighthouse metric.**

129.    Investors also wanted to know why the recurring CapEx guidance was significantly higher for the current year than it had been for the previous year.  Taylor stated that Defendants purportedly decided how much recurring CapEx they would have in a given reporting period based upon their "capacities":

> [Analyst:] [J]ust to clarify, it was more on the guide for recurring CapEx. I think that stepped up $10 million relative to the prior guide for the year. So I was just wondering if there's anything notable to be aware of there?
>
> [Taylor:] . . . **As it relates -- no, there's a little bit more recurring CapEx. When we have capacity and we look across the portfolio and think what can we do based on the capacities we have.** And so sometimes when we work with Rob Abdel's organization said, we have capacity to put a little bit more recurring CapEx into the year. And so what you could do is pull it forward from 1 year and put it into the year prior. And so that's what you've just seen. **We have -- we felt we had a little bit more capacity to invest in some recurring CapEx this year.** That really takes away that obligation for next year.

130.    Analysts also asked questions regarding how power density requirements impacted the Company's xScale service (which was directed towards large businesses like hyperscalers) where Equinix would have only one or two clients in a data center.  In responding, Meyers stated that Defendants would "dense up" the system, alluding to – but not disclosing – Defendants' practice of overselling power in its data centers with many clients:

> [Analyst:]  You talked about the power density requirements a couple of times. So how are you thinking about that strategically? Are there redesigns or retrofitting you're thinking about doing to your IBXs? And how does that impact the xScale that you've built so far and that you might build from here? I know people like Meta have been reconsidering data center design.
>
> [Meyers:] **Yes. Yes. And we certainly are actively thinking about what our – the evolution of our design and ensuring that it's evolving and keeping pace with the market.** In our retail space, we do have the – what's really nice about the retail business is when you serve a very broad range of customers with differing density requirements, **you're able to sort of dense up and extract more from the system over time.** And we've really, I think, benefited from that. When you in more of the hyperscale or xScale type arena it's a little more challenging. I think you have to just be – because you allocate all that power out typically to a single customer or maybe 2 in a facility, and it's a little bit different.

131.    Analysts also wanted to know how availability of power would impact Equinix's ability to grow.  Meyers responded to this question by saying the Company was "very comfortable"

with their power allocations and that Equinix would not be constrained with respect to quantity of power:

> [Analyst:] [H]ow should we, as investors, think about the P[rice] versus the V[olume] equation as power availability kind of constricts V and how do you think about your ability to ramp the P on the price to kind of monetize that scarcity element of the business that you're in?
>
> *        *        *
>
> [Meyers:] I think in terms of volumes, I think volumes are also going to grow. The question of whether or not power availability would constrain supply is an interesting question. I think that it could in market by market, but I think that -- on our side, we feel very comfortable that our relationships and our visibility to power allocations are going to allow us to continue to execute on the build plan that we have in place.
>
> *        *        *
>
> **So I don't think quantity is going to be . . . materially constrained in our retail business by power availability,** but it is something that I think we, as an industry, need to continue to grapple with.

132.    Taylor also chimed in to answer this question and stated that the Company's growth was contingent on having power available to fuel that growth but assure investors of Defendants' competency in that area:

> [Taylor:] And I just think that's something that we prudently do. We manage ourselves, and it's something that's going to be very important on a look-forward basis as well. And you have to tie that back into the comments Charles made about power. **In the end, you have to have the available power, you have the available cooling and making sure that you have the appropriate kit to roll out the data centers in a fair way that you can deliver the capacity to the need. And again, a lot of work is done on that.**

133.    On August 8, 2023, Equinix appeared at the TD Cowen Communications Infrastructure Summit.  Chip Newcom, Director of Investor Relations, appeared on behalf of the Company.  Newcom rejected the notion that power was a bottleneck from Equinix and emphasized that Equinix's lower power requirements compared to its competitors made it easier for it to secure the power it needed to support its data centers:

> [Analyst:] One of the things that I was most surprised about through my conversation today is when I ask folks, what's the greatest challenge or bottleneck in their business. They all say the same thing, utility power. So as we think about Equinix, how do you position the company to ensure that you have long-term access to power to support the continued growth of that retail business?
>
> *        *        *

[Chip Newcom:]  I think the other big difference too, as you look at our business relative to others, is the velocity with which we sell power is completely different. So taking the example of Northern Virginia, where we've got 2 facilities that were just finished wrapping up on, and we've got the power to be able to continue to operate there through the current challenges that domain means having in terms of transmission.

134.    On October 25, 2023, Equinix held its 3Q23 earnings conference call.  Meyers and Taylor appeared on behalf of Equinix and stated that AFFO exceeded their expectations and explained the purported drivers:

[Taylor:] Global Q3 AFFO was $772 million, above our expectations due to strong business performance and timing of recurring CapEx spend. Q3 AFFO included minimal FX impact when compared to our prior guidance rates.

135.    Meyers also stated that Equinix continued to see high demand due to AI, which was translating into growth:

[Meyers:] ***We continue to see strong demand as customers embrace AI*** and advance their digital transformation agendas with infrastructure that is more distributed, more cloud connected and more ecosystem enabled than ever before. Despite a variety of cross currents in the business, we are translating healthy bookings growth, a favorable pricing environment and increasing power densities into strong increases in cabinet yield. These dynamics, combined with the continued focus on driving operating leverage and expense discipline through the business, are allowing us to deliver compelling value on a per share basis.

136.    On the conference call, analysts sought information about the relationship between power utilization and cabinet utilization.  Meyers stated that the Company's power utilization was purportedly "meaningfully lower" than its cabinet utilization, and presented this as an opportunity for growth when in truth Defendants were overselling power capacity by 150%:

[Analyst:] And just curious if you could share with us how the power utilization of your portfolio compares to the cabinet utilization of your portfolio? And the opportunity based on access to the utility load and thinking about the cost, like how much further can you take the power in the existing portfolio?

[Meyers:] Yes. Great question, Mike. It's unfortunately not a particularly simple matter. But I will give you an answer to your question, which is ***our power utilization is actually meaningfully lower than our cabinet utilization***, *right? **And so that does represent, I think, some opportunity for us if we -- to the extent that we can match space and power and have the appropriate cooling requirements to unlock productive value creation capacity from the platform.***

Again, it's not super straightforward because you have to ensure that you can -- you have the -- draw can be very different facility to facility. . . .  And I think it is something that is working to our advantage in terms of the kind of overall dynamics of the business now, but 1 where we always have to continue to ensure that we are delivering superior reliability to our customers, understand exactly what

their requirements are, can cool that – can cool it properly, deliver the reliability and resiliency they need and sort of manage all those factors simultaneously.

So . . . I think you're properly interpreting an opportunity there that says, okay, well, then if you're churning cabinets out at lower, selling them at higher *and you have some sort of headroom from a power perspective* and you're freeing up space or cabinet capacity, *can you take action to sort of augment power over time in ways that would allow you to create value. I think the answer is yes,* and we'll be hard at work figuring out how to do that best.

137.    On the conference call, Meyers alluded to – but did not disclose – that Equinix oversold power capacity by explaining that data centers that served numerous small clients presented a greater "opportunity," as compared to xScale facilities with one or two clients:

[Meyers:] [W]hen you're talking about a very large number of customers in a facility, that's extremely different. And so we wouldn't have that same view relative to an xScale facility, for example, right? I mean that you design it as a certain power capacity, you sell that to a customer, sometimes an entire building to a customer at that and sort of that is what it is. One or 2 customers sort of it doesn't matter. *But when you're talking about very large numbers of customers with very widely ranging power requirements, it represents both a challenge and an opportunity and 1 that I think, over time, we've developed a set of processes and capabilities to manage quite effectively.*

138.    On October 26, 2023, Barclays issued an analyst report titled "3Q23 Earnings - beat & raise, but with some soft indicators" which concluded that, based on Meyers' representation, Equinix's power usage was less than 80% of available power – when in truth Equinix was overselling power capacity by 150%. Barclays noted the importance of this purportedly available power capacity to the Company's ability to grow in the AI space:

*Spare power available. EQIX had a cabinet utilization rate of 80% in 3Q23, but management indicates the company is consuming less than 80% of available power. This is important as the company seeks growth via additional AI exposure which consumes more power per rack*. With the ability to densify existing racks, EQIX can extract more revenue out of its footprint. The company also remains focused on engineering improvements to lower its PUE, thus allowing a shift in the amount of power used for cooling in favor of what can be monetized via servers.

139.    On October 26, 2023, BNP Paribas issued an analyst report, titled "Q3 steady with FY guidance higher; cabinets billing more noise" which also concluded based on Meyers' remarks that the Company had the power necessary to generate further growth:

In our view, overall power consumption is more relevant than the number of cabinets and based on the commentary on the call we believe that EQIX has scope to raise the power density of the portfolio over time, ultimately leading to higher revenue throughput.

