ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
DANIEL J. PFEFFERBAUM (248631)
ALAINA L. GILCHRIST (335807)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
agilchrist@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| WAYNE CHAN, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>EQUINIX, INC., et al.,<br><br>                              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:24-cv-02656-VC<br><br><u>CLASS ACTION</u><br><br>LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DATE: December 5, 2024<br>TIME: 10:00 a.m.<br>JUDGE: Hon. Vince Chhabria<br>CTRM: 4, 17th Floor |

4855-4517-5028.v1

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ..................................................................................................1

II.   LEGAL STANDARD............................................................................................3

III.  ARGUMENT.........................................................................................................3

      A.    Defendants Do Not Move to Dismiss the Alleged Fraudulent Scheme..................3

      B.    The Complaint Sufficiently Pleads Materially False Statements and
            Omissions.........................................................................................................4

            1.    False and Misleading Statements and Omissions Concerning
                  Overselling Power........................................................................................4

            2.    False and Misleading Statements and Omissions Concerning
                  AFFO Calculations .....................................................................................7

            3.    False and Misleading Statements Concerning the AI Growth
                  Opportunity ..................................................................................................9

            4.    FE1's Account Is Reliable and Must Be Credited...................................10

            5.    The Court Must Credit the Allegations Based Upon the
                  Hindenburg Report....................................................................................11

            6.    Equinix's Risk Warnings Do Not Shield Defendants From
                  Liability.......................................................................................................13

      C.    The Complaint Sufficiently Alleges a Strong Inference of Scienter ....................14

            1.    Defendants' Statements and Admissions Demonstrate They Knew
                  the Company Oversold Power Capacity ...................................................14

            2.    Defendants Had Actual Knowledge of Accounting Manipulations
                  that Overstated AFFO..............................................................................15

            3.    The Core Operations Doctrine Supports a Strong Inference of
                  Scienter as to Overstatement of AFFO ......................................................16

            4.    Defendants' Bonus Compensation and Stock Sales Support a
                  Strong Inference of Scienter .....................................................................17

            5.    Defendants' Admitted Pressure Campaign to Misclassify CapEx
                  Supports a Strong Inference of Scienter ...................................................18

      D.    The Complaint Sufficiently Alleges Loss Causation............................................19

IV.   CONCLUSION....................................................................................................20

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Baron v. Hyrecar Inc.*,
2022 WL 17413562 (C.D. Cal. Dec. 5, 2022) ........................................................................18

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ....................................................................................................4

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ..................................................................................................19

*Felipe v. Playstudios Inc.*,
2024 WL 1380802 (D. Nev. Mar. 31, 2024) ..........................................................................18

*Foman v. Davis*,
371 U.S. 178 (1962)................................................................................................................20

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ..................................................................................................10

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ......................................................................................................4

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ..........................................................................15

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .........................................................................................6, 19, 20

*In re Fibrogen, Inc.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022)..........................................................................15

*In re Finisar Corp. Sec. Litig.*,
646 F. App'x 506 (9th Cir. 2016) .............................................................................................4

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024) .......................................................................................13, 19, 20

*In re GlenFed, Inc. Sec. Litig.*,
60 F.3d 591 (9th Cir. 1995) ....................................................................................................14

*In re Invision Techs., Inc. Sec. Litig.*,
2006 WL 538752 (N.D. Cal. Jan. 24, 2006)..............................................................................7

**Page**

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) .....................................................................................9

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   2012 WL 2512280 (S.D.N.Y. June 29, 2012) ..........................................................................15

*In re Nektar Therapeutics*,
   2020 WL 3962004 (N.D. Cal. July 13, 2020)...........................................................................13

*In re Qualcomm Inc. Sec. Litig.*,
   2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ..........................................................................15

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ...........................................................................................11, 13

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. 2022) .....................................................................................13

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).......................................................................................................19

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003) ...................................................................................17

*In re Silver Wheaton Corp. Sec. Litig.*,
   2019 WL 1512269 (C.D. Cal. Mar. 25, 2019)............................................................................9

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) .................................................................................................18

*In re Vaxart, Inc. Sec. Litig.*,
   2023 WL 3637093 (N.D. Cal. May 25, 2023) ............................................................................3

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ...................................................................................................18

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..................................................................................................3, 4

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ...................................................................................................13

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) .................................................................................................20

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:24-cv-02656-VC
4855-4517-5028.v1

- iii -

**Page**

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)......................................................................................................5

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) ...............................................................16, 18

*Mulligan v. Impax Lab'ys, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................10, 11

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
   2023 WL 11965444 (2d Cir. Aug. 23, 2023)..............................................................8

*New Mexico State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) .................................................................................14

*Ng v. Berkeley Lights, Inc.*,
   2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ............................................................13

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ................................................................................6, 17

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ..................................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)....................................................................................................8

*Pampena v. Musk*,
   705 F. Supp. 3d 1018 (N.D. Cal. 2023) ....................................................................18

*Reese v. Malone*,
   747 F.3d 557, 569 (9th Cir. 2014) ......................................................................14, 16

*Ret. Assoc. v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)........................................................................17

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ....................................................................................16

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
   2024 WL 3579322 (N.D. Cal. July 29, 2024)............................................................16

*SEC v. Phan*,
   500 F.3d 895 (9th Cir. 2007) ...................................................................................7, 8

**Page**

*SEC v. Winemaster*,
    529 F. Supp. 3d 880 (N.D. Ill. 2021) ...................................................................................19

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) .......................................................... *passim*

*Snellink v. Gulf Res., Inc.*,
    870 F. Supp. 2d 930 (C.D. Cal. 2012) ...............................................................................16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)....................................................................................................3, 14, 17

*Turocy v. El Pollo Loco Holdings, Inc.*,
    2017 WL 3328543 (C.D. Cal. Aug. 4, 2017).......................................................................15

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) ...............................................................................14

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
    §78j(b)...............................................................................................................................3, 4
    §78u-4(b)(1)(B)........................................................................................................................4
    §78u-4(b)(2)(A) ....................................................................................................................14

Federal Rules of Civil Procedure
    Rule 10b-5...............................................................................................................................3
    Rule 12(b)(6)...........................................................................................................................3
    Rule 15 .................................................................................................................................20

