**Pages 1 - 42**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge Presiding

WAYNE CHAN, individually and   )
on behalf of all others        )
similarly situated,            )
                               )
        Plaintiff,            )
                               )
  VS.                          )    **NO. 3:24-cv-02656-VC**
                               )
EQUINIX, INC., CHARLES MEYERS, )
and KEITH D. TAYLOR,           )
                               )
        Defendants.           )
_____)

                San Francisco, California
                Thursday, December 5, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                  ROBBINS, GELLER, RUDMAN & DOWD LLP
                  Post-Montgomery Center
                  One Montgomery Street - Suite 1800
                  San Francisco, California  94104
        **BY:  DANIEL J. PFEFFERBAUM, ATTORNEY AT LAW**
             **ALAINA L. GILCHRIST, ATTORNEY AT LAW**
             **HAILEY ZANUTTO, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Stenographically Reported By:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Stenographic Reporter

**APPEARANCES**:   (CONTINUED)

For Defendants:

DAVIS, POLK & WARDWELL LLP
900 Middlefield Road - Suite 200
Menlo Park, California  94063
BY:   **NEAL A. POTISCHMAN, ATTORNEY AT LAW**
      **JONATHAN K. CHANG, ATTORNEY AT LAW**
      **VINCENT BARREDO, ATTORNEY AT LAW**

Also Present:          **Liz Hagerty, Senior Counsel Equinix**

**Thursday - December 5, 2024**                    **10:03 a.m.**

## P R O C E E D I N G S

### ---oOo---

**THE COURTROOM DEPUTY:**  Now calling Civil Case 24-2656, Chan vs. Equinix, et al.

Will counsel please come forward and state your appearances for the record, starting with the movant.

**MR. PFEFFERBAUM:**  Good morning, Your Honor.  Dan Pfefferbaum from Robbins Geller here on behalf of the Uniformed Sanitationmen's Accrual Fund, lead plaintiff, and with me today is Alaina Gilchrist and Hailey Zanutto.

**THE COURT:**  Hi.

**MR. POTISCHMAN:**  Good morning, Your Honor. Neal Potischman from Davis Polk on behalf of defendants.  With me from Davis Polk are Jonathan Chang and Vincent Barredo, and with me from Equinix is Liz Hagerty.

**THE COURT:**  Hi.

Okay.  Let me pull up the complaint here, amended complaint.

So I guess I sort of feel like there are three kinds of -- I guess I'll start with you, Mr. Pfefferbaum.  I feel like there are three kinds of securities fraud complaints.  The first kind is the kind that comes in and it needs to be dismissed with leave to amend, and you kind of have a sense that, you know, it's -- the problems are never going to be

fixed.

The second kind is the kind that needs to be dismissed with leave to amend, and you have a sense that the problems can be -- probably can be fixed.

And then the third kind, which is exceedingly rare, is the kind that comes in and you don't even need to dismiss it once; it goes through.

I sort of feel like this complaint is somewhere between number two and number three, and I can't quite figure it out. I think there are a couple problems with both of your theories. They seem like they're potentially solvable, but I can't -- I haven't sort of decided if they are big enough problems that they require dismissal or whether, you know, you can go through on this round.

So maybe we could start with the power stuff. So I -- what I couldn't find in the complaint was a very clear explanation or very clear allegations of just how much a precarious position they were putting themselves in; right?

We -- you know, it sounds like they weren't disclosing that they were overselling power, and I think that probably only matters if they were putting themselves in a really precarious position by overselling power, and the discussion of what could happen as a result of overselling power seems kind of speculative to me.

And so then I guess that's the first -- that's the first

question is, you know:  Have you -- you know, have you adequately explained in the complaint just how precarious a position they were in as a result of overselling their power by 150 percent?  And if so, where is it in the complaint?

MR. PFEFFERBAUM:  Thank you, Your Honor.

So starting with the power allegations, it sounds like you accept that we have adequately alleged that power was oversold.

THE COURT:  Yes.

MR. PFEFFERBAUM:  Excellent.

And so once we get there, the question that I hear from you is:  Well, what did -- what were the consequences of that for the company?  And in the complaint, you know, we do talk about a couple of different consequences.  I mean, the first is the very real chance, as we see it, that the company could run out of power if all of the contractually sold power was demanded at any given moment.  Right?  I mean, and so that is a real risk.

Now, we don't know -- the defendants say, "Well, it never came to pass."

THE COURT:  "It never came to pass" is not necessarily a good answer, but I think they only have to provide a good answer if you've adequately alleged that they were in a precarious position with respect to that; and from the allegations in the complaint, it seems like it's sort of speculative as to how much of a risk it really was, how

immediate of a risk it really was, how precarious of a position they were in.  It seems more theoretical -- the discussion, the comments that you quote seem more theoretical than anything else.

**MR. PFEFFERBAUM:**  So I would --

**THE COURT:**  Could I put it one other way just to --

**MR. PFEFFERBAUM:**  Certainly.

**THE COURT:**  It's like there's the analogy to, you know, overselling seats on an airplane, I think -- or maybe we came up with that analogy ourselves, I can't recall -- but, you know, if you -- if you oversell your seats by, you know, 125 percent and history shows that that's never been a problem over the last eight years and, you know, we know that, you know, typically 35 percent of people don't show up for their flights, it's not a problem.

But if you oversell, you know, 120 percent and usually you only have 21 percent of people not showing up, then you're really -- you're putting yourself in a precarious position. And I didn't see any allegations about that, about how much power was actually being used and how close the company might have been to experiencing one of these power outages or having their growth be limited -- the company's growth be limited because, you know, there was not enough power capacity.