140.    On December 6, 2023, Equinix presented at the Barclays Global Technology Conference.  Simon Miller, Chief Accounting Officer, appeared on behalf of Equinix and was asked about the distinction between recurring and non-recurring CapEx.  Miller admitted that the Company placed significant pressure on its design teams so that the Company could categorize spending as non-recurring CapEx, while continuing to conceal the true extent and nature of Defendants' accounting scheme:

> [Analyst:] Maybe one accounting question. You can walk us through the variety of maintenance CapEx costs that you have, which ones do you consider operating expenses versus recurring CapEx? And I suppose the genesis of the question is that PP&E [Property Plant & Equipment] has grown at about 11% CAGR over the past 6 years, while recurring CapEx is [only up about] 5%. So I suppose there's an element of you have some newer facilities that are probably just operating more efficiently. But maybe there's a consideration that there's some catch up in maintenance CapEx coming up.

> [Miller:] Yes. No, we've got some facilities that are well over 20 years old. This is actually something that's been on our mind for a few years now. ***Generally, when we go in and do a big maintenance project, we put a lot of pressure on our design and construction teams to release capacity. Where we are able to release capacity and live up to this standard of how we define AFFO in our earnings release, if we create capacity for incremental revenue, not just [maintain] revenue, we push that into expansion CapEx***. And that takes the shape of replacing CRAC units so that we can provide more air flow to the white space and therefore distribute more power, so you can take cabs off of engineering (inaudible).

> So I may be [able] . . . after 1 maintenance project, release 300 cabs in data center. Well, that's 300 cabs of incremental revenue. And I'm actually going to get a return on it. ***So we'll put that into expansion.*** Where we don't have that opportunity, it's just traditional recurring CapEx. And we've got a, as you mentioned, we've got some big ones coming up, ***putting a ton of pressure on the team to just rethink how we might engage in replacing some of the bigger parts of that infrastructure***, definitely around air movers, CRAC [computer room air conditioner] units, in some cases power distribution.

141.    According to Miller, Equinix had some "very creative ways" to categorize operating costs as non-recurring CapEx:

> [Miller:] The good news is we've got one of the best design and construction team in the business, and they're coming up with a ***very creative ways*** to not only give us a surety that a critical data center is going to stay up and live and relevant and meet our customers' demands, but actually improve, on the efficiency side, drive down PUE and give us additional capacity to sell, which is for us, that's affinity and what we're always trying to achieve.

142.    Miller elaborated that Equinix labeled certain projects a "refresh" that could be considered "maintenance" but continued to conceal that the Company's CapEx classification

violated both the Company's stated methodology and SEC Rules and Regulations:

> [Miller:] It's a big one. But honestly, I mean, it's a great question because we've been looking at this for a couple of years now. This is not something that – like we've been sort of seeing this coming for a while, started having a couple of just high-level conversations with the team like 3 years ago. But when it came to putting the actual plans on paper and putting execution and a few [arms] around it, it happens, right? If you talk about it enough and really explain to people why it's so important and show the value that you can create and why if you're IBX operator, your project has a higher likelihood of getting approved – but I'm just being – playing – then everybody gets on board with it. We get some amazing solutions out of it.
>
> Stuff – quite honestly, we're putting stuff right now that I just never – I really didn't dream 2 years ago when we were kind of looking at this probably 5-year to 7-year period of, I'd call it – **we call it a refresh, but maintenance is probably a good word for it.**

143.    On February 14, 2024, Equinix held an earnings conference call.  Meyers and Taylor spoke on behalf of the Company, reiterating Equinix's mantra that AFFO was their "lighthouse metric" that again delivered "outsized performance":

> [Meyers:] [W]e continue to realize the benefits of efficiency investments over the past few years and are showing strong operating leverage in the business, allowing us to maintain our differentiated return on invested capital, expand margins **and deliver outsized performance on AFFO per share, which we continue to see as our lighthouse metric and the bedrock of long-term value creation**.
>
> *     *     *
>
> [Taylor:] **Global Q4 AFFO was $691 million, above our expectations due to strong business performance and favorable interest income**, offset in part by higher seasonal recurring CapEx.

144.    In response to an analyst's question regarding whether Equinix would begin reporting new metrics to assist investors in understanding the business, Taylor stated that the Company would not reveal power usage, but gave no substantive reason other than Defendants' "feel":

> [Analyst:] Last quarter, we talked a lot about cabinets, (inaudible) per cab consumption and how that was evolving and the potential to bring a new number to the forefront, which would be something like a cabinet's equivalent billing number. Could you kind of elaborate a little bit on how that looked like in the fourth quarter and where we are in evolving that disclosure.
>
> *     *     *
>
> [Taylor:] Yes, David. So as it relates to some new metrics, we're continuing to review the data sets. The team, we're not clear that exactly what needs to be presented that we can comfortably put out to the market on a consistent basis. . . .

So that's what we're thinking about because we think the cabinet is probably the best representation for you to get a sense of how we're utilizing the asset.

That all said, we still -- I think we have to continue to be quite transparent about the overall density of the cabinets sold so that you can see sort of a trend line. **We spent some energy thinking about power. Power just doesn't feel like the right metric to be sharing** given the nature of our business model relative to others. Again, as you know, we're a retail player and it just -- it's just a different type of metric, and we're not sure that, that is a valuable metric.

145.    Meyers also fielded a question from an analyst regarding how Equinix was restructuring their data centers to accommodate AI from a power and cooling perspective.  In response, Meyers stated that these questions were top of mind.  He admitted that AI was power-hungry but also stated that the Company was "in a good position" to meet this demand:

[Analyst:] [A]long a similar vein for AI inference. The thought is that the model [we need is] proximate to the data, which candidly lives within your facilities. Although I think there's also a question of whether that's CPU-based or GPU-based. As you look to capture demand for inference, how is the standard data center design for you, guys, evolving from both a power density perspective and a cooling architecture standpoint? Any color there would be helpful.

*         *         *

[Meyers:] On the inference side, and I think broadly on the retail side, we are seeing . . . power densities rise but at a much slower rate. And I think that our ability to implement liquid cooling as long as we have access to a chilled water loop, our ability to get liquid cooling into the facility to support high-density implementations is quite high. And in fact, we announced that we can do that in a large number of markets around the world.

*So, I think, we're in a good position. I don't think we face a situation where we're going to have meaningful obsolescence even of our significantly more dated assets*. And so – especially as we can implement liquid cooling inside of those facilities. And so – but I think we're – *those are things we continue to track, and I do think they're going to have to be very top of mind for us*. And probably the overall pace of change in our design is going to increase in this next decade than it was in the one prior for sure.

146.    On the same call, Meyers continued to assure investors that AI was generating "robust demand" in Equinix's xScale initiative and that there was a "meaningful pipeline of opportunities":

[Meyers:] *Shifting to our xScale initiative, the wave of hyperscale demand to support AI and cloud is translating into robust demand in preleasing activity*. . . .

Wins this quarter included supporting strategic Gen AI workloads as well as the hyperscalers first-scale liquid cooling deployment at Equinix. Looking

ahead, we have a meaningful pipeline of opportunities to drive continued xScale momentum in the quarters to come.

147.    Each of the statements set forth above during the Company's conference calls, presentation, and SEC filings concerning: (i) the Company's reported financial results, including AFFO, AFFO/share, and recurring CapEx, and the purported drivers of those results (¶¶115, 117, 118, 121, 128-129, 134, 140-143); (ii) the Company's access to, and sale of, power (¶¶119, 124, 130-133, 137); (iii) the Company's reported cabinet utilization (¶¶116, 136); (iv) the Company's ability to meet AI-driven demand (¶¶135, 145-146); and (v) the repeating statements in the Company's SEC filings as discussed in §XIII.A. above, were materially false and misleading when made because Defendants knew or deliberately disregarded and failed to disclose the following:

(a)    Equinix overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC Rules and Regulations;

(b)    Equinix would not have met or beat annual AFFO guidance but for its improper classifying of CapEx;

(c)    Equinix deliberately oversold its power capacity at its data centers by 150% which presented a current and ongoing risk that Equinix could not deliver contracted for services to its customers (¶¶37-39);

(d)    Equinix's reported financial results, including AFFO and revenue, were achieved by the overselling of power;

(e)    Equinix's ability to utilize its existing cabinets was currently limited by its overselling of power capacity and its usage of power far exceeded its cabinet utilization rate;

(f)    Overselling power capacity limited Equinix's potential for growth – in particular with respect to capitalizing on AI's power-intensive computing needs;

(g)    Equinix lacked adequate disclosure controls and internal controls; and

(h)    that, as a result of (a)-(g) above, Equinix's business, operations, financial results and performance were overstated, and its growth and outlook were less optimistic than the Company represented to investors during the Class Period.