17 C.F.R.
    §240.10b-5 ..............................................................................................................................3

## I.    INTRODUCTION

Lead Plaintiff Uniformed Sanitationmen's Association Compensation Accrual Fund ("Plaintiff") hereby submits this opposition to Defendants' Motion to Dismiss the Amended Complaint (ECF 54) ("Motion" or "Mot").  The Amended Complaint for Violations of the Federal Securities Laws (ECF 43) ("Complaint") alleges that defendants Equinix, Inc, ("Equinix" or the "Company"), its former CEO Charles Meyers ("Meyers"), and its CFO Keith D. Taylor ("Taylor") (collectively "Defendants") engaged in a long-running scheme to defraud investors by overselling the power capacity at the Company's data centers[1] and manipulating the Company's accounting of capital expenditures ("CapEx") to inflate the singular financial metric that they told investors to focus on: AFFO.[2]  Quarter-over-quarter throughout the Class Period (May 3, 2019 through March 24, 2024), this scheme ensured that Equinix beat its AFFO guidance and reached the AFFO targets required for Meyers and Taylor to receive stock bonus awards of $150 million.

Defendants furthered their scheme by making false and misleading statements throughout the Class Period.  For example, the Company oversold its power capacity at its data centers – increasing the risk it would be unable to deliver contracted for power and limiting its future growth – but Defendants falsely told investors that its power usage (150%) was below its reported cabinet utilization (80%).  Defendants also mislead investors about how the Company calculated AFFO and overstated reported AFFO and AFFO per share, their self-described "lighthouse metric."  In fact, Defendants were violating the very accounting policies they told investors they would follow, as well as the United States Securities and Exchange Commission ("SEC") Rules and Regulations, by misclassifying maintenance expenses (*i.e.*, recurring CapEx) for items like batteries, chillers

---

[1]    Each data center had a limited amount of electrical power it could draw from the local utility. Equinix sold power on a "per circuit" basis meaning that customers paid for a defined amount of power regardless of their actual usage.  Counting on their customers not using their full power capacity, Defendants contracted to sell 150% or more of their power supply at their data centers.

[2]    Following its conversion to a real estate investment trust ("REIT") in 2015, Equinix began reporting the non-GAAP metric, AFFO, or "adjusted funds from operation," and using it to determine executive bonuses.  AFFO is intended to measure the net amount of cash that flows into a REIT from regular, ongoing business activities and to be an indicator of operating performance. ¶6.

and lightbulbs, as growth expenses (*i.e.*, non-recurring CapEx). This misclassification scheme artificially increased AFFO.

As this scheme continued to enrich the Defendants, investors gradually learned the truth, and the stock price declined with each partial disclosure. For example, on September 23, 2022, Barclays downgraded Equinix after accurately deducing from public sources that Equinix was manipulating its CapEx accounting and overstating AFFO by 15% – but it lacked internal confirmation of accounting violations. On June 21, 2023, Defendants conceded that power-hungry artificial intelligence ("AI") would not be a near-term driver for the Company, but continued to conceal that it was because they had already oversold their power capacity. Then on March 20, 2024, Hindenburg Research published a report ("Hindenburg Report") based on interviews with 37 former employees, competitors and industry experts, confirming that the Company was misclassifying CapEx to inflate AFFO and provided detailed examples from former Equinix employees. Former employees also revealed that the Company was overselling power at all of its data centers by as much as 175%. Analysts largely confirmed these allegations.

The Motion wholly ignores this well-pled scheme and attempts to re-cast Plaintiff's Complaint as a short report masquerading as a securities action. The problem, for Defendants, is that the Hindenburg Report does not stand alone. Indeed, its allegations are virtually all admitted by the Defendants or corroborated by other sources, including by a former employee witness who reported that power capacity was oversold by 150%. Moreover, Defendants have apparently embraced the basic contours of the Hindenburg Report, by adopting an "everyone does it" defense *i.e.*, every retail data center oversells power and every REIT is allowed significant latitude for capital expense "judgment calls." Thus, at this stage of the litigation, the Court should credit the allegations based upon the Hindenburg Report.

Similarly, the Court should reject the Motion's falsity and scienter arguments because, in many cases, Defendants simply mischaracterize or ignore well-pled allegations. For example, they wholly ignore that Defendants themselves connected power usage and cabinet utilization metrics. They also fail to address that the Company explained to investors how they would apply the accounting policies that they proceeded to violate. Nor do they address that Barclays put them on

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:24-cv-02656-VC          - 2 -
4855-4517-5028.v1

notice of accounting violations in 2022. Lastly, Defendants' loss causation arguments are contrary to well-established Ninth Circuit law and without merit. The Court should deny the Motion.

## II.    LEGAL STANDARD

To establish a claim of securities fraud under §10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, a plaintiff must allege: (i) a material misrepresentation or omission; (ii) made with scienter; (iii) in connection with the purchase or sale of a security; (iv) relied upon by plaintiff; (v) a loss causally connected to the alleged fraud; and (vi) economic loss or damages. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). In assessing a motion to dismiss under the Federal Rules of Civil Procedure 12(b)(6), a court must "consider the complaint in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).

## III.    ARGUMENT

### A.    Defendants Do Not Move to Dismiss the Alleged Fraudulent Scheme

SEC Rule 10b-5 makes it unlawful: "(a) To employ any device, scheme, or artifice to defraud, . . . [or] (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (2018). The Complaint explicitly alleges a "fraudulent scheme" (¶¶9-11, 15-16, 140, 148, 177, 194, 197, 211-212, 215, 218, 230-231 and §VIII)[3] which entailed concealing that the Company was overselling power at its data centers and misclassifying CapEx expenses to inflate AFFO. In four of the five years during the Class Period, the scheme enabled Meyers and Taylor to beat the AFFO targets necessary to receive $106 million and $43 million, respectively, in stock bonuses. ¶¶197-199. Meyers and Taylor then sold $107 million and $39 million, respectively, of Equinix stock at inflated prices during the Class Period. ¶200. These allegations are sufficient to allege an actionable scheme to defraud. *In re Vaxart, Inc. Sec. Litig.*, 2023 WL 3637093, at *3

---

[3]    All "Ex." citations herein are to the exhibits (ECF 54-2 through 54-26) attached to Defendants' Declaration of Vincent Barredo in Support of Defendants' Motion to Dismiss the Amended Complaint (ECF 54-1). All "¶__" citations are to Plaintiff's Complaint.