**MR. PFEFFERBAUM:**  Understood, Your Honor.  I would point you to paragraph 174.  The company ultimately refuses to

disclose that metric.  Right?  The analysts repeatedly asked for power.  Paragraph 174 we quote an analyst report that basically says, you know, the company refuses to do it because it would allow investors to back into exactly how much power is being used at these facilities.

But what I would point you to is paragraph 163.  That's the --

THE COURT:  But even that -- I mean, since you pointed me to 174, I mean, even that is speculative.  Right?  They are speculating that the company is kind of trying to keep investors in the dark; but, you know --

MR. PFEFFERBAUM:  Again, I would -- you know, the company does explicitly say that it believes power is not the correct metric to share with investors.  I mean, so I don't -- it may be speculative in 174 that they're saying that's why --

THE COURT:  Yeah.

MR. PFEFFERBAUM:  -- you know, they won't share it.

THE COURT:  And maybe -- but maybe that's right, that power is not the correct metric because maybe, you know, the overselling of power is just not putting them in a precarious position because they have so much, you know, wiggle room.

MR. PFEFFERBAUM:  I would point Your Honor to paragraph 173.  That's the HSBC Global Research report.  That is the analyst report, and we have it in bold italic in the second paragraph of that analyst report that's quoted --

right? -- the accusation that Equinix is selling more power than its available capacity to customers could imply significant operational and reputational risks.

**THE COURT:**  "Could imply significant operational and reputational risks," but then the analysts -- and then there are a number of other quotes from analysts in the complaint that say something to the effect of, "But we don't have visibility into that so we don't know."  Right?

And I think that's the point.  We know that people are concerned about this.  Right?  We know this report, Hindenburg report, comes out, identifies this as a concern.  There's some quotes from people and, you know, analysts are concerned about it; but we don't -- but, you know, as far as I know, the Hindenburg report doesn't provide any greater specificity on these questions than I'm asking about than your complaint does.

And so there's this concern that's expressed by the Hindenburg report.  Analysts are expressing concern about it. They are saying, "We don't have visibility into this."  So we know that much, but maybe if they had visibility into it, they would discover that it wasn't really a problem, that the company wasn't putting itself in a precarious position.

And I think, and you can correct me if I'm wrong, but I think you have to give the reader of the complaint sort of reason to infer that they actually were putting themselves in a -- the company was actually putting itself in a precarious

position by the amount of power it was overselling.

**MR. PFEFFERBAUM:** So then let me go -- so we've talked about there's the reputational/operational risk.  We identified that in the analyst report.

The second -- the second, I think, impact of it is, it is the -- it limited the company's growth going forward, we allege.  In particular, it limited its ability to capitalize on the booming -- you know, kind of the AI boom.  Right?  Everyone in this space sees AI as the hot new technology.  It's tremendously power intensive, and the analysts -- remember, if you go back to the statement that we allege is false, which is that when they say that their cabinet -- that their power utilization is below their cabinet utilization, the analysts say that means that there's spare power to capitalize on AI.  The analysts --

**THE COURT:** But that's not -- you portray that statement as false in your complaint, but I don't think it is.  Right?  I mean, it's -- power utilization is below -- presumably is below cabinet utilization.  Right?  Because, you know, people who have the cabinets aren't using all the power that they could.  Right?

It's the 100 -- the overselling of -- the overselling of power is not power utilization.  Right?  At least that's not the plain meaning of the word "utilization."

**MR. PFEFFERBAUM:** I think that even if you -- that

is -- I mean, first of all, I think that investors could understand utilization to be the contracted amount of power sold.  They are utilizing more than 100 percent of their power in generating the revenues that they're bringing in.

THE COURT:  I don't know.  I mean, that sounds counterintuitive to me.

MR. PFEFFERBAUM:  But even if you accept that it's literally accurate, that their utilization is -- that power utilization is below their cabinet utilization, it is absolutely misleading to suggest that you have -- their cabinet utilization was 80 percent.  So it would be absolutely misleading to suggest that you had a 20 percent growth runway -- right? -- to expand your business without also disclosing at the same time that you're talking about your power utilization, that you have sold 150 percent of your power capacity.

THE COURT:  I think it depends how likely it is that, you know, the existing users of the cabinets were going to increase their power utilization, and that's the part that I just don't have a good understanding of from going through the allegations in the complaint.

MR. PFEFFERBAUM:  Understood, Your Honor.

Ultimately the company doesn't disclose that precise power metric.  What we do know is that the, you know, analyst investors reacted negatively to it.  They thought it increased

the reputational/operational risk, which, you know, that gets kind of into the scheme allegations that go unaddressed.  The reliability of this service to their customers I think is implicated by the overselling of power.

And then you've got the company and its analysts in 2023 having told investors that AI was driving big customer wins and having set up the expectation -- right? -- that AI is the next driver for the company, suddenly telling everyone that's a 25-year horizon for the company.

And, again, it's -- I -- the analysts connect the overselling of power and the limitations on the power capacity to the inability to capitalize on the AI boom.

So I think that you can -- that we satisfy -- you know, I think this is really a materiality question.  Right?  It's clear that they oversold power, and they didn't disclose it; and when it was disclosed, there was negative reaction from the analysts and investors.

And I think what you're putting to me is:  Well, would it have -- had it been disclosed, would the ordinary -- would it have changed the total mix of information for the ordinary investor?  And I think that we've shown you that it would because -- you know, because of these limitations it plays particularly on growth going forward.

THE COURT:  Well, I mean, I don't -- I think you're probably putting too much on the AI stuff.  I mean, the AI

stuff all seems very nebulous, and I'm not sure there's any --
you know, I'm not sure really they made any particular promises
about AI.  And, you know, obviously sort of the AI space is
amorphous and, you know, hard for people to understand.  I
don't -- I didn't -- that part of your presentation I wasn't
particularly convinced by.