148.    For each fiscal year from 2019 to 2023, the Company reported meeting or beating its annual AFFO guidance provided to investors at the outset of each fiscal year (typically during February, and at times raised during the course of the year).  But for Defendants' deliberate scheme to mischaracterize recurring CapEx as non-recurring CapEx, Equinix would not have achieved their AFFO guidance in each year from 2019 to 2023:

| Adjusted AFFO Results | | | | | |
|---|---|---|---|---|---|
| (amounts in millions) | 2019 | 2020 | 2021 | 2022 | 2023 |
| Reported AFFO | $1,931.1 | $2,189.1 | $2,451.2 | $2,713.8 | $3,018.5 |
| Actual AFFO without Inflated CapEx | $1,839.0 | $2,049.9 | $2,318.5 | $2,539.6 | $2,827.4 |
| AFFO $ Overstatement | $92.1 | $139.2 | $132.7 | $174.2 | $191.1 |
| AFFO Guidance | $1,913.0 | $2,157.0 | $2,444.0 | $2,676.0 | $2,996.0 |
| AFFO Guidance without Inflated Capex | $1.820.9 | $2,017.7 | $2,311.3 | $2,501.7 | $2,804.8 |
| Guidance Miss | 4.8% | 6.5% | 5.4% | 6.5% | 6.4% |
| **Meet or Beat?** | **No** | **No** | **No** | **No** | **No** |

### G.    Meyers Abruptly Announces Resignation of CEO Position; Chairman of the Board Also Announces Departure

149.    On March 12, 2024, just one week after Equinix's stock hit a Class Period high closing price of $913.66, and just eight days before Hindenburg Research issued a negative report based on interviews with multiple former Equinix executives, the Company made the unanticipated announcement that CEO Charles Meyers would be stepping down.  In the same release, Equinix announced that Chairman Peter Van Camp would be leaving his position on the board:

> On March 7, 2024, as part of a planned succession process, the Board of Directors (the "Board") of Equinix, Inc. (the "Company") approved the appointment of Adaire Fox-Martin, a current member of the Board, as its new President and Chief Executive Officer. The appointment will be effective on a mutually agreed date that is expected to be later in our second fiscal quarter, but no later than June 17, 2024 (the applicable start date, the "Transition Date").

> *      *      *

> As part of this succession process, effective on the Transition Date, Peter Van Camp, the Company's current Executive Chairman, will resign from that position and from his service as a Board member.

150.    On March 12, 2024, BMO Capital Markets issued an analyst report titled "Surprise CEO Change; Expecting Smooth Transition" which noted that Meyers' announcement was unanticipated:

> We are somewhat surprised by the announcement, but given Ms. Fox-Martin's industry background and familiarity with EQIX, we expect a smooth transition. We do not expect any near-term strategic changes and continue to expect EQIX to deliver HSD LT AFFO/share growth.

151.    On March 13, 2024, Wells Fargo issued an analyst report titled "EQIX: A Surprising Change to the EQIX C-Suite" which confirmed the unexpected nature of the announcement:

> While we were surprised to see EQIX CEO Charles Meyers stepping away after 5+ years at the helm, it doesn't appear to signal any shift in corporate strategy or focus given incoming CEO Adaire Fox-Martin's familiarity with the company.

152.    On this news, Equinix stock price declined from $892.81 on March 12, 2024, to $867.23 on March 13, 2024, a decline of $25.58 or 2.87% on increased volume.

## IX.    The Truth is Revealed: The Hindenburg Report Discloses Accounting Manipulations and Overselling of Power; Analysts Corroborate

153.    On March 20, 2024, Hindenburg Research published a report titled "Equinix Exposed: Major Accounting Manipulation, Core Business Decay And Selling An AI Pipe Dream As Insiders Cashed Out Hundreds of Millions."[8]  The Hindenburg Report stated that it was based upon an investigation that "involved interviewing 37 former Equinix employees, industry experts and competitors, along with reviewing financial statements and litigation records."

154.    The Hindenburg Report stated that Equinix was facing significant competitive pressure particularly from hyperscalers (*e.g.*, Amazon, Google and Microsoft) and Equinix's effort to offer solutions to these hyperscalers – or compete with them – was failing.   While the Company's financials indicated significant spending on growth, that growth had failed to materialize, and the Company appeared to be in a slowdown.  The Hindenburg Report determined that the Company's financial results were the product of deliberate accounting manipulations as

---

[8]    Hindenburg describes itself as: "Founded by Nate Anderson, Hindenburg Research specializes in forensic financial research.  While we use fundamental analysis to aid our investment decision-making, we believe the most impactful research results from uncovering hard-to-find information from atypical sources.  In particular we often look for situations where companies may have any combination of: Accounting irregularities [;] Bad actors in management or key service provider roles [;] Undisclosed related-party transactions [;] Illegal/unethical business or financial reporting practices [;]  Undisclosed regulatory, product, or financial issues."  Hindenburg held a short position in Equinix at the time of publication of its report.

well as the undisclosed practice of over-selling its power capacity.

155.    The Hindenburg Report stated that Equinix manipulates AFFO by improperly categorizing maintenance costs as spending on growth.  According to the Hindenburg Report, this accounting manipulation resulted in overstating AFFO by an estimated 19% in 2015 and by at least 22% in 2023.  The Hindenburg Report concluded:

> We estimate that Equinix's manipulation of maintenance CapEx has resulted in a cumulative $3 billion boost to reported AFFO since 2015.

156.    The Hindenburg Report attributed the manipulation of CapEx to pressure from "top management" seeking to overstate AFFO.[9]    According to the Hindenburg Report, former employees described the practice as "driven by management's obsession with boosting AFFO":

> This "pressure" to push items into growth CapEx appears to permeate the organization, from management to operational teams. A former executive we interviewed explained that accounting teams headed by the Chief Accounting Officer were pressured by management to classify as much CapEx as expansion (growth CapEx) as possible:
>
> "But he's definitely like all accounting people get pressure from management to push as much of CapEx into expansion."
>
> The tone from the top also became evident when speaking with numerous former employees. ***Even as they detailed accounting games that outsiders would likely view as flagrant manipulation,*** many described these examples as though they were nothing more than a creative and dutiful execution of their responsibilities placed on them by management to boost reported AFFO by almost any means necessary.

157.    The Hindenburg Report detailed instances of improper accounting related to chillers used to cool the Company's data centers in which maintenance CapEx was improperly characterized as growth CapEx.  Classifying the refurbishment of chillers as non-recurring CapEx was directly contrary to the Company's CapEx methodology it previously reported to investors, as

---

[9]    The Hindenburg Report also reported that Equinix's accounting violated GAAP by improperly categorizing spending on operating expenses as an expense to be capitalized, thus artificially inflating revenue.  According to the Hindenburg Report, the Company's margins were driven by inflating revenue through the capitalizing of OpEx.  In other words, instead of recognizing expenses as reductions to revenue in the year they occurred, they were improperly deemed as capitalized expenses and spread over multiple years, thus boosting current year revenues and margins.  "Former employees described ***pressure*** from different teams within Equinix to push operating expenses into CapEx.  A data center manager told us the accounting team viewed OpEx as 'dirty spend.'"

well as SEC Rules and Regulations:

> A former Equinix director we interviewed detailed specific situations in which maintenance CapEx was shifted to growth CapEx.

> For instance, when fixing a chiller, a key piece of data center equipment that helps regulate temperature, they described how the company would obtain new serial numbers for refurbished chillers so it could then be accounted for as a 'new' item post-repair, and sometimes recognized as growth CapEx:

> "Chillers stay in place. You don't replace chillers. All you do is rebuild them. There's been some debate on this. What happens and what you work towards is you do a chiller overhaul. And you'd work with your chiller vendor to give you a new serial number on the unit."

> "A new serial number with the unit, for all intents and purposes, looks, talks, walks like a brand new installation."

158. The Hindenburg Report, based on the accounts of multiple former employees, stated that Equinix improperly characterized battery replacements as growth CapEx instead of maintenance CapEx. Batteries which provide an uninterruptable supply of backup power are one of the largest data center maintenance costs, but Equinix labeled their replacement as growth spending. Classifying the replacement of batteries as non-recurring CapEx was explicitly contrary to the Company's CapEx methodology it previously reported to investors, as well as SEC Rules and Regulations:

> Multiple former executives confirmed this was one of the biggest costs, with one saying:

> "One of the biggest ones [maintenance costs], obviously, is the batteries. You've got millions of dollars of batteries sitting there."

> Another added:

> "This is the largest expense in a data center. Battery replacement. That sucks. That is just money leaving your pocket… It sat there, hopefully did nothing for its lifetime, just sat there getting charged. You never had to use them and then you just replace them."

> The former operations director told us that Equinix would classify otherwise routine battery replacements as growth CapEx by characterizing this activity as replacing a "battery system".

> "So replacing a battery system is a capital improvement. Non-recurring… As long as it's part of that, as long as you replace the entire battery system… All you do is replace the batteries within the cabinets. And that's considered the system."

As a result, one of Equinix's largest data center costs, an obviously recurring cost across its data centers, appears to be showing up in growth CapEx.

159.    The Report also found that Equinix classified the replacement of lightbulbs at its data centers as non-recurring CapEx. This was contrary to the Company's CapEx methodology it previously reported to investors, as well as SEC Rules and Regulations:

A former senior Equinix operations manager described changing lightbulbs as a routine, daily operation:

"You would be surprised how quick these light bulbs blow on this. Thousands of them. Right. So part of the daily inspections is to look at areas where the light bulbs are blown."

Even here, the company found 'creative' ways to book things like basic lightbulb replacements as growth CapEx. A former operations director explained:

"Say you changed out fluorescents to LED light bulbs, that's a capital improvement. You're not replacing lightbulbs, you're enhancing."