(N.D. Cal. May 25, 2023) (Chhabria) ("Defendants did not merely trade on material nonpublic information; they participated in an intentional scheme to manipulate the price of Vaxart shares for the purpose of selling them at an artificially inflated price.").  Because the Motion fails to address these allegations, the scheme claims cannot be dismissed.[4]  *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021).

**B.    The Complaint Sufficiently Pleads Materially False Statements and Omissions**

To allege falsity, Plaintiff need only "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement [was] misleading."  15 U.S.C. §78u-4(b)(1)(B); *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016).  Even a literally true statement "may be misleading if it omits material information."  *Khoja*, 899 F.3d at 1008-09. *See also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (omission is actionably misleading when it "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists").

**1.    False and Misleading Statements and Omissions Concerning Overselling Power**

Defendants affirmatively misled investors that the Company's power utilization was ***below*** its cabinet utilization during an October 25, 2023, conference call:

> [Analyst:] And just curious if you could share with us how the power utilization of your portfolio compares to the cabinet utilization of your portfolio? . . .
>
> [Meyers:] Yes. Great question, Mike.  It's unfortunately not a particularly simple matter.  But I will give you an answer to your question, which is ***our power utilization is actually meaningfully lower than our cabinet utilization***, right?  And so that does represent, I think, some opportunity for us . . .

¶136.  Meyers' statement was false:  Reported cabinet utilization was approximately 80% while Defendants oversold power capacity by 150% or more.   ¶¶147(c), 37-39, 160-162, 166. Defendants claim that there is no "connection" between the Company's cabinet utilization rate and the overselling of power (Mot at 15), but they made the connection themselves, and analysts

---

4    Defendants move to dismiss the §20(a) claims only on the basis of their arguments against §10(b), therefore, the §20(a) claims survive as well.

immediately recognized its significance.  For instance, on October 26, 2023, Barclays issued a report stating that Equinix had "spare power", which was "important as the company seeks growth via additional AI exposure which consumes more power per rack."  ¶138.  When the Hindenburg Report revealed this misrepresentation, BMO Capital Markets flagged it as such:  "EQIX also previously described its power utilization as 'meaningfully lower' than cabinet utilization."[5]  ¶165.

The Complaint alleges that the Company's reported "cabinet utilization" metric, which was defined as "the percentage of cabinet space billed versus total cabinet capacity, *taking into consideration power limitations*," was misleading.  ¶¶70, 79, 91, 103, 116.  This metric falsely conveyed to investors that Equinix already had sufficient infrastructure (*i.e.*, cabinet space and power) to support growth of approximately 20% when the Company had already contractually engaged to sell 150% or more of its power capacity.  *See, e.g.*, ¶138.  Thus, the Company was dependent on re-selling power capacity it had already sold to existing customers and hoping that those customers did not utilize their full power allocation.  ¶¶37-39, 160-162.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (an omission is material where disclosure would have """"significantly altered the "'total mix'" of information available"""").  Similarly, Taylor mislead investors by likening the sale of power to a hotel reservation: "whether you show up and sleep in bed or not, you're still going to pay for it if you signed up," while omitting that Defendants were taking reservations for rooms they did not have.[6]  ¶119.

The Complaint sufficiently alleges that the Company oversold power.  *E.g.*, ¶¶77(c); 89(c); 101(c), 114(c), 147(c).  First, a former employee ("FE1") reported that the ten data centers FE1 oversaw were oversold by 150% and that a power outage could occur if a customer increased their power usage.  ¶¶37-39.  Second, the Hindenburg Report contained the accounts of multiple former employees reporting that Equinix oversold its power capacity at all of its data centers from 120%

---

[5]    The Motion claims that the overselling of power capacity is unrelated to power usage, but this plainly contradicts the understanding of analysts who followed the Company and is an improper factual dispute at this stage.  Mot at 16 n.20.

[6]    For the same reason, Defendants' statements that they were carefully monitoring power consumption and that Equinix had ample power capacity available were false and misleading by omission.  *E.g.,* ¶124 ("[energy constraints] it's the 1 that maybe I worry about most"); *see also* ¶¶97, 107, 119, 124, 131, 133, 144.

to 175%.  ¶¶160-162.  For example, a former executive reportedly stated that "[m]ost Equinix data centers are . . . over-utilized anywhere from 120 to 175% of power."  ¶160.  Another former executive reportedly stated "every single site in the estate is oversold by 25%."  ¶162.  Third, a March 21, 2024, TD Cowen report confirmed that their "conversation with Equinix led us to believe there is likely a degree of [overselling power] which occurs in its data centers."  ¶166.

Market reaction confirmed that the March 20, 2024 disclosure that Equinix was overselling power represented new materially negative information to investors.  *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (stock price decline "supports a finding of materiality").  On March 20, 2024, HSBC Global Research reported: "The accusation that Equinix is selling more power than its available capacity to customers could imply ***significant operational and reputational risks***."  ¶163.  On March 21, 2024, BMO Capital Markets described "the claim of overselling power as most concerning" and indicated that it was previously unknown information by describing it as a new "risk factor" and stating that it was "where we lack visibility."  ¶165; *see also* ¶¶166, 169.

The Motion's arguments against the sufficiency of the power capacity statements should be rejected.  First, the Motion claims that overselling power never led to a "cascade" of failures; but the most extreme consequence of the risk does not have to come to pass for Defendants' statements to be actionable.[7]  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 793 n.4 (9th Cir. 2020) (shareholders' allegations that they were damaged by concealed risk "remains true regardless of whether the risks concealed by BofI's misstatements ever materialized and harmed the bank's bottom line").  Second, the Motion suggests that overselling power is an industry-wide practice.  Mot at 15.  While this confirms the accuracy of the allegations, it does not make Defendants' statements inactionable.  It is, in essence, a materiality argument that cannot be resolved at this stage, particularly because investors clearly reacted negatively to the disclosure.