But can we go to the accounting gimmickry, as you would
probably put it?

**MR. PFEFFERBAUM:**  Sure, Your Honor.

**THE COURT:**  So I found the allegations to be quite
strong overall on this one as well, but the one -- my one area
of concern is what the company disclosed about its methodology.
Right?  And so I'm looking at -- I have printouts now of
Exhibit 5 and Exhibit 11.  We can start with Exhibit 11.

**MR. PFEFFERBAUM:**  I'm just grabbing my binder.  One
second, Your Honor.

**THE COURT:**  So page 36 of this presentation, this
earnings presentation, from Q4 '15.

**MR. PFEFFERBAUM:**  Yes.

**THE COURT:**  You got that?

**MR. PFEFFERBAUM:**  Yes.

**THE COURT:**  So it's got the definition of "recurring
capital expenditures," and we -- you know, you talk a lot about
that.  And then it's got this definition of "nonrecurring
capital expenditures" and it says, you know, primarily for

development and buildout of new IBX capacity. It also includes discretionary expenditures for expansions, transformations, and incremental improvements to the operating portfolio; e.g., electrical, mechanical, and building upgrades, IT systems, network gear, blah blah blah, which may expand the revenues base and increase efficiency by either adding new assets or extending useful life of existing assets. Right?

So you have -- in the definition of "recurring capital expenditures," you have "to extend the useful life of IBXs or other Equinix assets." And then in the definition of "nonrecurring capital expenditures," you have "increase efficiency by either adding new assets or extending the useful life of existing assets."

And so I guess the -- I think maybe what their best argument is against you -- up against your theory here is that the ambiguity in the distinction between the two was there for everybody to see. The vagueness and the discretion and the wiggle room that they have is out there in the open, and so anybody who's -- you know, anybody who's reading this is going to know that there are going to be, you know, expenditures on the margin that are probably going to go into -- naturally go into the category of nonrecurring capital expenditure. And so where's the fraud? Right?

These classifications that you're describing about the batteries and the LED lights and all that seem pretty sketchy

and it seems pretty clear that sort of if you -- if you're distinguishing between recurring capital expenditures and nonrecurring capital expenditures, that stuff would go into recurring capital expenditures, and certainly seems sketchy what they did.  The question is whether it was hidden -- you know, the possibility of that happening was hidden from investors or whether it was sort of disclosed to investors by virtue of the sort of amorphous definitions that they gave to these concepts.

**MR. PFEFFERBAUM:**  Understood, Your Honor.

The clearest response and the response that I believe shows that we've met our pleading burden here is paragraph 53.

**THE COURT:**  Okay.  Hold on let me get there.

Sorry.  It's a long complaint.

Okay.  Go ahead.

**MR. PFEFFERBAUM:**  It's not the worst thing said about any of my complaints, so...

Paragraph 53.

**THE COURT:**  Yep.

**MR. PFEFFERBAUM:**  So this is -- let's just take a step back.  This is 2014, 2Q 2014.  This is the company on the verge of transitioning from a C Corp. to a REIT.  They're going to change their CapEx classification method.  We don't take any issue with that.  They are going to use a new CapEx classification method, and they lay out exactly how that

method, the new method, the one that was in place during the class period, would treat --

THE COURT:  Chillers and strings of batteries, yeah.

MR. PFEFFERBAUM:  Exactly.

-- the end-of-life equipment replacement; i.e., chillers and strings of batteries.  This is the only place that I am aware that the company outlined precisely how it would treat those specific expenditures.

Now, from defendants' briefing, they claim:  Well, we changed our policy in Exhibit -- is it 11 or 12? -- in Exhibit 11.  Right?

THE COURT:  This is about -- I mean, Exhibit 5 seems like it must be about the new system that they're adopting.  Right?  Exhibit 5 is what you were reading from in paragraph 53 I think; right?

MR. PFEFFERBAUM:  Ah, yes.  So that -- so that is the only place -- and I would note for you that nowhere in their briefing do they use this expression "end-of-life equipment replacement."  Right?  This is the only place where this is addressed.  So if -- and their -- so if their position is that we in a -- you know, in a quarterly presentation in kind of a footnote there changed our accounting policy -- right? -- without informing investors after we did this very big presentation graphically showing how all CapEx was going to be broken down, each of the different buckets, I think that that

at a minimum presents a fact issue that there was a -- that there was an undisclosed change and that it -- or a disclosed -- you know, a change that was not --

THE COURT:  Or, I mean, another way to put it would be the language in Exhibit 11 is not enough to sort of give them cover for the classifications that they made in light of the pretty clear statement in paragraph 53 --

MR. PFEFFERBAUM:  Right, which is --

THE COURT:  -- and 54.

MR. PFEFFERBAUM:  -- Exhibit 5 at 13.

THE COURT:  Right.

MR. PFEFFERBAUM:  Right.

THE COURT:  Right.

MR. PFEFFERBAUM:  Look, Exhibit 5 at 13 is where they say for these -- and these are the key -- two of the most significant expenses -- right? -- for the company.  The chillers are the ones that keep the buildings cool while the computers make -- generate heat.  Right?  And the batteries, these are the backup batteries in case there's, you know, a power failure, they run out of power -- right? -- the batteries kick on, they keep everything running.  And these are two of the most significant expenses that they have.  And so they're telling investors exactly how those two expenses will be classified.

So I think at a minimum, I don't know if -- I don't agree

that Exhibit 11 says that they treated the replacement of batteries and chillers correctly in accordance with their policy, but what I do know is that they absolutely told investors that -- in, you know, paragraph 53 of the complaint, that this is how these transactions would be handled.