By qualifying light bulb changes as "enhancements" that improve overall facility efficiency, the routine spend becomes growth CapEx. They explained:

"Say you have a facility. You needed to change light bulbs…Or you had to change all the ballasts in your light fixtures because they were just at age. Which is costly. You need an electrician to come in to take it down. You need to unwire it and rewire it. Now, if you were to go back in and now convert those florescent bulbs or systems with the ballast and the bulbs to an LED light, now you're performing an 'energy efficiency project'."

Hindenburg Researcher: "And that can be a non-recurring capital expenditure?"

Former Employee: "Correct. Absolutely."

A former Equinix finance director at first expressed surprise that we knew about the practice before acknowledging:

"This is one of the tricks that the operations teams use to say, well, this is not ongoing. This is non-recurring CapEx."

160.    The Hindenburg Report stated that Equinix had been overselling the power capacity of its data centers by as much as 175%, thereby increasing the Company's revenues but placing increased stress on the Company's infrastructure and placing it at heightened risk that it would be unable to fulfill the services it contracted to provide to its customers. This was described by a former executive as the Company's "dirty little secret." According to the Hindenburg Report:

Multiple former employees explained that the nature of Equinix's business model involves overselling and sometimes even double selling power to its customers. One former executive told us:

". . . we, Equinix, oversell capacity, as the dirty secret of the data center world. . ."

\*        \*        \*

In brief, Equinix doesn't have enough power at some of its facilities to satisfy its current customer contracts, according to former employees. To date, this lurking risk hasn't severely hampered the company's financials because customers have used less power than they are contracted for overall.

\*        \*        \*

Despite the lack of disclosure around Equinix's practice of "overselling" power in data centers, a former Equinix executive in Europe explained this was prevalent:

"Overselling is a big thing in the data centers… depending on the customer mix that they [Equinix] have there, they can sell 120%."

Another former executive told us that power overselling could be as high as 175%:

"Most Equinix data centers are what they call over-utilized anywhere from 120 to 175% of power."

They added:

"They're double selling the power as well. The whole thing is like a little bit of a shell game."

161.    According to the Hindenburg Report, overselling power created the risk that Equinix could not meet its contractual obligations to customers and presented a potential reputational risk for the Company:

Hindenburg Researcher: "The risk is basically outage. Is that right?"

Former Executive: "Yeah, Yeah… And it would be a very significant reputational challenge to mend I think in order to explain why suddenly you sold capacity you didn't have."

162.    The Hindenburg Report also stated that the overselling of power left Equinix unable to capitalize on the power-intensive AI boom (which it reported was projected to double power demands at data centers within two years) because Equinix's facilities lacked sufficient power and cooling, and could not be easily retrofitted:

A former Equinix executive told us this could be a "big problem", believing it would require rolling back contracts to address the new wave of power requirements:

"That's a big problem because every single site in the estate is oversold by 25% and there's no easy way of fixing that. You can't just inject capital to fix it. So I think that again, one of the challenges that they're going to struggle with is how they now reel back some of those contracts to be able to support the capacity they actually have."

A former Equinix Sales Director was doubtful that Equinix could meaningfully upgrade power in its old facilities:

"I think Equinix is going to have a very, very hard time retrofitting the data centers to get that kind of output in their existing sites."

"I would say many of the sites that were built prior to 2019, probably, will be very hard to retrofit for liquid cooling or for any kind [of upgraded cooling]…"

163.    On March 20, 2024, HSBC Global Research published an analyst report outlining the Hindenburg Report and downgrading Equinix to "Hold" and stating that a response from the Company would be required, particularly regarding the overselling of power:

**Key accusations:** Equinix is accused of accounting manipulation to boost its AFFO metric and improve management remuneration, according to a report by Hindenburg, a US investment research firm focused on activist short-selling. The major points of contention from Hindenburg are as follows: 1) Maintenance capex is being categorized as growth capex, boosting AFFO (adjusted funds from operations), according to Hindenburg; this has been one of the main points of debate in the industry as companies have some discretion in how to categorize maintenance and growth capex . . .  2) Management reportedly benefits as its compensation is partly linked to AFFO, according to Hindenburg. 3) Equinix is accused of accounting opex as capex to enhance profitability numbers. 4) Hindenburg says Equinix has been selling more power than the existing capacity (measured in power) in the hope that customers would not use their entire capacity; this, if true, could pose reputational and operational risk. And 5) the company's business model is under threat from cloud operators.

**Awaiting company response:** As of the publication of this report, we are still awaiting a response from Equinix. The debate on growth vs. maintenance capex will likely continue for the foreseeable future as companies have some discretion on the this. ***The accusation that Equinix is selling more power than its available capacity to customers could imply significant operational and reputational risks.*** . . . The onus now appears to be on Equinix to address the accounting manipulation accusations. . . .

164.    On March 20, 2024, Wells Fargo published a "Flash Comment" titled "EQIX: Short Report Driving Stock Weakness" addressing the Hindenburg Report.  Although the report sought to downplay the reporting on manipulation of maintenance costs as an industry practice, it acknowledged that Equinix takes "liberties" with its AFFO accounting:

Equinix Manipulates Its Accounting For AFFO, Its "Key Profitability Metric." The report claims EQIX has financially engineered capex, reducing the mix of reported maintenance capex to inflate reported AFFO. . . . Ultimately, there is some management discretion around classifying capex – and whether it's revenue-generating or solely recurring.

\*    \*    \*

Stock Reaction. While we acknowledge EQIX (and other REITs) take some liberties with AFFO add-backs, these historical short attacks have only been temporary road-blocks.

165.    On March 21, 2024, BMO Capital Markets issued an analyst report titled "Addressing the Short Report" which noted that the Hindenburg's reporting on overselling power was a risk factor that the market "lacked visibility" into:

Earlier today, a research firm published a short report on EQIX, . . . ***We view the claim of overselling power as most concerning and where we lack visibility.*** While not surprised by the initial stock reaction, we remain constructive on EQIX's LT opportunity to deliver HSD AFFO/share growth.

\*    \*    \*

**Recurring capex classification.** The firm partly attributes EQIX's AFFO growth to financial engineering that minimizes maintenance capex with the key risk to EQIX on valuation (i.e., more expensive). While somewhat of a gray area, EQIX's definition of revenue enhancing includes capex that creates incremental capacity, which helps explain the growth delta between revenue (2015-2024 CAGR of +14.2%) and recurring capex (+7.2% CAGR). If recurring capex had grown at the same pace, we estimate 2024 AFFO/share would be 5% lower. . . .

**Overselling power.** The report alleges that EQIX is overselling power capacity that had been committed to other customers, ***a potential risk factor where we lack visibility***. For reference, EQIX's customers typically pay for power capacity, but don't fully utilize their allocation. While we look for EQIX to address, there has been a trend towards higher power densities that obfuscates its 79% cabinet utilization, but is helping drive MRR/cabinet growth and EQIX also previously described its power utilization as "meaningfully lower" than cabinet utilization.

166.    On March 21, 2024, TD Cowen published an analyst report titled "Same Short Thesis, Different Author: View Weakness as Buying Opp." which – based on conversations with the Company – confirmed the accuracy of the reporting on overselling power:

This morning, a short thesis was published on EQIX. . . . ***The comments on overselling power capacity are incremental***, but is a broader industry practice, more common with enterprise/retail DC operators. . . .

\*    \*    \*

**Overselling Power Capacity: The "Dirty Little Secret" Of The Data Center**

Industry

The overselling of power is a "dirty little secret" for the data center industry as we have learned in our time following the sector. Through our conversations with data center industry executives on the heels of the short report, we have learned that this is a common practice among (1) network-dense interconnection data centers (similar to those operated by Equinix), and (2) large multi-tenant retail data centers with a large and diverse customer base. In the case of network-dense data centers, operators we have spoken to have suggested that it is common to oversell capacity to the tune of 25-40% of the maximum capacity of a data center. ***Furthermore, our conversation with Equinix led us to believe there is likely a degree of this which occurs in its data centers.*** In addition, if a large retail data center has a large number of customers with small deployments (i.e., +200 unique customers), operators may elect to oversell capacity with the view that the data center is sufficiently diversified from a customer perspective such that the likelihood that its customers look to use all of the contracted power in the facility all at the same time is sufficiently low.

167.    Following the publication of the Hindenburg Report, and the analyst downgrades which followed, the price of Equinix stock declined from a close of $844.58 on March 19, 2024, to a close of $824.88 on March 20, 2024, on significantly increased volume of over 2.37 million shares traded.  On March 21, 2024 and March 22, 2024, the stock price declined further to $811.64 and $800.97, respectively, on elevated volume.

**A.    Equinix Reveals Audit Committee Investigation and DOJ Subpoena; Revises Accounting Methodology for Non-Recurring CapEx**

168.    On March 25, 2024, Equinix made its first public comments in response to the Hindenburg Report, issuing a press release announcing that the Company's Audit Committee would commence an independent investigation into the findings of the Hindenburg Report and that the Company had received a subpoena from the U.S. Attorney's office for the Northern District of California:

Equinix, Inc. (Nasdaq: EQIX), the world's digital infrastructure company, today filed an 8-K and announced that the Audit Committee of the company's Board of Directors has commenced an independent investigation to review the matters referenced in a recent short seller report. Shortly after the release of the report, the company received a subpoena from the U.S. Attorney's Office for the Northern District of California.