---

[7]    The Complaint alleges that Equinix was subject to at least one lawsuit related to its inability to meet contracted power obligations to a former customer, Blade Global.  ¶208 n.24.  While Blade Global did not explicitly allege that Equinix was overselling power (Mot at 12 n.18), the litigation is the expected result of such a practice.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:24-cv-02656-VC    - 6 -
4855-4517-5028.v1

*SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) ("Determining materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'").

### 2.    False and Misleading Statements and Omissions Concerning AFFO Calculations

The Complaint alleges that Defendants repeatedly made false and misleading statements concerning AFFO:  First, the Company falsely represented in its SEC filings that it subtracted specific maintenance costs (*i.e.*, recurring CapEx) from AFFO.  ¶¶66-67.  Second, the Company overstated quarterly and annual AFFO and AFFO/share figures in its earnings releases, SEC filings, and earnings conference calls, which resulted in them falsely reporting that the Company met or beat annual AFFO guidance.  *E.g.*, ¶¶69, 78, 90, 102, 115, 148.  Third, Defendants misleadingly attributed reported AFFO results to their operation of the business, as opposed to manipulating the way in which they accounted for maintenance costs.  *E.g.*, ¶¶71-73, 80, 83, 92, 94-95, 100, 104, 112, 117, 121, 128, 134, 143.  And, finally, by omitting that they were manipulating AFFO, Defendants misled investors when they referred to it as their "lighthouse metric," and asserted that "investors would not have all the necessary data to analyze Equinix effectively" without accurate AFFO numbers.  *E.g.*, ¶¶65, 75-76, 84, 105, 106, 113, 118, 128, 143.

The Complaint pleads with particularity that Defendants' CapEx classification of certain maintenance costs as non-recurring, instead of recurring, violated its own stated accounting policies and applicable SEC rules and regulations.  ¶¶68(a), 77(a), 89(a), 101(a), 114(a), 147(a).  Equinix's SEC filings stated that recurring capital expenditures "represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues." ¶67.  Equinix provided specific examples of recurring expenses to investors, including "End-of-life equipment replacement (*i.e.*, ***chillers, strings of batteries***, sprinkler system, etc.)."[8]  ¶53.

---

[8]    Defendants' effort to inject a fact dispute concerning the Company's accounting policy is both an improper factual dispute and inaccurate.  Mot at 9 n.12 (citing Ex. 11 at 36).  The Complaint sets forth the accounting method the Company stated it would use ***following its REIT conversion*** in 2015.  Indeed, the June 30, 2014 presentation provided examples of how the Company's CapEx classification would be applied to specific maintenance costs.  ¶¶52-54.  This is the same policy that Defendants point to in Ex. 11, *In re Invision Techs., Inc. Sec. Litig.*, 2006 WL 538752, at *2 n.1 (N.D. Cal. Jan. 24, 2006) ("To the extent that these [pre-Class Period] statements are used to demonstrate the truth or falsity of Class Period statements, they are relevant.").

Under SEC Regulation S-K 10(e) and Regulation G, the SEC views "an operating expense that occurs repeatedly or occasionally, including at irregular intervals, as recurring." ¶¶179-180, 186 (recurring costs were of "the nature [that was] reasonably likely to recur within 2 years").

The Complaint provides specific examples of Defendants violating these policies and rules: A former director reported that maintenance costs for chillers – which are rebuilt, not replaced – were improperly classified as non-recurring CapEx. ¶¶53, 67, 157.  The Company attempted to hide this misleading practice by obtaining new serial numbers for old devices.  *Id.*  "[M]ultiple former executives" reported that battery replacements, which were "one of Equinix's largest data center costs," were improperly classified as non-recurring CapEx.[9] ¶¶53, 67, 158.  A former senior Equinix operations manager and former finance director reported that replacing "thousands" of lightbulbs was a "routine, daily operation" and that Equinix used accounting "tricks" to mis-categorize this regular maintenance as non-recurring CapEx. ¶159.  While the Motion attempts to spin these as "enhancements" or "improvements" they are the same "end of life replacement" that the Company said was recurring CapEx and "extend the useful life of . . . data centers or other assets."  Mot at 9; ¶¶53, 67; *see also* ¶142 ("[W]e call it a refresh, but maintenance is probably a good word for it.").

Defendants' improper accounting overstated AFFO between $92 million and $191 million (4.8-6.5%) annually and allowed the Company to meet or beat its AFFO guidance in all five years of the Class Period. ¶¶13, 148.  In 2014, Equinix announced that it would be implementing a new CapEx classification methodology the following year and (without the motivation to achieve AFFO bonus targets) demonstrated that recurring CapEx would be 5% of revenue. ¶55.[10]

---

[9]   Defendants' effort to portray the alleged accounting manipulations as inactionable judgment calls and/or opinions subject to *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), should be rejected.  Mot at 10.  Defendants told investors they would do one thing, *i.e.*, categorize chiller and battery replacement as recurring CapEx, and then did the exact opposite.  Even if these were considered opinions, which they should not be, the Defendants clearly "'sa[id] one thing and [held] back another.'"  *Omnicare*, 575 U.S. at 192; *see also New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 2023 WL 11965444, at *9 (2d Cir. Aug. 23, 2023).

[10]   Application of this new methodology in 2015 resulted in substantially lower recurring CapEx rate than the methodology used prior to that time (which was approximately 10% of revenue). ¶55. While the Motion seeks to create confusion, Plaintiff's allegations are not based on the decision to

However, in 2015 and continuing throughout the Class Period, Equinix reported recurring CapEx fell materially below 5% of revenue as a result of Defendants' deliberate and improper accounting manipulation. ¶56. This downward departure from 5% was particularly notable because Equinix's data centers were aging and becoming more, not less, expensive to maintain. ¶¶56-57, 184-185. Contrary to the Motion's inaccurate assertion that Plaintiff's offer a "crude" figure "out of thin air," the AFFO overstatement quantification is based upon the deviations from Defendants' own June 30, 2014 analysis and is far more conservative than the analyses of AFFO overstatement by either Barclays (which concluded that AFFO was overstated by 15% annually) or the Hindenburg Report (which found that AFFO was overstated by 19% to 22% annually). ¶¶109, 155.