And so, you know, I think at a minimum, at this stage that is enough, and I think it's very telling that they don't discuss the end-of-life replacement anywhere.

THE COURT: Okay. I'm happy to hear from the defendants on both these points.

MR. POTISCHMAN: Thank you, Your Honor.

Would you like me to begin with the power or accounting, Your Honor?

THE COURT: Whatever you prefer.

MR. POTISCHMAN: I think let's stay with accounting since we're right there.

THE COURT: Okay.

MR. POTISCHMAN: I think there's a number of points that -- that need to be addressed on this; and if it's okay with Your Honor, I'd like to look at what's actually in Exhibit 5 --

THE COURT: Okay.

MR. POTISCHMAN: -- because that's where they're pulling from. And if we can look at Slide 13.

THE COURT: Okay.

**MR. POTISCHMAN:**  First of all, just to get grounded, there's obviously the old definitions "ongoing" and "expansion" and the new definitions "recurring" and "expansion."  Obviously there's also "nonrecurring," which is a synonym for "expansion."

The first thing that's important to keep in mind, Your Honor, is, as is clear from the graph, there are things from the old definition of "ongoing" that are moving to "nonrecurring."  Right?  Everything that is, quote/unquote, "expansion" is staying as "expansion" or everything that is "expansion" is staying as "nonrecurring," but not everything that was "ongoing" is staying as "ongoing" or as -- okay.

And in particular, there's a reference to three items.  If you look at efficiency improvements, that area, IT product network, some of that is staying as recurring and some of it is going to be moving down to expansion.  If you look at the expansion CapEx examples -- right? -- efficiency improvements are referenced.

Now, they're referring to this top language.  Our position is not, Your Honor, that the company changed their policy between this exhibit and Exhibit 11, and we can talk through this, but it's not that it changed.

They're referring to end-of-life equipment replacement, and we'll talk more about what that means, but they would need to come forward, Your Honor, with concrete specific examples,

including timing, of situations where what the company had was end-of-life replacements certainly that were not efficiency improvements.

If there's -- I think for this purpose if we look only at this one page and say, "This was the entire record," there is ambiguity about whether an end-of-life replacement that results in an efficiency improvement is or is not in one bucket or the other.  Okay?  But it's clear --

**THE COURT:**  I don't know.  I mean, I think -- I thought the complaint created a pretty strong inference that stuff was being misclassified.  I mean, the battery replacement, the light replacement, the chillers.  I mean, I thought that -- I thought that there was a pretty strong inference that they were misclassifying stuff.  And the question -- or when I say "misclassifying stuff," I mean misclassifying stuff if you look at the definitions -- if you look at Exhibit 5.  Right?

And, you know, that's why I pointed to Exhibit 11, which is a little more ambiguous, you know, the way they define the difference between recurring capital expenditures and nonrecurring is a little bit amorphous.

**MR. POTISCHMAN:**  Your Honor, I -- sorry.

**THE COURT:**  Go ahead.

**MR. POTISCHMAN:**  If you just give me a couple more minutes to walk through the rest of this --

**THE COURT:**  Okay.

**MR. POTISCHMAN:**  -- I think I can explain it because I think this is actually, respectfully, quite a weak argument that they have based on the actual disclosures.  And I realize it's hard in the space we had to sketch it all out clearly, but just to spend one more minute on page -- within Exhibit 5 on 32.

**THE COURT:**  Page 32?

**MR. POTISCHMAN:**  Yeah.  Just to continue with one of the points we were making, because one of their arguments and one of the -- I imagine one of the things that may be motivating Your Honor saying you think that there may be some mischief going on is the fact that the percentage of recurring CapEx compared to revenue goes down.

If you look, Your Honor, I mentioned that there were some items that were going to --

**THE COURT:**  I mean, I think that does some work, but I was more -- I was more focused, frankly, on the quotes from people about what was going on with the reclassifications, but --

**MR. POTISCHMAN:**  Well, let me get to your point first --

**THE COURT:**  Let me get first -- I just pulled up all of Exhibit 5.  Tell me which page you want me to look at.

**MR. POTISCHMAN:**  Page 32.

**THE COURT:** Okay. Give me a sec.

29... Page 32. Okay. Go ahead.

**MR. POTISCHMAN:** And, Your Honor, just to address the point you just made about the quotes, I will just say, maybe I will not persuade you, but I think for a securities complaint, the utter absence of detail about the particulars regarding those, where it is happening, when it is happening, they obviously don't have a confidential witness saying that in their complaint and Hindenburg doesn't, obviously, name anybody and it's super skeletal; nor do they have a confidential witness on the accounting side, as you see in most of these cases, saying either that we were misclassifying or that there was pressure to misclassify.

All they have, Your Honor, from Hindenburg is people saying there was pressure to do things, you know, push through efficiency improvements, and they may think whatever they want about that but there is nobody saying that, in fact, there was pressure to misclassify.

But to get back to page 32 before getting to Exhibit 11, I just want to note that, Your Honor, again the idea that the company was shifting items that had been considered recurring or ongoing to a different category, if Your Honor looks at just the first column Q1 2013, you see at the top is the legacy presentation, at the bottom is the revised presentation.

If you look under "Ongoing" on the left, the subtotal for

ongoing for Q1 2013 is 33997.  If you look down revised CapEx presentation under "Recurring," subtotal recurring, 15357.

So the amount being spent on ongoing/recurring is essentially getting cut in half under expansion.  Subtotal expansion 41670.  You follow that down to the expansion subtotal line below that, it's 6310.

I highlight this, Your Honor, primarily -- and the same is true for every one of these columns if Your Honor, you know, wants to reconcile them or I can walk through them.