169.    On March 25, 2024, Wells Fargo published an analyst report titled "EQIX: The Hindenburg Accounting Saga Drags On" which addressed the receipt of the subpoena from the DOJ and that Equinix's failure to respond to the Hindenburg Report was pressuring the stock – noting the overselling of power issue:

*Independent Investigation + Subpoena, Oh My*. An 8-K released this morning stated that EQIX's Audit Committee has initiated an independent investigation to review the allegations brought up in Hindenburg's recent short report. Separately, EQIX received a subpoena from the U.S. Attorney's Office for the Northern District of California, which EQIX stated "is not unusual in these circumstances." It does not appear as if we will hear a formal response from EQIX for some unknown period of time.

**Lack of Formal Response Maintains Overhang in Stock**. While many investors we've spoken with have viewed this as a buying opportunity, the lack of clarity on timing as to when these issues might be addressed – and no meaningful response from management – leaves the stock in a period of uncertainty. An independent investigation could take a good deal of time given the size and geographic breadth of EQIX's operations.

Investors seem less concerned about the classifications of growth vs. maintenance capex, an issue that has been debated for many years, and more interested in allegations of aggressive capitalization of certain expenses and the alleged *"over-selling" of power capacity that fits within the narrative around EQIX's recent struggles to grow billable cabinets.* EQIX's management generally gets the benefit of the doubt from investors, but the quotes from former executives did raise some eyebrows.

170.    In response to this new information, the price of Equinix stock declined from $800.97 on March 22, 2024, to $792.52 on March 25, 2024 (the next trading day), a decline of $8.45 on elevated volume.

171.    On May 8, 2024, the Company issued a press release announcing its 1Q24 financial results.  While the Company claimed that its Audit Committee investigation found no accounting errors, it also revealed that on April 30, 2024, Equinix received a subpoena from the SEC.

172.    On May 9, 2024, Equinix held its 1Q24 earnings conference call.  The Company announced that it was changing its methodology for classifying capital expenditures by adding a new category of non-recurring CapEx called "Redevelopment CapEx" which would apply to refurbishing older data centers.  This change acknowledged that the Company was treating replacement and refurbishment of infrastructure that had reached the end of its life as non-recurring CapEx in violation of its policies in effect during the Class Period, as well as SEC Rules and Regulations:

Now, we're also entering a stage in our asset lifecycle where we're evaluating select opportunities to invest in highly valued IBXs that have been operating for 20 years or longer. *Starting this quarter, we added a new category of non-recurring capex spend to our disclosures, referred to as redevelopment capex, to track these investments to enhance the capacity, efficiency and operating standards of facilities in this category, and to attract capital*

*investments that are intended to meaningfully extend the economic life of assets.* Our first redevelopment project is DC2, one of our original IBXs that opened in the early 2000s, and home to our networking ecosystem in northern Virginia. Total estimated spend on this DC2 project will approximate $76 million broken into two primary categories of capex investment, redevelopment and recurring. We expect the $56 million redevelopment portion of the investment to yield meaningful additional space and power capacity, and, given the favorable pricing environment and high customer demand for the DC2 asset, we anticipate that this capacity will generate additional revenues and cash flow that should result in an IR well above our current stabilized asset yields. The remaining portion of the investment, which relates to maintaining our existing revenues, such as roof replacement, will be categorized as typical as recurring capex.

173.    On May 9, 2024, Barclays issued an analyst report after market close titled "Three takeaways from 1Q24 earnings call" which stated that the new "redevelopment" CapEx categorization appeared to characterize recurring CapEx as non-recurring:

> **Introduction of "IBX redevelopment" capex.** The new sub-component of non-recurring capital expenditures adds granularity, but will do little to appease investors who have been critical of capex reporting. Per the company's definition, IBX redevelopment includes "capital spending in select IBXs to enhance the revenue capacity, efficiency and/or operating standards of IBXs data centers <u>that are near the end of their useful life</u>" (emphasis ours). ***If components are at the end of their useful life, spending on replacement components would be best characterized as recurring, in our view. This spending would be essential to support current revenues, which EQIX uses in its definition of recurring capex.*** It could be argued that this is a moot point, as recurring/non-recurring numbers are non-GAAP, and EQIX just passed its internal audit addressing this issue. Still, with the ongoing DOJ and SEC inquiries, this matter is not fully settled.

174.    On May 10, 2024, TD Cowen issued an analyst report noting that Equinix continued to refuse to provide metrics that would allow investors to understand power use by Equinix customers:

> [Management] offered additional color around billable cabinet net adds, pointing to the impact of higher densities on reported cabinet net adds, as it noted that the cabinets churned in the quarter were at an average density of 4.4kW/cabinet, while cabinets booked were at a density of 5.8kW/cabinet, driving a headwind of 1.5K cabs. That said, ***mgmt. noted that it does not plan to provide a new metric to adjust for higher cabinet densities, which we believe is a function of its hesitancy to give a metric that would allow investors to back into the kW booked/in its installed base.***

175.    Following the publication of the Barclays analyst report after the market close on May 9, 2024, and the TD Cowen report on May 10, 2024, Equinix stock price declined from a close of 772.43 on May 9, 2024, to 757.68 on May 10, 2024, a decline of $14.75 on elevated volume.

176.    As a result of Defendants' wrongful acts and omissions, and the subsequent declines in the market value of the Company's stock, Plaintiff and other Class members suffered losses and damages.

## X.    VIOLATIONS OF SEC RULES AND REGULATIONS

177.    As alleged herein, Defendants engaged in a scheme to inflate AFFO – the company's "lighthouse" financial metric. Beginning with FY14, Equinix revised its methodology to calculate AFFO and continued to use that method through the Class Period.  As part of its conversion to a REIT, Equinix began recording and reclassifying recurring capital maintenance expenditures as non-recurring capital expenditures.  Recurring capital expenditures reduce AFFO while non-recurring capital expenditures are excluded from AFFO.  Thus, every dollar of capital expense that Equinix classified as a non-recurring capital expenditure, as opposed to a recurring one, increased reported AFFO by the same amount.

178.    The SEC has promulgated rules and guidance for public companies that report and disclose non-GAAP financial metrics.  Regulation S-K 10(e) and Regulation G state that non-GAAP financial measures cannot be untrue or misleading when read in context of the information provided by the company:

> A registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure and any other accompanying discussion of that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

179.    Under Regulation S-K 10(e) and Regulation G misclassifying recurring operating expenses as nonrecurring expenses can result in the presentation of misleading non-GAAP measurements:

> Certain adjustments may violate Rule 100(b) of Regulation G because they cause the presentation of the non-GAAP measure to be misleading. Whether or not an adjustment results in a misleading non-GAAP measure depends on a company's individual facts and circumstances.
>
> ***Presenting a non-GAAP performance measure that excludes normal, recurring, cash operating expenses necessary to operate a registrant's business is one example of a measure that could be misleading***.

180.    In determining whether an expense is deemed recurring or non-recurring, the SEC staff considers operating expenses that occur repeatedly – even if occasional or irregular – as recurring expenses:

> When evaluating what is a normal, operating expense, the staff considers the nature and effect of the non-GAAP adjustment and how it relates to the company's operations, revenue generating activities, business strategy, industry and regulatory environment.
>
> ***The staff would view an operating expense that occurs repeatedly or occasionally, including at irregular intervals, as recurring.***"[10]

181.    Regulation S-K 10(e) and Regulation G explicitly prohibit eliminating recurring items when the charge is reasonably likely to recur within two years or there was a similar charge in the prior two years:

> **Prohibitions**: Adjusting a non-GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent, or unusual, when (1) the nature of the charge or gain is reasonably likely to recur within 2 years or (2) there was a similar charge or gain within the prior 2 years.[11]

182.    Prior to its REIT conversion in 2014, Equinix utilized an objective definition for classifying capital expenses: Cost to build or expand new data centers were recorded as "expansion capital expenditures" and was considered a non-recurring capital expenditure.  All other capital costs were recorded as "ongoing capital expenditures" and would be considered a recurring capital expenditure that reduced AFFO.

---

[10]    Non-GAAP Financial Measures Compliance & Disclosure Interpretations ("C&DIs") December 13, 2022.

[11]    8130 General Applicability and Requirements of Regulation G and S-K 10(e).

183.    Defendants changed their methodology for calculating AFFO in 2015 when they converted to a REIT.    Under the new methodology, Equinix reclassified certain capital expenditures as non-recurring but represented that maintenance (*i.e.*, recurring) expenses would remain around 5% of revenues.[12]    Defendants, however, concealed from investors that the Company was recording material amounts of recurring expenses as non-recurring expenses under the guise of the new methodology.    For example, Equinix stated that: "End-of-life equipment replacement (*i.e.*, chillers, strings of batteries, sprinkler system, etc.)" would remain as recurring/maintenance.    However, as plead herein, those recurring (maintenance) expenses were, in fact, being recorded and classified as non-recurring (growth) expenditures.    In fact, after the Hindenburg report was published in March 2024, Equinix disclosed, for the first time, that it was recording end of life, redevelopment type expenditures as non-recurring.