Defendants lean heavily on their audit committee's investigation and the lack of any restatement to argue that no accounting violation occurred. Mot at 11. But a securities fraud action does not require a restatement for the obvious reason that it would make the defendant corporation the gatekeeper of such a suit. *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008) ("To [require a restatement] would shift to accountants the responsibility that belongs to the courts."); *see also In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *10 (C.D. Cal. Mar. 25, 2019) ("[M]any courts have found adequate allegations of scienter even when the defendants had obtained 'clean' audit opinions from their independent auditors and had never restated their financial statements.").

### 3.  False and Misleading Statements Concerning the AI Growth Opportunity

The Complaint alleges that Defendants made false and misleading statements concerning Equinix's ability to capitalize on the boom in AI computing. For example, on February 10, 2021, Meyers stated: "[AI is] central to what we have in our funnel today and what's fueling our strong bookings." ¶87. And on November 3, 2021, Meyers stated that "AI [was] a key driver" in securing new customer wins with Nvidia and IBM. ¶96; *see also* ¶¶81, 99, 135, 146. These statements

---

change methodologies; nor does Plaintiff make an apples-to-oranges comparison as Defendants suggest. Mot at 11 n.17. Plaintiff alleges that Defendants violated the accounting policy in place from 2015 onward, including during the Class Period.

were false and misleading because Defendants failed to disclose that they had already sold 150% or more of their available power capacity and, therefore, lacked power capacity to capitalize on the AI boom.  As they later admitted, AI would be a long term, *i.e.*, 25 year, driver, not a short-term one.  ¶125.  *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1136 (N.D. Cal. 2017) ("[A] plaintiff can state a 10(b) claim based on a failure to provide 'context' where that failure 'affirmatively creates an impression of a state of affairs that differs in a material way from the one that actually exists.'").

Defendants' statements concerning AI-driven demand were material to investors and were not mere puffery.  *See* Mot at 14.  First, the challenged statements were made in response to analyst questions and thus "cannot be discounted as mere 'puffery.'"  *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770-71 (9th Cir. 2023).  Second, the market understood these statements to mean that "Equinix (EQIX) is uniquely positioned to be a beneficiary from AI growth."  ¶120 (Credit Suisse report); *see also* ¶122 (Evercore reporting that Equinix "noted that they see a growing pipeline of AI opportunities").  Third, the material falsity of Defendants' statements was confirmed when the truth was partially revealed on June 21, 2023 when Meyers stated that AI was not a near-term catalyst.[11]  ¶125.  Oppenheimer downgraded Equinix on this revelation noting that investors were seeking "confirmation that AI would mark a new growth inflection point," and Equinix's stock price declined $33.  ¶127.  The Hindenburg Report's disclosure that the Company overselling power hindered its ability to capitalize on AI further confirmed that Defendants' statements were false and misleading.  ¶162.

### 4.    FE1's Account Is Reliable and Must Be Credited

FE1's account concerning the overselling of power is reliable and must be credited. *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 962 (N.D. Cal. 2014) ("The Ninth Circuit has held that . . . describing the witnesses' job description and responsibilities constitutes a 'large

---

[11]   The Motion fundamentally mischaracterizes Plaintiff's allegations concerning Meyers' June 21, 2023 statement as an alleged misrepresentation, as opposed to a partial disclosure of the truth. Mot at 15.  As alleged, Meyers' statement revealed the impact of (the still undisclosed practice) of overselling power capacity; the full truth connecting these two disclosures would not become apparent to investors until March 20, 2024.  ¶125; *see also infra* §III.D.

degree of specificity,' especially where the witnesses' exact title is used."). Here, the Complaint describes FE1's roles at Equinix from 2014 to 2022 as "Manager," "Senior Manager," and then "Director, Facility Operations" who "oversaw operations for 10 data centers in the southern United States." ¶37. FE1's responsibilities included maintaining "uninterruptible power supplies ("UPSs"), cooling capacity, and emergency diesel generators." *Id*. In FE1's earlier positions, FE1 managed all mechanical and electrical systems for multiple data centers. *Id*.

The Complaint also describes with particularity the basis of FE1's conclusion that Equinix oversold power, including that he reviewed "Branch Circuit Monitoring reports" which contained power usage metrics for each data center, and that he attended monthly capacity team meetings where Equinix monitored customers' power usage. ¶38. FE1 reported that capacity team meeting attendees "determined when Equinix would sell power that customers were not using, even though those customers were still authorized to use it" and that there was a percentage by which power at a data center was oversold. *Id*. This is more than sufficient to establish FE1's credibility. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (holding complaint described the confidential witness "'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged'").

### 5.     The Court Must Credit the Allegations Based Upon the Hindenburg Report

The allegations drawn from the Hindenburg Report are corroborated by FE1, supported by analysts, and, in certain instances, admitted to by the Defendants, and, therefore, the Court should find these allegations plausible and sufficiently reliable at this stage of the litigation. ¶¶153-162. Hindenburg Research, which specializes in forensic financial research, published their report on Equinix on March 20, 2024 based upon an investigation that "involved interviewing 37 former Equinix employees, industry experts and competitors." ¶153 n.8.

With respect to the overselling of power, the Hindenburg Report contains consistent and corroborating statements from multiple former employees that the Company oversold its power capacity across all data centers by 120% to 175%. ¶¶160-162. These accounts are further corroborated by FE1 who reported that power was oversold by 150%. ¶39. Following its

publication, Equinix confirmed the accuracy of the Hindenburg Report in a private conversation with TD Cowen analysts. ¶166. Furthermore, the Motion admits that Equinix overselling power is "common" but (wrongly) suggests that this conduct did not mislead investors. Mot at 15. In light of these supporting and corroborating facts, the Court should find the Hindenburg Report reliable with respect to the details it provides concerning the overselling of power.