THE COURT:  Let me look at the other columns real quick.  Hold on.

(Pause in proceedings.)

THE COURT:  Okay.

MR. POTISCHMAN:  And I think the point is, Your Honor, plaintiffs may disagree or even some analyst may disagree with the best way to present this information in the most useful way, but the company was unambiguous about the fact that items that had been previously treated as recurring were no longer going to be.  They depicted it graphically and then they depicted it numerically.

Now, if we turn to Exhibit 6, Exhibit 6 is analyst investor day corresponding to the same presentation we were just looking at --

THE COURT:  Okay.

MR. POTISCHMAN:  -- at least as far as I understand

it.  And on the bottom of what is listed as page 75, or on ECF it looks like it's page 7, there's Mr. Taylor, the chief financial officer.

THE COURT:  Yeah.

MR. POTISCHMAN:  There's discussion of the 5 percent, which we don't have to talk about right now.  It says in the appendix that we've shared with you -- we will be sharing with you, is the breakdown of CapEx.

And historically when you think about -- when we talked about maintenance, a lot of what was synonymous, basically ongoing, we've now done a real detailed scrub about what that really means.  And so what you're going to get on a go-forward basis, particularly as we convert to a REIT, you're going to get a different look in what CapEx is going to look like.  It talks about the chart.  It says [as read]:

"... and examples of what would be.  Anytime we can extend the revenue stream or the useful life of an asset that drives incremental revenue, we put it in the expansion bucket, not the ongoing bucket now."

It goes to talk about the 5 percent and goes to talk about that maintenance is going to be lower.

So, Your Honor, for them, I think looking at Exhibit 5 and looking at Exhibit 6, to make the case that the company has lied --

THE COURT:  But they're still saying as part of this

same presentation that, you know, replacing strings of batteries and chillers doesn't go in the expansion bucket, it doesn't go in the, you know, bucket of "We can extend revenue stream or the useful life of an asset that drives incremental revenue."

**MR. POTISCHMAN:**  Your Honor, respectfully, that all presupposes that what you're doing does not extend -- excuse me -- does not result in an efficiency improvement.  And I think there is significant irony here.

**THE COURT:**  How does battery replacement result in efficiency improvement?

**MR. POTISCHMAN:**  Your Honor, that's exactly the point, and I think we can go with --

**THE COURT:**  Because there are, like, better batteries by the time you need to replace them?  Like, the batteries are more powerful?

**MR. POTISCHMAN:**  Yes.  Hold more power, last much longer.  I think just using my own home smoke detector sort of situation, there are --

**THE COURT:**  If that were the case, then why would you list replacing strings of batteries as an example of maintenance, as an example of recurring?  Because batteries always get better; right?  Technology always improves.  Like, lightbulb technology improves.  I'm sure chiller technology improves, although I don't know anything about chillers.

I mean, the idea -- the idea that you could classify it as an expansion because you're replacing a battery that -- you know, an old battery with a new battery that performs like 105 percent better or something seems ridiculous.

**MR. POTISCHMAN:**  Your Honor, I don't agree, and I'll say I don't agree and I think there is some irony in a case where they're focusing on the idea that a company is power constrained and at the same time raising a question about the company treating adjustments that make their facilities use less power and saying it is irrelevant.

And if we look at 11, Your Honor --

**THE COURT:**  Could I just make sure?  You know, you showed me that -- their reclassification of the 2013 and early 2014 numbers --

**MR. POTISCHMAN:**  Yep.

**THE COURT:**  -- and I just want to make sure I understand what is the significance of that as it relates to their allegations.  Right?

Because I think what they alleged -- and it's possible that I'm misremembering it because it's a pretty long complaint.  But the -- I think what they were alleging was that starting in 2014, more and more stuff started moving into expansion.  Right?  That over the course of 2014 until whenever -- I don't remember what the date was where the, quote/unquote, "truth was revealed" -- that during that period

of time, the stuff like the recurring CapEx expenditure number was getting smaller and smaller and the expansion number was getting bigger and bigger.  Isn't that what they allege?

**MR. POTISCHMAN:**  I mean, Your Honor, obviously Mr. Pfefferbaum can explain how he positioned it.  As I read their complaint, in general they're saying you would have expected the percentage of CapEx to be higher and to be going up over time, and you would not have expected it to be sub 5 percent.  And they do cite at least one analyst saying, "We don't know why the number, which pre-REIT conversion was in the teens, would now be below 5 percent."

And the significance of what I was just walking through is exactly that.  They disclosed that it was not going to continue to be in the teens.  They disclosed they were moving items from that bucket to another bucket.

**THE COURT:**  Got it.

**MR. POTISCHMAN:**  And they also disclosed going forward they expected recurring CapEx to be at or below 5 percent.

**THE COURT:**  But if you look at this presentation --

**MR. POTISCHMAN:**  Yes.

**THE COURT:**  -- battery replacements are recurring CapEx.

**MR. POTISCHMAN:**  So what I'm --

**THE COURT:**  And what the allegations are, and seems to be -- they seem to be pretty specific, is that battery

replacements are an example of something they were putting in expansion CapEx.

**MR. POTISCHMAN:**  And I appreciate Your Honor's indulgence in giving the time because I would like to bring it home with Exhibit 11, although before I do that, I just want to say I know Your Honor says you believe they're strong, there's -- I think there is almost nothing, in fact, that meets the PSLRA standard on this issue.  There are not particular people.  There's nobody in accounting.  There is no detail on the quantum of this.