184.    The following table chart shows the material reduction in recurring CapEx at the time Equinix converted to a REIT at the end of 2014 and its continued decline throughout the class period:



---

12    Equinix Q2 2014 Earnings Presentation, dated July 30, 2014.

185.    Since 2014 and throughout the Class Period, Defendants have been improperly recording and misclassifying recurring capital expenditures as non-recurring capital expenditures in order to materially inflate reported AFFO.  As a result, Defendants caused Equinix to report false and misleading information in its financial statements and accompanying disclosures filed with the SEC on Forms 10-K, 10-Q, 8-K and DEF 14A and made false and misleading statements during earnings calls and presentations regarding AFFO and AFFO/share in violation of SEC Regulation S-K 10(e) and Regulation G.

186.    Recording and classifying nonrecurring CapEx for refurbishing or replacing items like chillers, batteries, and lightbulbs when they reached their end-of-life was in direct violation of SEC Regulation S-K 10(e) and Regulation G because those costs were certainly of "the nature [that was] reasonably likely to recur within 2 years or . . . a similar charge [had occurred] within the prior 2 years."[13]  Further, the SEC views "an operating expense that occurs repeatedly or occasionally, including at irregular intervals, as recurring."[14]

187.    As explained above, this was also directly contrary to Equinix's description in their Q2 2014 earnings presentation that: "End-of-life equipment replacement (*i.e.*, chillers, strings of batteries, sprinkler system, etc.)" would be classified as recurring/maintenance CapEx.  Plainly, the improper recording and misclassification of capital expenditures was an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

---

[13]    8130 General Applicability and Requirements of Regulation G and S-K 10(e).

[14]    Question 100.01 of Non-GAAP Financial Measures Compliance & Disclosure Interpretations ("C&DIs") December 13, 2022.

188.    The improper classification and recording of recurring/maintenance CapEx as nonrecurring/growth CapEx allowed the Company to materially inflate its reported AFFO and AFFO/share and hit their annual guidance provided to investors.  Upon its conversion to a REIT, Equinix changed its classification method for recurring and non-recurring CapEx, which resulted in an expected recurring CapEx rate of 5% of revenue.  However, due to Defendants' accounting manipulation, Equinix repeatedly reported a recurring CapEx below this threshold.  Without this accounting manipulation to lower recurring CapEx below 5%, Equinix would have reported higher recurring CapEx – and thus materially lower AFFO – and would not have been able to meet or beat its annual AFFO guidance numbers during the Class Period as depicted in the table and charts below.

| (amount in thousands) | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Reported Revenue | $5,562,140 | $5,998,545 | $6,635,537 | $7,263,105 | $8,188,136 |
| Reported recurring CapEx | $186,022 | $160,637 | $199,089 | $188,885 | $218,287 |
| Actual recurring CapEx | $278,107 | $299,927 | $331,777 | $363,155 | $409,407 |
| Overstatement of recurring CapEx | $92,085 | $139,290 | $132,688 | $174,270 | $191,120 |
| Reported AFFO | $1,931,122 | $2,189,145 | $2,451,229 | $2,713,878 | $3,018,518 |
| Actual AFFO | $1,839,037 | $2,049,855 | $2,318,541 | $2,539,608 | $2,827,398 |
| **Overstatement of AFFO** | **$92,085** | **$139,290** | **$132,688** | **$174,270** | **$191,120** |
| % Overstatement | 5% | 6% | 5% | 6% | 6% |

## XI.    DEFENDANTS CERTIFY THEIR FINANCIAL REPORTING, INTERNAL CONTROLS AND DISCLOSURE CONTROLS

189.    Attached to the Company's quarterly annual SEC filings on Forms 10-Q and 10-K were certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") signed by Meyers and Taylor.  These certifications falsely affirmed that the financial statements were in compliance with GAAP, that the financial statements fairly presented the financial condition of the Company, that each had designed the Company's controls over financial reporting, and that such controls were effective during the Class Period.  Equinix's 1Q19 Form 10-Q contained the following certifications, executed by Meyers and Taylor.[15]  Among other things, the certifications stated that:

---

[15]    Substantially similar certifications appeared in the Company's Forms 10-Q for 2Q19, 3Q19, 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, 3Q23, and Forms 10-K for FY19, FY20, FY21, FY22 and FY23.

**CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, [Charles Meyers/Keith D. Taylor], certify that:

1. I have reviewed this quarterly report on Form 10-Q of Equinix, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ [Charles Meyers/Keith D. Taylor]

[Charles Meyers/Keith D. Taylor]

[Chief Executive Officer and President/Chief Financial Officer]

Dated: May 3, 2019

\*       \*       \*

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Equinix, Inc. (the "Company") on Form 10-Q for the period ending March 31, 2019, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, [Charles Meyers, Chief Executive Officer and President/Keith D. Taylor, Chief Financial Officer] of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ [Charles Meyers/Keith D. Taylor]

[Charles Meyers/Keith D. Taylor]

[Chief Executive Officer and President/Chief Financial Officer]

May 3, 2019

190.    Each of the Company's quarterly SEC filings included evaluations of the adequacy of the Company's internal controls and disclosure controls.  For example, the Company's 1Q19 Form 10-Q, filed on May 3, 2019, contained the Individual Defendants' representation that they had evaluated and found effective the Company's disclosure controls:[16]

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures"

---

[16]  Substantially similar statements appeared in the Company's Forms 10-Q for 2Q19, 3Q19, 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, and 3Q23.

as of the end of the period covered by this quarterly report. Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report.

191.    Each of the Company's annual SEC filings contained similar representations.  For example, the Company's FY19 Form 10-K, filed on February 21, 2020, contained the following statement about the Company's internal controls:[17]

> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act").  Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2019.

192.    The Company's quarterly and annual SEC filings also contained the Individual Defendants' representation concerning the effectiveness of the Company's internal controls.  For example, the Company's 1Q19 Form 10-Q, filed on May 3, 2019, stated that Meyers and Taylor evaluated the Company's internal controls and disclosure controls and found them to be effective:[18]

> Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level.  However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting will prevent all errors and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls. The design of any system of controls also is based in part upon certain assumptions about the likelihood of

---

[17]   A substantially identical statement appeared in the Company's Forms 10-K for FY20, FY21, FY22 and FY23.

[18]   Substantially similar statements appeared in the Company's Forms 10-Q for 2Q19, 3Q19, 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, and 3Q23; and Forms 10-K for FY20, FY21, FY22 and FY23.

future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected.

193.   The Company's annual filings on Form 10-K further provided the following representation concerning "Management's Report on Internal Control Over Financial Reporting":[19]

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

Based on our evaluation under the framework in Internal Control – Integrated Framework (2013), our management concluded that our internal control over financial reporting was effective as of December 31, 2019.

194.   Each of these certifications was false and misleading as Defendants knew or deliberately disregarded and failed to disclose the scheme and material misrepresentations set forth herein. As a result, Equinix's internal controls were not effective or were circumvented by Defendants. Equinix concealed and failed to disclose the true nature of its revenue, and its attendant risks, when it was concealing that it was overselling material amounts of power by 150% at its data centers. The Company's disclosure controls were not effective or were circumvented by Defendants because the Company failed to properly account for and classify capital expenditures in violation of SEC Regulation S-X 10(e) and Regulation G.

---

[19]   A substantially identical statement appeared in the Company's Forms 10-K for FY20, FY21, FY22 and FY23.

## XII.    DEFENDANTS' INCENTIVE COMPENSATION

195.    During each year of the class period, the Compensation Committee[20] put in place executive compensation plans that required the Company to hit certain revenue and AFFO/share targets for Meyers and Taylor to receive their bonuses – and in the event Equinix failed to get within 5% of these targets Meyers and Taylor could lose their entire potential bonus.  These bonuses dwarfed the Individual Defendants' annual salary.  Over the course of the class period, Meyers received more than $106 million in bonuses, which was twenty times his salary, and Taylor received more than $42 million in bonuses, which was twelve times his salary.

196.    The individual defendants received multiple forms of bonuses each year:  Annual incentive compensation, which was based 50% on meeting an AFFO/share target and 50% on a revenue target.  Defendants also received long-term compensation which had three components: (i) an award based on AFFO/share and revenue (40%); (ii) an award based on three year TSR (20%); and (iii) a time based award (40%).  Thus, half of the annual bonus and 20% of the long-term compensation was directly at risk if the Company did not meet its AFFO/share target.

197.    For each completed year during the Class Period (FY19-FY23), the Company's DEF 14A Proxy falsely reported that the Company met or exceeded the AFFO/share target necessary for the Individual Defendants to receive 100% or more of their various bonuses.[21]  In four out the five years, but for Defendants' fraudulent scheme, they would not have achieved the necessary AFFO/share to support their bonus payments:

---

[20]    Also called the Talent, Culture and Compensation Committee.