With respect to the allegations concerning improper CapEx accounting and the overstatement of AFFO, the Hindenburg Report is also repeatedly corroborated. First, on September 23, 2022, Barclays issued a report finding that "some non-recurring growth capex would be better classified as recurring" and concluded that Equinix improperly overstated AFFO by 15% by misclassifying capital expenditures. ¶¶108-110. Following the Hindenburg Report, Wells Fargo issued an analyst report broadly confirming the AFFO manipulation: "we acknowledge EQIX (and other REITs) take some liberties with AFFO add-backs." ¶164. HSBC Global Research and Wells Fargo also reported that accounting manipulation was not unexpected with REITs, again bolstering the Hindenburg Report's credibility. ¶¶163-164. After the Class Period, on May 9, 2024, Equinix announced a new category of non-recurring CapEx called "redevelopment CapEx" which was consistent with prior reports that the Company was improperly classifying CapEx expenses. ¶¶172-173. Indeed, Barclays reacted that the change was contrary to the Company's own definition of recurring CapEx: "If components are at the end of their useful life, spending on replacement components would be best characterized as recurring [because t]his spending would be essential to support current revenues, *which EQIX uses in its definition of recurring capex*." ¶¶52-54, 67, 172-173.

The Motion's attacks on the Hindenburg Report as the work of an unreliable short seller should be rejected.[12] Indeed, other courts accept allegations based on similar reports where, as

---

[12] The Motion concedes the accuracy of the Hindenburg Report claiming it "did not reveal any 'truth' not already understood by investors, because investors already understood that companies like Equinix (1) exercise judgment when characterizing CapEx, and (2) consider actual power usage . . . when assessing capacity." Mot at 20. While Defendants are wrong that the Hindenburg Report did not reveal material new facts to investors, they are correct that the content of the Hindenburg Report is accurate and must be credited.

here, the specific facts of the case provide indicia of reliability.[13] *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1178, 1181-83 (9th Cir. 2024) (finding falsity and loss causation adequately pled where allegations based on reports from "[a]ctivist short sellers, like Citron Research and Hindenburg Research"). In *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714 (N.D. Cal. 2022), Judge Orrick credited a similar report from Scorpion Capital at the pleading stage despite its reliance on unnamed former employees because "'plaintiffs need not name their sources as long as [other factual information] provide[s] an adequate basis for believing that the defendants' statements were false.'" *Id.* at 732.

### 6. Equinix's Risk Warnings Do Not Shield Defendants From Liability

The Motion suggests that various fragments of cautionary language insulate Defendants' misrepresentations of current or historical fact – this argument is unpersuasive. Mot at 5, 13-14. Defendants cannot satisfy the Private Securities Litigation Reform Act ("PSLRA") safe harbor because it only applies to forward looking statements. Nor would it provide any protection for the false statements alleged here because "the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about ***current or past facts***." *Quality Sys.*, 865 F.3d at 1142; *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005) ("[E]xtension of the bespeaks caution doctrine to statements of historical fact is inappropriate."). In fact, here, Plaintiff alleges that the Company's risk warnings concerning its power capacity were false and misleading for failing to disclose their present and deliberate practice of overselling power capacity by 150% or more. ¶¶207-210.

---

[13] Defendants' reliance on *In re Nektar Therapeutics*, 2020 WL 3962004 (N.D. Cal. July 13, 2020) and *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699 (N.D. Cal. Feb. 20, 2024) is unpersuasive. Mot at 7. These opinions do not create a bright-line rule excluding short seller reports, and instead called the plaintiffs' presentation of the short seller reports unreliable because the complaints only identified the short-seller and did not set forth what sources the report was in fact based on, anonymous or not. In the instant case, Plaintiff's Complaint asserts that the Hindenburg Report was based on interviews with "37 former Equinix employees, industry experts and competitors." ¶153.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:24-cv-02656-VC     - 13 -
4855-4517-5028.v1

### C.    The Complaint Sufficiently Alleges a Strong Inference of Scienter

A complaint sufficiently pleads scienter if it "state[s] with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  15 U.S.C. §78u-4(b)(2)(A).  Plaintiffs can do so by "by raising a strong inference that the defendant possessed actual knowledge or acted with deliberate recklessness."  *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011).  "'[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'"  *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014).  A "'strong inference'" of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences'"; and allegations of motive are not required.  *Id*. at 324-35.[14]

#### 1.    Defendants' Statements and Admissions Demonstrate They Knew the Company Oversold Power Capacity

The Court should find scienter pled where Defendants "'bridged the scienter gap' . . . by referencing the data directly."  *Reese*, 747 F.3d at 572.  Here, on the Company's 3Q23 earnings conference call, Meyers represented that Equinix's "power utilization is actually meaningfully lower than our cabinet utilization."  ¶136.  In doing so, the Court can infer that Meyers knew (or was deliberately reckless in not knowing) the truth about those two metrics.  *Shenwick*, 282 F. Supp. 3d at 1147 (finding scienter adequately alleged where defendant referenced the state of two company-specific metrics as "'similar to what they were' at Analyst Day").  Meyers' statements that Defendants "continue to track [power density]" further support their knowledge.  ¶145; *see Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 884 (N.D. Cal. 2023) (finding scienter because

---

[14]    Plaintiffs do not engage in "group pleading" because they identify "'the roles of the individual defendants in the misrepresentations.'"  *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995).  Here, both Meyers and Taylor made false and misleading statements regarding AFFO and the Company's practice of overselling power, and the complaint identifies the speaker for each of these statements.

defendants tracked data).  This is consistent with FE1's report that "all employees could view . . . power usage by customer or by data center."  ¶38; *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at \*13 (N.D. Cal. Nov. 4, 2020) ("access to data" cutting against statements to investors supports strong inference of scienter).

Defendants gave "specific answers to specific [analyst] questions" about power, which supports scienter.  *In re Fibrogen, Inc.*, 2022 WL 2793032, at \*23-\*24 (N.D. Cal. July 15, 2022). *See, e.g.*, ¶132 (Taylor stating growth dependent upon having the "available power"); ¶97 (Taylor stating power was at "the forefront of everybody's mind").  Defendants also made statements, which – in light of later disclosures – evidence that they knew the Company was overselling power. For example, when asked about "power density," Meyers explained to investors that Equinix would "***dense up*** and extract more from the system over time."  ¶130; *see also* ¶137.  These statements provide further support that "Defendants 'actually knew specific information' that was 'at odds with the state of affairs they presented.'"  *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at \*18 (C.D. Cal. Aug. 4, 2017).  Moreover, Defendants refused analysts' requests for information about power usage, stating that Defendants "spent some energy thinking about power.  Power just doesn't feel like the right metric to be sharing."  ¶144.  Refusing to provide this information "strongly impl[ies] that [Defendants] had access to the disputed information" but refused to share it and "'knowingly misled the public.'"  *Shenwick*, 282 F. Supp. 3d at 1147.