But if I --

**THE COURT:**  On the extent to which misclassification was happening and when --

**MR. POTISCHMAN:**  Correct.

**THE COURT:**  -- and all that.  Okay.  I understand.

**MR. POTISCHMAN:**  But looking to Exhibit 11 --

**THE COURT:**  And I'll ask the plaintiffs' side to address that.

**MR. POTISCHMAN:**  Looking to Exhibit 11, Your Honor, and point -- looking at page 36, which Your Honor had drawn attention to, I do think there are a couple of words that didn't get put into the record which are important; and under the definition of "recurring capital expenditures," it refers to extending -- right? -- the useful life of IBX or other Equinix assets that are required to support current revenue.

And the distinction, Your Honor, and this is -- this is -- from this -- this is from 2015.  This language continues, Your Honor, every year.  Right?  The cost period doesn't begin for years more.

The focus on the recurring expenses is supporting current revenues; whereas, as Mr. Taylor said and as the disclosure of nonrecurring revenue talks about, nonrecurring expands the revenue base.

So I don't believe Your Honor had suggested that there was a lot of ambiguity here, and we were trying to live with the ambiguity.

**THE COURT:**  Right.  But replacing -- again, replacing batteries clearly falls in the former category.  You're not expanding the revenue base by replacing batteries.

**MR. POTISCHMAN:**  Your Honor, respectfully, I disagree with you and I don't think they've pleaded anything that suggests that that is right, and the reason is for partly the reason I talked about, which is this entire business is extremely power focused and power intensive.  They have tons of disclosures talking about the fact that, in fact, power limitations are some of the most significant they face.

If you put, Your Honor, 10,000 LED bulbs into your ceiling as opposed to 10,000 incandescent bulbs, you not only may have to not replace your bulbs once every 10 years, but you now be able to add more cabinet capacity.  If you have batteries,

Your Honor, that hold charges better and that last twice as long, you may not only not need to replace them --

**THE COURT:** Well, so if the allegations were that, you know, "Hey, all these regular lightbulbs are working, but let's do -- let's go -- let's -- at the facility let's replace them all with LED bulbs so we can save power," that would be one thing.  But that's not what the allegations are; that's not the quotes from the people who are quoted in the Hindenburg report and in the complaint.

**MR. POTISCHMAN:** First of all --

**THE COURT:** In the report and in the complaint it's, like:  Okay, we can -- we're replacing lightbulbs as needed and when the lightbulbs are, you know, about to go out or go out, or something like that, we're going to use a different lightbulb and so we're going to call it a capital improvement.

**MR. POTISCHMAN:** Your Honor, I have to say I don't think the Hindenburg report is remotely detailed about this, about when it is the lightbulb has gone out and we're going to replace it versus when the lightbulb maybe is going to go out in a day versus when it's part of a major capital improvement project.  I don't think there's any specificity, certainly not about the quantum.

But I would say that even as you're nearing end of life, if you make changes that expand your ability to put more cabinets in, which is really how the business gets its revenue,

I just don't think they have a fraud claim.

The expenses which may expand the revenue base and increase efficiency by either adding new assets or extending the useful life of existing assets, if you replace batteries, Your Honor, in a way -- and let's put aside whether it's a year before they die, the day before they die, or the day they die, and you now can install further cabinets, the company has disclosed:  We're going to treat that as expansion because we're trying to expand our revenue base.  And there's a direct relation, Your Honor, between the accounting and the power limitations that's inherent in this business.

THE COURT:  All right.  But even if you replace a battery with the exact same kind of battery -- right? -- you're, quote/unquote, "extending" the useful life of an existing asset.  Right?  You can't -- you're not going to be able -- and you're protecting the revenue base.  Right? You're -- because if you don't replace the batteries, you're not going to be able to use the asset and you're not going to be able to generate revenue from it; right?

MR. POTISCHMAN:  Your Honor, I'm not -- I'm not an accountant, but I will just say as a lawyer, as I read this, if you take out one Duracell and replace it with another one, you are supporting your current revenues, and that's a recurring -- that would be a recurring expense.

THE COURT:  But if the Duracell has improved its

quality by 5 percent, then you are extending the useful -- then you're increasing efficiency by adding new assets.

**MR. POTISCHMAN:**  Your Honor, I don't want to suggest how an accountant at Equinix would have dealt with that precise situation.  One thing is for sure, the complaint doesn't contain any indication that there was an attempt, including with accounting people, to misclassify those items; but do I think the company is clear that if you're increasing efficiency, they do have that option.

I will say the analysts -- the analyst reports that they cite, Your Honor, say much of the same thing.  They refer in particular to the supporting current revenue versus expanding the revenue base anytime they can increase efficiencies.  I do think the analysts, in fact, understood this.

**THE COURT:**  Okay.  The main thing I want to hear from you is a response on -- to the notion that the statements about the misclassifications are not specific enough or not detailed enough.  You've quoted a bunch of people talking about --

**MR. PFEFFERBAUM:**  Yes.

**THE COURT:**  -- misclassifications, and he's saying they're not specific enough as to the who, what, when, where, why, et cetera, so...

**MR. PFEFFERBAUM:**  Your Honor, you have in our complaint we've quoted the Hindenburg report.  You've got the Hindenburg -- defendant submitted the Hindenburg report to you

as well.  There is a -- there are multiple former employees -- right? -- talking about pervasive pressure to misclassify these specific types of expenses.

They -- I acknowledge, Your Honor, they do not give, you know, a specific date or amount, but that does not mean that the quantification is absent from the complaint.

The defendants refuse to engage with the analysis that we present in the complaint that in 2014, when they were going to make this transition to the new -- to a REIT and CapEx accounting style, they did a demonstration -- right? -- that showed that recurring CapEx was going to be 5 percent of revenue.

And the important thing about that demonstration is that it was done without the motivation to meet their new stock bonus plan, which was contingent on meeting AFFO targets, and it was without the motivation to achieve their AFFO -- there publicly stated AFFO guidance.