[21]    For FY23, the Individual Defendants were awarded more than 100% of their annual incentive compensation but less than 100% of their long term incentive compensation because, despite meeting the AFFO/share target, they missed on other targets.  They still received more than 84% of total potential long term compensation and more compensation than the prior year.

| Adjusted AFFO/Share Results | | | | | |
|---|---|---|---|---|---|
| (shown AFFO/share) | Target | Reported Results | Adjusted Results | Actual Results | Meet or Beat Target |
| 2019 | $22.23 | $22.81 | $22.69 | $21.72 | No |
| 2020 | $24.60 | $24.76 | $24.93 | $23.19 | No |
| 2021 | $25.56 | $27.11 | $26.97 | $25.65 | Yes |
| 2022 | $29.44 | $29.55 | $30.65 | $27.66 | No |
| 2023 | $30.38 | $32.25 | $30.97 | $30.08 | No |

198.     As a result of meeting the AFFO/share and revenue targets, Defendants received bonus compensation far exceeding their salaries.  Meyers' total compensation awarded during the Class Period was as follows:

| Meyer's Class Period Compensation | | | | | |
|---|---|---|---|---|---|
| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
| 2019 | $1,000,000 | $15,477,843 | $59 | $97,694 | $16,575,596 |
| 2020 | $1,048,654 | $24,748,074 | $605 | $38,935 | $25,836,268 |
| 2021 | $1,050,000 | $22,150,441 | $256 | $47,496 | $23,248,193 |
| 2022 | $1,050,000 | $21,145,956 | $297 | $86,675 | $22,282,928 |
| 2023 | $1,050,000 | $22,821,961 | $503 | $54,988 | $23,927,452 |
| **TOTAL** | **$5,198,654** | **$106,344,275** | **$1,720** | **$325,788** | **$111,870,437** |

199.     Taylor's total compensation awarded during the Class Period was as follows:

| Taylor's Class Period Compensation | | | | | |
|---|---|---|---|---|---|
| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
| 2019 | $680,000 | $6,912,204 | $208 | $8,250 | $7,600,662 |
| 2020 | $680,000 | $8,524,885 | $82 | $12,045 | $9,217,012 |
| 2021 | $680,000 | $8,023,062 | $544 | $8,550 | $8,712,156 |
| 2022 | $680,000 | $8,607,310 | $1 | $34,517 | $9,321,828 |
| 2023 | $680,000 | $10,916,747 | $249 | $45,808 | $11,642,804 |
| **TOTAL** | **$3,400,000** | **$42,984,208** | **$1,084** | **$109,170** | **$46,494,462** |

## XIII.  INSIDER TRADING

200.     The Individual Defendants and other insiders engaged in a massive volume of insider selling during the Class Period.[22]  Meyers and Taylor were the largest Class Period sellers,

---

[22]    For all reporting individuals during the Class Period, insider selling totaled over 400,000 shares amounting to over $300 million in proceeds.

capitalizing on Equinix's inflated stock price by selling off significant percentages of their holdings:

| Individual Defendants' Insider Selling | | | |
|---|---|---|---|
| Filer Name | Shares Sold | Proceeds | % of Holdings Sold |
| Meyers (Charles John) | 149,933 | $107,315,619 | 92% |
| Taylor (Keith David) | 54,287 | $39,574,926 | 69% |
| **TOTAL** | **204,220** | **$146,890,545** | |

## XIV. EQUINIX'S SALES OF COMMON STOCK

201.    Defendants sold more than $4.5 billion dollars of common stock at inflated prices throughout the Class Period pursuant to prospectuses and registration statements which incorporated by reference false and misleading statements in other quarterly and annual SEC filings, as well as proxy statements, as set forth herein.

202.    On May 12, 2020, Equinix filed a 424B Prospectus and Prospectus Supplement for its secondary offering of 2,587,500 shares of common stock at $665 per share with proceeds up to $1.7 billion.  The prospectus included the Company's summary financial data, including FY19 and 1Q20 revenue.  The prospectus also incorporated by reference multiple of the Company's SEC filings containing false and misleading statements and omissions as discussed above, including: the FY19 Form 10-K, 1Q20 Form 10-Q, and portions of the April 27, 2020 DEF 14A Proxy.

203.    On October 30, 2020, Equinix filed a Prospectus Supplement on Form 424(b)(5) announcing the sale of common stock with an aggregate price of $1.5 billion to be made at market prices as directed by Equinix.  The prospectus also incorporated by reference multiple of the Company's SEC filings containing false and misleading statements and omissions as discussed above, including:  FY19 Form 10-K; 1Q20, 2Q20 and 3Q20 Forms 10-Q; and portions of the Company's April 27, 2020 DEF 14A Proxy.

204.    On November 7, 2022, Equinix filed a Prospectus Supplement on Form 424(b)(5) announcing the sale of common stock with an aggregate price of $1.5 billion to be made at market prices as directed by Equinix.  The prospectus also incorporated by reference multiple of the Company's SEC filings containing false and misleading statements and omissions as discussed above, including: the FY21 Form 10-K; 1Q22, 2Q22 and 3Q22 Forms 10-Q; and portions of

Company's April 12, 2022 DEF 14A Proxy.

205.    Over the course of the Class Period, Equinix sold more than 6.8 million shares of common stock at artificially inflated prices for net proceeds of over $4.5 billion:

| Equinix Class Period Common Stock Sales | | | |
|---|---|---|---|
| Period | Shares | Net Proceeds (millions) | Offering Type |
| Q2 2019 | 722,361 | $348.20 | At the market |
| Q3 2019 | 181,194 | $99.40 | At the market |
| Q1 2020 | 162,530 | $101.80 | At the market |
| Q2 2020 | 2,587,500 | $1,683.10 | Public offering |
| Q3 2020 | 252,982 | $196.40 | At the market |
| Q2 2021 | 137,604 | $99.60 | At the market |
| Q4 2021 | 500,013 | $398.40 | At the market |
| Q3 2022 | 1,160,706 | $796.00 | At the market |
| Q1 2023 | 458,459 | $300.80 | At the market |
| Q4 2023 | 643,428 | $499.40 | Forward sale agreement |
| **Total** | **6,806,777** | **$4,523.10** | |

## XV.    APPLICABILITY OF THE CORE OPERATIONS INFERENCE

206.    The false and misleading statements alleged herein were made with knowledge of, or deliberate disregard to, their falsity as they concerned the most critical operations at the core of Equinix's business model. With respect to AFFO and AFFO/share, Defendants repeatedly referred to it as their "core metric" (*e.g.*, ¶88); they described it as their "lighthouse metric" (*e.g.*, ¶¶76, 106, 113); it was utilized to determine their bonuses (§XII); and when analysts asked questions about other financial metrics, Defendants would redirect the analysts to the AFFO number – emphasizing that AFFO was the metric Defendants used to operate the Company. (*e.g.*, ¶¶113, 118). Similarly, power capacity was the primary limiting resource driving Defendants' business decisions and Defendants noted that power availability was "on their minds" (¶¶97, 107, 145). Each data center had access to a fixed amount of power (*e.g.*, ¶132); each customer purchased specific allocations of power (*e.g.*, ¶119); Defendants oversold power capacity by having multiple clients draw upon the same power supply, banking on the clients not drawing their allotted power at the same time (*e.g.*, ¶¶130, 137).

## XVI.    INSUFFICIENT RISK WARNINGS

207.    The Company's SEC filings throughout the Class Period contained purported risk

warnings which were false and misleading, and insufficient to insulate Defendants from liability because the purported risks warned of had already come to pass and were already impacting the Company.  In particular, as alleged herein, the Defendants oversold power by 150% which, among other things, placed the Company at increased risk that it would be unable to fulfill its contractual obligations to its customers and limited its ability to grow.

208.    For example, the SEC filings included a purported risk disclosure related to the potential failure of the Company's infrastructure or offerings, including the possibility of "power loss" which the Company warned could result in service interruptions at its data centers without disclosing that Defendants deliberately oversold the Company's power capacity heightening the risk that they would be unable to deliver paid-for power.  The 1Q19 Form 10-Q contained the following:[23]

> Our office buildings and IBX data centers are subject to failure resulting from, and infrastructure within such IBX data centers is at risk from, numerous factors, including: . . . ***power loss*** . . .
>
> Problems at one or more of our IBX data centers, whether or not within our control, could result in service interruptions or significant equipment damage. . . . Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers.
>
> *      *      *
>
> We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers,

---

[23]    Substantially identical statements appeared in the Company's Forms 10-Q for 2Q19, 3Q19, 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, 3Q23, and Forms 10-K for FY19, FY20, FY21, FY22 and FY23.

which would adversely affect both our ability to generate revenues and our operating results.[24]

209.    The SEC Filings also purportedly warned of the potential risks that high power density equipment may play in the future regarding the Company's ability to utilize its data centers without revealing that this risk was already impacting the Company. The 1Q19 Form 10-Q stated:

> Some customers have increased their use of high power density equipment, such as blade servers, in our IBX data centers which has increased the demand for power on a per cabinet basis. Because many of our IBX data centers were built a number of years ago, the current demand for power may exceed the designed electrical capacity in these centers. As power, not space, is a limiting factor in many of our IBX data centers, our ability to fully utilize those IBX data centers may be impacted.