### 2. Defendants Had Actual Knowledge of Accounting Manipulations that Overstated AFFO

Defendants had knowledge of AFFO and CapEx accounting improprieties no later than September 23, 2022, when Barclays downgraded Equinix, correctly concluding that it was improperly classifying recurring capital expenses. ¶¶108-111.  *See In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2012 WL 2512280, at \*11 (S.D.N.Y. June 29, 2012) (finding scienter partly because analyst reports contained "facts [that] were readily available to [Defendant] . . . that if investigated they would have revealed a GAAP violation").

A strong inference of scienter is further supported by Defendants' "repeated and specific representations to investors about [AFFO]."  *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301,

at \*10 (S.D. Cal. Mar. 18, 2019).  For example, Meyers admitted to "tracking [Equinix's] financial and operating metrics to ensure profitable growth and maintain a keen focus on AFFO per share as a lighthouse metric for the business."  ¶84.  Meyers also repeatedly stated that "[AFFO is] our kind of laser-focus in terms of a guiding light metric."  ¶75; *see also* ¶¶105-106, 113, 118, 128. Indeed, given that they preached their focus on AFFO in nearly every public forum they attended, it would defy credibility to suggest that Defendants were in fact unaware that AFFO was inflated. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (holding that Defendants' admissions to monitoring database combined with other factors made it reasonable to infer scienter); s*ee also SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2024 WL 3579322, at \*12 (N.D. Cal. July 29, 2024) ("The fact that senior executives 'habitually monitored' the company's earnings raised a strong inference of scienter.").  In fact, Defendants bragged that Equinix "deliver[ed] more AFFO per share than ***the next 6 . . . public companies combined***."  ¶82. This type of outlier performance should have triggered further investigation.[15]  *See Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 941 (C.D. Cal. 2012) (finding scienter partly because of company's "high . . . profit margin compared to competitors").

### 3. The Core Operations Doctrine Supports a Strong Inference of Scienter as to Overstatement of AFFO

Courts may impute scienter to individual defendants "based on the inference that key officers have knowledge of the 'core operations' of the company."  *Reese*, 747 F.3d at 575-76. The core operations theory is sufficient to plead scienter where the "prominence" of the disputed information makes it "'absurd'" to suggest that management did not know of it.  *Id.*; *see also S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).  Here it would be absurd to suggest that Defendants were unaware that AFFO was overstated.  Equinix's SEC filings stated

---

[15]  Additionally, Meyers and Taylor each signed the Company's Sarbanes-Oxley ("SOX") Certifications indicating the accuracy of the financials and the functioning of their internal controls.  ¶¶189-194. This is indicative of scienter because it "support[s] an inference that defendants were aware of matters relevant to their certifications or recklessly failed to make themselves aware."  *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1028 (N.D. Cal. 2020). Defendants only cite to cases where SOX certifications *alone* were insufficient to raise a strong inference of scienter which is not the case here.

that they presented non-GAAP metrics, including AFFO, because they were "focus[ing] on what ***management believes to be our core***, ongoing business operations."  ¶65.  Defendants also stated that AFFO per share was their "***core metric***" (¶88), that it was "very deeply ingrained into [their] thinking about how [they ran] the business" (¶113), and that they were "really focused on" AFFO (¶118).  They repeatedly referred to AFFO as their "lighthouse metric."  *See, e.g.*, ¶¶75-76, 84, 105-106, 113, 118, 128, 143.  They further admitted that they "[ran] the business to deliver against [the] AFFO target at the midpoint or better."  ¶84.  At every opportunity, the Defendants told investors that they were focused on reported AFFO; it would be absurd to suggest that they were unaware of the accounting manipulation that drove it.

### 4.    Defendants' Bonus Compensation and Stock Sales Support a Strong Inference of Scienter

Defendants had a motive to inflate AFFO and oversell power because their executive compensation was contingent upon achieving certain target AFFO and revenue targets.  ¶¶195-199; *see Am. W.*, 320 F.3d at 944 (finding scienter because Defendants were "motivated to inflate [Company's] financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance"); *Tellabs*, 551 U.S. at 325 ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference."). Equinix's executive compensation plan set forth certain AFFO and revenue targets at the outset of each calendar year, and if the Company did not meet these targets, the executives could lose their entire bonuses.  ¶195.  Indeed, but for the accounting manipulation, Meyers and Taylor would not have met the AFFO target in four out of five years during the Class Period.  ¶¶197-199.

Defendants capitalized on their fraudulent scheme by selling a combined $145 million in stock during the class period at inflated prices.  ¶200.  Indeed, Meyers sold 92% of his holdings and Taylor sold 69% of his holdings during the class period.  ¶200.  *Fresno Cnty Emps.' Ret. Assoc. v. comScore, Inc.*, 268 F. Supp. 3d 526, 554-56 (S.D.N.Y. 2017) (finding scienter when defendants sold between 92% and 68% of their shares); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (finding selling 7.6% of holdings supported scienter because the "amount of income he generated through his sales, $18 million, is

significant"); *Baron v. Hyrecar Inc.*, 2022 WL 17413562 (C.D. Cal. Dec. 5, 2022) (holding selling 17-45% of shares supported scienter). Moreover, the Company sold an additional $4.5 billion at inflated prices in multiple secondary offerings.  ¶201.  *Mulderrig*, 492 F. Supp. 3d at 1029 (secondary offerings support inference of scienter).