And so that analysis that we have shown -- so they showed that applied in a no-pressure situation -- right? -- it would be 5 -- recurring CapEx would be 5 percent of revenue.  As soon as the company and the defendants had the motivation to meet their guidance and their bonus metrics, that number started declining below 5 percent.

And we presented to you allegations that say that that is contrary to the expectations of a company that is maintaining

aging facilities. And we have -- I think we have a chart in here that shows the declining CapEx spend per facility across their entire portfolio. And --

THE COURT: Where's that?

MR. PFEFFERBAUM: Let's see, let me make sure I have that chart for you.

That is at paragraph 57 on the top of page 17, you've got the average CapEx spend per data center.

THE COURT: Okay. Wait. Hold on.

Sorry, which? Okay. Wait.

MR. PFEFFERBAUM: Paragraph 57.

THE COURT: Okay. Hold on.

(Pause in proceedings.)

THE COURT: Okay.

MR. PFEFFERBAUM: So you've got the -- so, again, the declining CapEx spend per data center while the data centers are aging -- right? -- would indicate that misclassification of CapEx's growth instead of maintenance.

You've also got the Barclays September 2022 analyst report, that's at paragraph 108 to 111, Barclays analyzing the company's public filings, as well as industry -- right? -- industry trends. Right?

THE COURT: Yeah.

MR. PFEFFERBAUM: Barclays determined that the large -- and I'm looking at paragraph 109, the quote on

paragraph 109 -- the large differential --

**THE COURT:**  Yeah.

**MR. PFEFFERBAUM:**  -- right? -- suggests some --

**THE COURT:**  Is that everybody's phone going off?

**MR. PFEFFERBAUM:**  We're getting a tsunami alert.

**THE COURT:**  Okay.  I'm comfortable ignoring the tsunami alert, but if anybody is uncomfortable ignoring the -- I mean, we're pretty high up; right?  Do we want to recess and, like -- I don't -- I mean, I don't to -- I want to take warnings seriously, but...

**MR. PFEFFERBAUM:**  I think I'm okay continuing if everyone else is.

**THE COURT:**  Bhavna, what do you think?

**THE COURTROOM DEPUTY:**  I think we're okay.

**THE COURT:**  Yeah.  What do you guys think?  You're looking at your phones.

**THE LAW CLERK:**  I assume if we have something, the building would tell us.

**THE COURT:**  Yeah, I think the alarms would go off or somebody would come in or something.

Oh, it's an earthquake?  Oh, okay.  This building is very safe for earthquakes.  So all right.

**MR. PFEFFERBAUM:**  Well, that was a first, Your Honor.

**THE COURT:**  I've sat through many, many earthquakes in this building going back to almost 30 years ago actually.

Anyway, sorry.

**MR. PFEFFERBAUM:**  Sorry.

We were talking about the quantification issue; right?  So Barclays looks at these trends, and including -- but they're looking at the trend -- right? -- of CapEx spending versus --

**THE COURT:**  I'm going to interrupt you because I read the Barclays stuff really closely, and I get your -- I mean, that's one of the reasons why I said I though your presentation on this was pretty strong.

**MR. PFEFFERBAUM:**  Yes.  I mean, they came out and say it's overstated by 15 percent; right?  The Hindenburg report concludes that AFFO is overstated by 20 percent.

There is one additional point in terms of quantification that I'd like to draw your Court's attention to that I did not flag in our opposition brief.

**THE COURT:**  Okay.

**MR. PFEFFERBAUM:**  And that is also that the -- that's paragraph 165, the BMO Capital Markets analyst report.

**THE COURT:**  Okay.  Wait.  Hold on one second.  Let me get there.

**MR. PFEFFERBAUM:**  No problem.

**THE COURT:**  Okay.

**MR. PFEFFERBAUM:**  Paragraph 165, the BMO Capital Markets report, the second paragraph quoted there that starts with "Recurring CapEx classification," that paragraph concludes

with the sentence [as read]:

"If recurring CapEx had grown at the same pace, we estimate 2024 AFFO per share would be 5 percent lower."

Again, another quantification, though, that aligns with precisely -- almost precisely.  We are -- plaintiffs allegations --

THE COURT:  I think it's question begging to a certain degree, and there are questions about why the numbers went the way they went.  And maybe, you know, as stuff gets older, you know, you start focusing more on capital improvements and less on maintenance.

You know, I'm with you, I think, that this -- you know, this raises a pretty -- for purposes of the pleading standard, even the heightened one, you know, this seems to raise a pretty strong inference that they were misclassifying stuff.

MR. PFEFFERBAUM:  I agree, Your Honor, and I think that you can -- in addition to those, so the Hindenburg describes the types of transactions.  We have multiple analyses supporting a quantification of those transactions.

And I'd also say, you know, there are some statements by the chief investment officer about applying pressure to come up with creative solutions.

THE COURT:  Could I ask you on -- go back to the power for just a minute.

MR. PFEFFERBAUM:  Yeah.

**THE COURT:**  Do you think that you've done your best job at including allegations that would address the issue that I raised with you?  In other words, do you think you've done your best job of alleging with specificity that the company truly was in -- had truly put itself in a precarious position with its overselling of power?

Or do you think that there's a better job -- that you could do a better job of explaining how it was that at the time the company had put itself in a precarious position, either with respect to the risk of a power outage or with respect to, you know, inability to absorb growth, or whatever the case may be?

**MR. PFEFFERBAUM:**  Well --

**THE COURT:**  Do you have more stuff?  Are you aware of more stuff that you could add?  Do you think that you've done your best job possible on that particular point?