210.    The Company's SEC filings also purportedly warned of a potential future risk caused by shortages of power and its impact on Equinix's ability to serve its customers as customers' power use increased but failed to disclose that this was a current risk it already faced due to overselling power capacity. For example, the 2Q19 Form 10-Q, filed on August 2, 2019, stated:[25]

> In each of our markets, we rely on third parties to provide a sufficient amount of power for current and future customers. At the same time, power and cooling requirements are increasing per unit of equipment. As a result, some customers are consuming an increasing amount of power per cabinet. We generally do not control the amount of power our customers draw from their installed circuits, which can result in growth in the aggregate power consumption of our facilities beyond our originally planning and expectations. This means that limitations on the capacity of our electrical delivery systems and equipment could limit customer utilization of our IBX data centers. These limitations could have a negative impact on the effective available capacity of a given center and limit our ability to grow our business, which could have a negative impact on our financial performance, operating results and cash flows.

## XVII. LOSS CAUSATION AND ECONOMIC LOSS

211.    During the Class Period, as detailed herein, Defendants engaged in a scheme to

---

[24]    One of Equinix's clients did sue the Company on December 13, 2021, alleging that "Equinix's negligent misrepresentation – that Suite 1130 would accommodate Blade Servers and produce 600 kW – has a material effect upon their agreed exchange of performances [and] Equinix is unable to perform its obligations under the 600 kW Agreement." *In re Blade Glob. Corp.*, No. 21-50275-MEH, Complaint (Bankr. N.D. Cal. Dec. 13, 2021).

[25]    The Company's Forms 10-Q for 3Q19, 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, 3Q23, and Forms 10-K for FY19, FY20, FY21, FY22 and FY23 contained substantially identical risk warnings.

defraud by overstating AFFO and overselling power; this scheme also included making materially false and misleading statements and/or omitting material information concerning Equinix's AFFO and AFFO/share metrics, power availability, the drivers of the Company's operating results, its current and future prospects, and the risks facing the business. This scheme caused Equinix's stock to trade at artificially inflated prices throughout the Class Period, including a Class Period high of $913.66 per share on March 4, 2024. By artificially inflating Equinix's stock price, Defendants deceived Plaintiff and the Class causing them to suffer substantial losses, *i.e.*, damages under the federal securities laws when the truth was revealed. The damages suffered by Plaintiff and other members of the Class was a direct and proximate result of Defendants' misrepresentations and omissions which artificially inflated Equinix's common stock price and the subsequent significant stock price declines that occurred when the concealed risks materialized and/or the true state of Equinix's business was revealed to the market in a series of corrective disclosures.

212. Defendants' scheme to defraud, including its false and misleading statements and omissions, were revealed to the market through a series of partial disclosures of the truth, which caused Equinix's stock price to decline as a result. Some of these partial disclosures were mitigated by further misrepresentations that caused the price to remain artificially inflated. In certain instances, the revelation of the fraudulent conduct, or the previously concealed risk, and its causally-related impact on the Company's stock price occurred at separate points in time during, or after, the Class Period. In certain instances, partial disclosures of the truth were accompanied by new, unrelated positive information, which, as result, caused Equinix's price to decline less than it would have in the absence of the positive information.

213. As discussed above, the partial disclosures – which coincided with declines in Equinix's stock price and elevated trading volumes – included, but are not limited to: (i) the September 23, 2022 Barclays analyst report downgrading Equinix because of concerns over potential accounting manipulation; (ii) the Company's June 21, 2023 analyst day comments that AI would be a long term, not a short term, driver of growth; (iii) the June 22, 2023 Oppenheimer analyst report downgrading Equinix over concerns about the Company's ability to capitalize on

demand driven by power-intensive AI computing; (iv) the March 12, 2024 resignation announcements of Meyers and Van Camp in close temporal proximity to Hindenburg Research's investigation and interviews with former Equinix executives; (v) the March 20, 2024 Hindenburg Report concerning Equinix's manipulation of recurring CapEx to inflate AFFO and the practice of overselling power and its impact on the Company's outlook; (vi) the March 20, 2024 Oppenheimer analyst report stating that Equinix acknowledged that it oversold power; (vii) the March 21, 2024 TD Cowen and BMO Capital Markets analyst reports confirming the overselling of power; (viii) the March 25, 2024 Equinix announcement that the Company received a subpoena from the U.S. Attorney's Office for the Northern District of California and the Audit Committee would be conducting an independent investigation into the matters addressed in the Hindenburg Report; (ix) the May 9, 2024 Barclays analyst report noting that this accounting change appeared to violate the Company's own previously stated policy; and (x) the May 10, 2024 TD Cowen analyst report concerning Equinix's refusal to provide information to investors concerning power usage.

214.    Equinix's common stock price declined on these disclosures of new and unexpected negative information.  The timing and magnitude of Equinix's stock price declines negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

215.    The economic loss, *i.e.*, damages suffered by Plaintiff and other Class members, was a direct result of Defendants' fraudulent scheme and material misrepresentations, which artificially inflated Equinix's stock price, and the subsequent significant decline in the value of Equinix's stock as the true state of the Company's operations, and the risks it faced, was revealed to the market.

## XVIII. CLASS ACTION ALLEGATIONS

216.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Equinix common stock during the Class Period and were damaged thereby as alleged herein (the "Class").  Excluded from the Class are Defendants and their immediate families, the officers, directors, and affiliates

of Defendants, at all relevant times, and their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

217.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Equinix stock trades on the NASDAQ and Equinix has millions of shares outstanding, owned by thousands of persons.

218.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants engaged in a fraudulent scheme by overselling power and misclassifying CapEx;

(c)    whether statements made by Defendants to the investing public omitted and/or misrepresented material facts about Equinix;

(d)    whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)    whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)    whether the price of Equinix stock was artificially inflated; and

(g)    the extent of damages sustained by Class members and the appropriate measure of damages.

219.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

220.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

221.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a

class action.

## XIX.    APPLICABILITY OF THE FRAUD-ON–THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

222.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiff and other members of the Class purchased Equinix common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

223.    At all relevant times, the market for Equinix common stock was efficient for the following reasons, among others:

(a)    as a regulated issuer, Equinix filed periodic public reports with the SEC; and

(b)    Equinix regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

224.    Plaintiff will also rely upon the presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## XX.    NO SAFE HARBOR

225.    The "Safe Harbor" warnings accompanying Equinix's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from

liability.   To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Forms 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

226.    Defendants are also liable for any false and misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Equinix who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.

227.    Equinix's purported cautionary language is inadequate to insulate Defendants' false statements under the statutory safe harbor because each of the disclosures is vague and boilerplate. In multiple instances, the purported risks were referenced as potential or contingent future outcomes when in fact, the purported risks warned of had already come to fruition and were negatively impacting the Company.

### COUNT I
### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

228.    Plaintiff incorporates ¶¶1-227 by reference.

229.    During the Class Period, Equinix and the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

230.    Equinix and the Individual Defendants violated §10(b) of the Exchange Act and

Rule 10b-5 in that they:

> (a)    employed devices, schemes, and artifices to defraud;

> (b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Equinix stock during the Class Period.

231.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Equinix stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Equinix stock and experienced losses when the artificial inflation was released from Equinix stock as a result of the partial revelations and price declines detailed herein.  Plaintiff and the Class would not have purchased Equinix stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' scheme to defraud.

232.    By virtue of the foregoing, Equinix and the Individual Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II
### For Violations of §20(a) of the Exchange Act Against All Defendants

233.    Plaintiff incorporates ¶¶1-232 by reference.

234.    Equinix and the Individual Defendants acted as controlling persons of Equinix within the meaning of §20(a) of the Exchange Act.  By reason of their controlling positions with the Company, the Individual Defendants had the power and authority to cause Equinix to engage in the wrongful conduct complained of herein.  Equinix controlled the Individual Defendants and all of its employees.  By reason of such conduct, Equinix and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.      determining that this action is a proper Class action, having designated Plaintiff as Lead Plaintiff and Class Representative under Rule 23 of the Fed. R. Civ. P. and appointing Plaintiff's counsel as Lead Counsel;

B.      awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      awarding such equitable, injunctive, or other relief as deemed appropriate by the Court.

## XXI.  JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 12, 2024                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                           SHAWN A. WILLIAMS
                                           DANIEL J. PFEFFERBAUM
                                           ALAINA L. GILCHRIST


                                              s/ Daniel J. Pfefferbaum
                                           DANIEL J. PFEFFERBAUM

                                           Post Montgomery Center
                                           One Montgomery Street, Suite 1800
                                           San Francisco, CA  94104
                                           Telephone:  415/288-4545
                                           shawnw@rgrdlaw.com
                                           dpfefferbaum@rgrdlaw.com
                                           agilchrist@rgrdlaw.com

                                           Lead Counsel for Lead Plaintiff

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY 10271
Telephone: 212/652-3890
vpitta@pittalaw.com

Additional Counsel