The Motion's efforts to downplay these sales should be rejected.  Mot at 18.  It cites no case where bonuses were directly contingent upon meeting the accounting metric that was alleged to be fraudulently manipulated.  Additionally, in regards to insider trading, Plaintiffs allege more than just large numbers "by themselves."  *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002).  Rather, Plaintiffs allege that Defendants engaged in a scheme wherein they reached their AFFO numbers only because they manipulated CapEx, which resulted in them receiving their bonus compensation, which they then traded in exchange for even more compensation.  As such, the "circumstances surrounding the sales" also give rise to a strong inference of scienter."  *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1051 (N.D. Cal. 2023) (finding scienter because "Defendant[s were] in a position to know that the statements [they] made were not true and [Plaintiffs] have laid out in detail [Defendants'] motive for misleading the market").

### 5.    Defendants' Admitted Pressure Campaign to Misclassify CapEx Supports a Strong Inference of Scienter

The fact that the Company exerted pressure from the top to meet the AFFO numbers and qualify for their bonuses also gives rise to a strong inference of scienter.  During a conference call, the Company's Chief Accounting Officer admitted that Defendants "put[] a ton of pressure" on the design team related to replacing infrastructure and CapEx accounting.  ¶140.  Former employee accounts in the Hindenburg Report confirmed this by describing "pressure" from top management to misclassify CapEx in violation of the Company's own accounting policy.[16]  ¶156.  *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012) (finding scienter where

---

[16]   Defendants' attempt to require that FE1 must have directly interacted with individual Defendants should be rejected.  Mot at 16, *see Felipe v. Playstudios Inc.*, 2024 WL 1380802, at *17 (D. Nev. Mar. 31, 2024) (crediting CWs even where they "do[] not directly allege that [defendant] communicated with CW1 or CW2"); *Shenwick*, 282 F. Supp. 3d at 1146 ("Even if the CWs statements are unreliable as to the individual Defendants' state of mind, they reliably bolster the" inference of scienter.).

defendants "encouraged employees to engage in 'aggressive' accounting to ensure [the company] hit [their] financial targets"); *see also SEC v. Winemaster*, 529 F. Supp. 3d 880, 916 (N.D. Ill. 2021) ("'violation of a company's own policy supports an inference of scienter.'"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ("[D]efendants' asserted actions contrary to expressed policy . . . can form the basis for proof of recklessness.").[17]

### D.    The Complaint Sufficiently Alleges Loss Causation

The Complaint sufficiently pleads loss causation in connection with multiple partial disclosures from September 23, 2022 through May 10, 2024, that revealed the truth about the Company overselling power and manipulating AFFO.  ¶¶15, 111, 127, 152, 167, 170, 175, 211-215; *BofI*, 977 F.3d at 790 ("[T]he true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures.").  "'Plaintiffs need only show a "causal connection" between the fraud and the loss', and they can do so 'even when the alleged fraud is not necessarily revealed prior to the economic loss.'" *Genius Brands*, 97 F.4th at 1183.  Here, for example, on September 23, 2022 Barclays published an analyst report accurately finding that Defendants were improperly classifying CapEx to boost reported AFFO – a virtual mirror image of the alleged fraud – but Barclays lacked confirmatory accounts from within Equinix; the stock declined $16.13 on this partial disclosure of the truth but remained artificially inflated.  ¶¶111, 213.  On March 20, 2024, the Hindenburg Report further revealed the truth about both the Company overselling power and overstating AFFO, supported by the accounts of multiple former employee witnesses; again, Equinix's stock price declined $23.91 in response to this disclosure but remained artificially inflated.  ¶¶167, 213.

Defendants' arguments against loss causation are readily dispatched.  Mot at 19-20.  First, the Ninth Circuit has held that a Hindenburg Report can constitute a corrective disclosure: "In the

---

[17]    Meyers shocked investors when he resigned as CEO on March 12, 2024 just one week after Equinix's stock reached its Class Period high and eight days before the Hindenburg Report's release also supports a strong inference of scienter. ¶¶149-151. *Shenwick*, 282 F. Supp. 3d at 1148 (finding fact that key executives resigning weeks before corrective disclosure was indicative of scienter); *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017) (holding that resignations support an inference of scienter where they are "accompanied by suspicious circumstances").

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:24-cv-02656-VC        - 19 -
4855-4517-5028.v1

end, 'a corrective disclosure can . . . come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters.'" *Genius Brands*, 97 F.4th at 1184. Second, the Ninth Circuit has found that a Hindenburg Report reflecting public information can be sufficient for loss causation:  "We have held that '[a] disclosure based on publicly available information can, in certain circumstances, constitute a corrective disclosure,' like when 'the alleged corrective disclosure provide[s] new information to the market that was not yet reflected in the company's stock price.'" *Id.* at 1186.  Third, a corrective disclosure "'need not precisely mirror the earlier misrepresentation.'  It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *BofI*, 977 F.3d at 790.  Fourth, the Ninth Circuit has recognized that "the announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation."[18] *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1203 (9th Cir. 2016).  While the Motion simply refuses to acknowledge it, each alleged corrective disclosure is causally connected to the alleged fraud. For example, analysts understood Meyers' October 25, 2023 statement concerning power usage to indicate that Equinix had "spare power" to pursue AI opportunities.  ¶¶136-138.  His June 21, 2023 admission that AI would not be a near-term driver revealed in part the falsity of this prior misrepresentation.  ¶125.

## IV.    CONCLUSION

For the foregoing reasons the Motion should be denied.  If the Court is inclined to grant all or part of the Motion, Plaintiff respectfully requests leave to amend to address any deficiencies the Court might identify.  Fed. R. Civ. P. 15; *Foman v. Davis*, 371 U.S. 178, 182 (1962).

DATED:  October 31, 2024

s/ Daniel J. Pfefferbaum
DANIEL J. PFEFFERBAUM

---

[18]    Equinix announced that they received subpoenas from the U.S. Attorney's Office for the Northern District of California and the SEC on March 25, 2024 and May 8, 2024 respectively. ¶¶168, 171.  On news of the DOJ investigation, the Company's stock declined $8.45 on elevated volume, and the stock fell an additional $14.75 after analysts issued reports on May 9, 2024 reacting to the SEC subpoena news.  ¶¶170, 175.

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
DANIEL J. PFEFFERBAUM
ALAINA L. GILCHRIST
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
agilchrist@rgrdlaw.com

Lead Counsel for Lead Plaintiff

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY  10271
Telephone: 212/652-3890
vpitta@pittalaw.com

Additional Counsel