**MR. PFEFFERBAUM:**  Well, Your Honor, it's difficult to say on the spot because I haven't considered that.  Our view is that what has been alleged satisfies the scheme and, especially given the statements, is enough to show that those statements were misleading because the statements are emphasizing sufficient power.

But I would --

**THE COURT:**  But I'm asking if you think you've done your best job of explaining.  Again, the whole discussion we

had is:  Is this a theoretical concern or is it real?  Was it real?  Was it immediate?  Was it -- you know, were they in a precarious position?  Have you done your best job of showing that in this complaint?

**MR. PFEFFERBAUM:**  Obviously if Your Honor were inclined to dismiss the power allegations, we would like an opportunity to try and amend to address those concerns and do, you know, everything we can to provide greater detail about that issue if you're inclined to dismiss -- or to grant the motion with respect to the power allegations.

**THE COURT:**  Okay.

All right.  You want to have the final word, just take three minutes and then we'll wrap up?

**MR. POTISCHMAN:**  Thank you, Your Honor.  I'll be -- I will certainly do it within three minutes.

First, on power, Your Honor, I would just say that paragraph 38 of the complaint, which is -- this is their only confidential witness, we'll put aside all of our criticisms about that witness, the only one there for part of the period, et cetera.  We've briefed it.

That witness, I believe it's a him, but himself or herself describes not -- not a reckless process where the company just -- they were told to just keep on signing up new cabinets. It talks about they met monthly.  They monitored.  They determined how much was not being used.  They determined how

much power in their words to, quote/unquote, "oversell." Capacity meetings were held by --

THE COURT:  I'll stop you there and just say, I hear what you're saying.  I think that's one of the reasons why I've sort of pressed the plaintiff on that point.  I agree with your analysis of that -- of those statements.

MR. POTISCHMAN:  Thank you, Your Honor.

With respect to the accounting, there's been a big focus on Barclays, and this -- if Your Honor takes a look at paragraph 108 -- I know you said you read Barclays very closely.  Maybe you don't need to look at it.

I would just say, Your Honor, there's -- Barclays themselves, the whole hook for this report is:  Look, the number has gone down.  Right?  We're surprised at the percentage of recurring CapEx as a percentage of revenue. There's two points I want to make and I'll be brief, Your Honor.

One, left unaddressed in this entire discussion is the fact that it's a fraction keyed off of revenue.  So if your revenue is going up -- and your revenue may go up for any of a number of reasons, including that you raise your prices that are not cost sensitive -- so they have to show -- right? -- that this is actually an industry of fraud; but I think the most important statement given everything we've talked about this morning is in the bottom of paragraph 108, the quote [as

read]:

"Equinix's recurring CapEx averaged 8.7 percent of revenue."

This is preconversion. During this period, Equinix used the term "ongoing CapEx" but, again, no material difference in definition.

That's why we spent, Your Honor, I don't know how long it was, 15 minutes walking through the fact that they did change what they were doing in 2014. That is the chart that shows they are taking expenses expressly out of recurring, or what was called ongoing there, and moving them into expansion.

Barclays doesn't seem to acknowledge it, and that's fine, Your Honor. Barclays is not a defendant here and that's fine. But the supposition that this is suspicious because the definition never changed is wrong.

THE COURT: In other words, when it says earlier in paragraph 108 the company's recurring CapEx averaged 8.7 percent of revenue but before transitioning to REIT but dropped to just 3.6 percent of revenue afterward doesn't take into account the backward-looking reclassification that the company did and showed in 2014?

MR. POTISCHMAN: Correct.

THE COURT: Right. But, you know, it's -- this complaint is so much also about what happened from 2014 after they changed the way they looked at things --

**MR. POTISCHMAN:**  Sure, Your Honor.

**THE COURT:**  -- to whatever date, 2018, whatever it was.  I can't remember.

**MR. POTISCHMAN:**  But, Your Honor, if you take a look at Exhibit 6, which is Mr. Taylor's statement, when the initial 2014 presentation goes, he said:  5 percent.  This is talking about going forward.  I think it's probably a little conservative from a maintenance CapEx perspective.  I think that the number will be -- I think that the number should -- meaning on a recurring CapEx for maintenance, will be lower than that number on a go-forward basis.

The suggestion that they announced something in 2014 and then decided to commit fraud nine months later is, respectfully, I think, ridiculous; but it's the sub 5 percent number is what Mr. Taylor, the chief financial officer, has said to expect.  And so the idea that it's suspicious when it then happens, I just don't think that story holds together, Your Honor.

**THE COURT:**  Okay.

All right.  I'll give it a little more thought, and then issue a ruling.

Maybe could I ask you one other quick question?

**MR. PFEFFERBAUM:**  Certainly, Your Honor.

**THE COURT:**  If I were to conclude that you've done enough on the accounting theory and you haven't done enough on

the power theory, what would the next step be?  You would want to amend your complaint to beef up the power theory or you would want to just go forward?

**MR. PFEFFERBAUM:**  In that case, Your Honor, we would probably just want to go forward.  I assume that we would work out a case schedule that would allow -- there would probably be a date by which we have to amend --

**THE COURT:**  Amend, right.

**MR. PFEFFERBAUM:**  -- if, you know, discovery showed support.  So we would probably just prefer to move forward.

**THE COURT:**  Okay.

All right.  Thank you.

**MR. PFEFFERBAUM:**  Thank you.

**MR. POTISCHMAN:**  Thank you, Your Honor.

**THE COURTROOM DEPUTY:**  Court is in recess.

(Proceedings adjourned at 11:01 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Tuesday, December 17, 2024

_____

Kelly Shainline, CSR No. 13476, RPR, CRR
U.S. Court Reporter