ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
DANIEL J. PFEFFERBAUM (248631)
HADIYA K. DESHMUKH (328118)
HAILEY S. ZANUTTO (358143)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
hdeshmukh@rgrdlaw.com
hzanutto@rgrdlaw.com

Lead Counsel for Lead Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNIFORMED SANITATIONMEN'S ASSOCIATION COMPENSATION ACCRUAL FUND, <br><br> Plaintiff, <br><br> vs. <br><br> EQUINIX, INC., et al., <br><br> Defendants. | Case No. 3:24-cv-02656-VC <br><br> <u>CLASS ACTION</u> <br><br> DECLARATION OF DANIEL J. PFEFFERBAUM IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF PLAN OF ALLOCATION; AND AN AWARD OF ATTORNEYS' FEES AND EXPENSES <br><br> DATE:    December 18, 2025 <br> TIME:    2:00 p.m. (via Zoom) <br> CTRM:   4, 17th Floor <br> JUDGE:  Hon. Vince Chhabria |

4923-8507-1473.v1

I, DANIEL J. PFEFFERBAUM, declare as follows:

I am an attorney duly licensed to practice before all courts of the State of California. I am a member of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), and counsel for Uniformed Sanitationmen's Association Compensation Accrual Fund ("Accrual Fund" or "Lead Plaintiff"). I have been actively involved in the prosecution of this action since 2024 when the Accrual Fund moved for appointment as lead plaintiff, and am closely familiar with its proceedings (the "Litigation" or "Action").[1] I have personal knowledge of the majority of the matters set forth herein based upon my active participation in and supervision of all material aspects of the Litigation. As to the remaining matters, I have reviewed our litigation files and consulted with other attorneys and support staff who worked on this case. I could and would testify competently to the matters set forth herein if called upon to do so.

I submit this declaration in support of: (a) Lead Plaintiff's motion for final approval of the $41.5 million all-cash settlement on behalf of the Class (the "Settlement") and approval of the proposed Plan of Allocation (the "Plan"); and (b) Lead Counsel's motion for an award of attorneys' fees and expenses.

## I.    PRELIMINARY STATEMENT

1.    This action was brought against Equinix, Inc. ("Equinix" or the "Company"), Charles Meyers ("Meyers"), and Keith D. Taylor ("Taylor") (collectively, "Defendants") (together with Lead Plaintiff, the "Parties") for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    The Amended Complaint for Violation of the Federal Securities Laws (ECF 43) ("Complaint" or "Amended Complaint") alleged that Equinix, Meyers, and Taylor violated the securities laws by making materially false and misleading statements and omissions pertaining to the Company's purported "lighthouse" metric – Adjusted Free Funds from Operations or "AFFO," and engaged in a scheme to defraud investors by overselling the Company's available power capacity at

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed in the Stipulation of Settlement, dated July 15, 2025 (ECF 103-2) (the "Stipulation").

DECL. OF DANIEL J. PFEFFERBAUM ISO FINAL APPROVAL OF CLASS ACTION SETTLEMENT;
APPROVAL OF PLAN OF ALLOCATION; AND AN AWARD OF ATTYS.' FEES AND EXPENSES -
3:24-cv-02656-VC    - 1 -
4923-8507-1473.v1

its datacenters. *Id.*, ¶¶68, 77, 89, 101, 114, 155-159, 160-162.[2]  With respect to AFFO, the Complaint alleges that Defendants violated the accounting policies they had previously explained to investors by improperly classifying certain maintenance capital expenditures (*i.e.*, recurring CapEx) as growth expenses (*i.e.*, non-recurring CapEx). ¶¶7, 19, 49-54.  This misclassification of CapEx caused the Company's most important accounting metric, AFFO, to be materially overstated.  As a result of this misclassification, Equinix beat the AFFO guidance it had provided to investors and Defendants Meyers and Taylor received $150 million in stock bonus awards, which were contingent on meeting certain AFFO targets.  ¶¶16, 195-199.  Meyers and Taylor further benefitted from the systemic misclassification of CapEx and subsequent inflation of Equinix's stock price by selling a significant percentage of their personal holdings in Equinix securities during the Class Period. ¶200.

3.      With respect to power capacity, the Complaint alleged that Defendants engaged in a fraudulent scheme to oversell available power capacity at the Company's datacenters, which created a risk that Equinix could not fulfill its power obligation to customers and limited the Company's ability for future growth.  ¶¶38-39.  Equinix's customers contracted and paid for a specified maximum power capacity at datacenters regardless of whether they used the entirety of the capacity purchased.  Based on information provided by former employees of Equinix, the Complaint alleged that Defendants oversold power capacity by as much as 150% at their datacenters, banking on customers not utilizing their full purchased power allocation.  ¶39.  The Complaint alleged Defendants' scheme misled Equinix investors about the Company's management of their power use and capacity, the availability of power for future growth, as well as Defendants' ability to capitalize on demand fueled by power-intensive AI computing.  ¶¶88, 89, 96, 160-162.

4.      In response to Defendants' motion to dismiss the Complaint, the Court upheld the AFFO-related accounting allegations but dismissed the allegations related to the overselling of power on the basis that Lead Plaintiff failed to sufficiently allege a material impact from this business practice on the Company.  ECF 67.

---

[2]    All "¶_" citations herein are to the Complaint unless otherwise indicated.

5.      Defendants denied – and continue to deny – Lead Plaintiff's allegations.  They contend that they did not make any false or misleading statements and that they disclosed all information required by the federal securities laws.  Defendants claim that any decline in Equinix's stock price was the result of events or information unrelated to the allegedly false or misleading statements and subsequent disclosures alleged by Lead Plaintiff, and assert additional truth-on-the-market defenses to the allegations.

6.      Lead Counsel diligently prosecuted the claims throughout the Litigation and defended them against Defendants' attacks.  But, as detailed herein, obtaining the requisite discovery, achieving class certification, and proceeding to summary judgment and a jury trial presented substantial risks.  Even assuming Lead Plaintiff successfully litigated the action past each of these hurdles to obtain a judgment against Defendants, the likelihood of collecting any recovery, let alone one of this magnitude, remained uncertain.  In agreeing to settle the Litigation, Lead Plaintiff and Lead Counsel were fully informed of the various strengths of their case, as well as the substantial risks they would face should litigation continue.  Lead Plaintiff remained well-informed throughout the Litigation and settlement negotiations and ultimately approved the Settlement.  *See* Declaration of Dennis Shock, attached hereto as Exhibit A.  In opting to settle, Lead Plaintiff and Lead Counsel determined that resolution on the terms obtained was in the Class' best interest and represented a significant recovery.

7.      Lead Counsel achieved the proposed Settlement after a vigorous litigation, during which time Lead Counsel, among other things:

- successfully moved for appointment of the Accrual Fund as Lead Plaintiff and Robbins Geller as Lead Counsel (ECF 20, 28, 29);

- conducted an extensive factual and legal investigation, including locating and interviewing former Equinix employees, culminating in the drafting and filing of the Amended Complaint in September 2024;

- successfully opposed, in part, Defendants' motion to dismiss the Complaint resulting in the Court's January 6, 2025 Order Re Motion to Dismiss (ECF 54, 56, 58, 67);

- pursued discovery from Defendants and 16 nonparties, engaged in meet and confers, and negotiated resolutions to potential discovery disputes concerning relevancy, scope, and privilege;

- negotiated a protective order covering confidential documents and a stipulation governing the search for and production of electronically stored information;

- obtained and analyzed over 78,000 pages of discovery from Defendants and nonparties;

- deposed a corporate representative of Equinix pursuant to Fed. R. Civ. P. 30(b)(6);

- responded to discovery requests from Defendants, including interrogatories and document requests, and produced responsive documents;

- filed a motion to certify the class, appoint class representative, and appoint class counsel, supported by expert opinion on the issues of market efficiency and damages; and

- engaged in court-ordered mediation under the supervision of Mr. Miles Ruthberg of Phillips ADR Enterprises ("Mr. Ruthberg"), including the exchange of detailed mediation statements and participation in a full-day, in-person mediation.

8. The Settlement is the product of Lead Plaintiff's and Lead Counsel's efforts over the course of the Litigation, including those described in this declaration. The Settlement is also the product of the Parties' arm's-length negotiations, including a ten-hour, in-person mediation session facilitated by Mr. Ruthberg, a mediator with extensive experience in federal securities litigation. These negotiations were conducted by experienced counsel with an intimate understanding of the case. After careful consideration of the Parties' positions, Mr. Ruthberg made a mediator's proposal to settle this Action for a cash payment of $41.5 million. Both sides accepted Mr. Ruthberg's proposal the following day, and agreed to the material terms of the Settlement on June 12, 2025.

9. The $41.5 million proposed Settlement is the culmination of vigorously contested litigation with strong advocacy from both sides, and represents a strong result for the Class. Based upon the investigation, research, analysis, motion practice, and discovery conducted, Lead Plaintiff believes that this case has significant merit and Lead Counsel's efforts during the course of litigation resulted in the discovery of evidence supporting the alleged claims. The proposed Settlement is more than adequate and represents approximately 18% of the estimated reasonably recoverable

damages. This recovery is many multiples of the median percentage recovery (1.2%) in securities cases in 2024. *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* at 27, Fig. 24 (NERA Jan. 22, 2025), attached as Exhibit C.

10.     Despite Lead Counsel's confidence in the strength of the claims and the evidence developed in discovery, there were substantial risks to Lead Plaintiff's ability to obtain, protect, and recover damages on a favorable judgment at trial. As an initial matter, the Court had already dismissed the claims that were based on Equinix's overselling of power capacity for failure to allege a material impact on the Company. To be successful on the surviving claims, Lead Plaintiff first had to overcome Defendants' opposition to certifying this action as a class action. Next, Lead Plaintiff would have to overcome Defendants' certain efforts to show that Lead Plaintiff could not demonstrate a genuine issue of material fact on multiple elements in summary judgment briefing. Then, ultimately, Lead Plaintiff would be required to prove all elements of its claims, and the risks of proving falsity, materiality, scienter, and loss causation on the allegations of accounting fraud present significant obstacles for Lead Plaintiff, especially because Defendants need only succeed on one defense to potentially defeat the entire Action.

11.     Lead Plaintiff anticipated a battle of the experts on numerous disputed issues at summary judgment and trial. Each side would assuredly retain proficient experts to offer opposing testimony about, *inter alia*, technical accounting issues specific to real estate investment trusts ("REIT") and non-GAAP accounting standards and principles, the classification and characterization of CapEx as recurring versus non-recurring, loss causation, and damages. There could be no guarantee that a jury would find Lead Plaintiff's expert testimony more convincing than the countervailing testimony offered by any experts Defendants would have undoubtedly retained.

12.     Even if Lead Plaintiff prevailed at trial, there was also significant risk of delay in providing Class Members with compensation for the harm caused by Defendants' fraud. Post-trial proceedings, including proceedings attendant to the determination of damages, pose a serious threat to delay the Class' recovery on any favorable judgment obtained at trial. In all likelihood, Defendants would appeal any verdict achieved in Lead Plaintiff's favor and the appeals process

could span years, during which time the Class would receive no recovery. Any appeal would also create the risk of reversal, in which case the Class would receive nothing despite having prevailed on the claims at trial.

13.     All of these factors, together with the others discussed herein, were considered by Lead Plaintiff and Lead Counsel in concluding that, on balance, the mediator's proposal to settle the Litigation for $41.5 million was fair, reasonable, adequate, and in the best interests of the Class. The Settlement confers a substantial benefit on the Class without delay and eliminates the significant risks inherent in trial and post-trial proceedings. It is therefore respectfully submitted that the Settlement should be approved as fair, reasonable, and adequate.

14.     Lead Counsel prosecuted this Action on a wholly contingent and "at risk" basis, advancing and incurring substantial litigation expenses, charges, and costs over the course of the Litigation. Lead Counsel shouldered substantial risk in doing so, and, to date, has not received any compensation for its efforts. Accordingly, in consideration of Lead Counsel's extensive efforts on behalf of the Class, Lead Counsel is applying for an award of attorneys' fees in the amount of 25% of the Settlement Amount (and all interest on such amount at the same rate and for the same period as earned by the Settlement Fund).

15.     As set forth in the accompanying Memorandum of Points and Authorities in Support of Motion for an Award of Attorneys' Fees and Expenses (the "Fee Memorandum"), the requested fee of 25% of the Settlement Amount (plus interest accrued thereon) is consistent with the Ninth Circuit benchmark, within the range of fees awarded in Private Securities Litigation Reform Act of 1995 ("PSLRA") securities class action settlements in this district, and is justified in light of the strong result achieved for the Class and the significant risks undertaken by Lead Counsel in this complex litigation. To date, no Class Member has objected to the requested fee amount. Lead Counsel submits that the fee application is fair to the Class, under all applicable standards, and warrants the Court's approval.

16.     Lead Counsel also seeks payment for expenses, costs, and charges of $233,757.84, which were reasonably and necessarily committed to the prosecution of the Litigation. These

expenses include, among others: (a) the fees and expenses of experts and investigators whose services were required for the successful prosecution and resolution of this case; (b) imaging and managing a database of documents for the Litigation; (c) vendor expenses related to conducting discovery and a deposition; (d) online factual and legal research; and (e) mediation expenses.

17.     Lead Counsel also seeks approval of the proposed Plan of Allocation, which Lead Counsel submits is fair and reasonable.  The Plan was drafted with the assistance of Lead Plaintiff's damages expert.  As further described below and in the Notice, the Plan provides formulas for calculating the recognized claim of each Class Member that submits a Proof of Claim form based on when the claimant transacted in Equinix common stock.  Each Authorized Claimant, including Lead Plaintiff, will receive a *pro rata* distribution pursuant to the Plan, and Lead Plaintiff will be subject to the same formula for distribution of the Net Settlement Fund.

18.     The following summarizes the principal events during the Litigation and the legal services provided by Lead Counsel to Lead Plaintiff and the Class.

## II.     HISTORY OF THE ACTION

### A.     The Initiation of the Action and Appointment as Lead Plaintiff

19.     The initial complaint in the Action was filed on May 2, 2024, in an action titled *Wayne Chan v. Equinix, Inc., Charles Meyers, and Keith D. Taylor*.  ECF 1.

20.     On July 1, 2024, the Accrual Fund timely filed a motion seeking to be appointed lead plaintiff and to appoint Robbins Geller as lead counsel.  ECF 20.  Another putative class member filed a competing motion the same day.  ECF 16.  On July 15, 2024, the Accrual Fund filed an opposition to the competing motion for lead plaintiff, arguing that the Accrual Fund had the largest financial interest and thus was presumptively the best-suited investor to lead this action.  ECF 28.

21.     On July 16, 2024, the Court granted the Accrual Fund's motion, appointing the Accrual Fund as Lead Plaintiff and Robbins Geller as Lead Counsel.  ECF 29.

### B.     Lead Plaintiff Vigorously Pursued its Claims at the Pleading Stage

22.     Lead Counsel conducted an extensive factual investigation prior to filing the Amended Complaint, which resulted in substantial new allegations in support of the alleged claims

and additional corrective disclosures.  This diligent inquiry included analyzing years of Equinix's public filings with the SEC, earnings conference call transcripts, presentations at analyst days and industry conferences, coverage by securities analysts, media reports, and trading data.  To support this effort, Lead Counsel, through and in conjunction with a private investigative firm, located and conducted interviews with witnesses believed to potentially have information about the claims at issue in the Action, including former Equinix employees.  Lead Counsel also utilized its in-house forensic accountants to assess whether potential accounting violations had occurred.  Throughout the Complaint drafting process, Lead Counsel performed considerable legal research to evaluate exactly which theories of liability Lead Plaintiff could allege and how to best allege them.  Following months of research and investigation, Lead Plaintiff filed the Complaint on September 12, 2024. ECF 43.

23.    The Complaint alleged violations of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder on behalf of all persons who purchased or otherwise acquired Equinix common stock between May 3, 2019 and March 24, 2024, inclusive ("Class Period").  *Id.*, ¶2. Specifically, the Complaint alleged that Defendants defrauded investors by making false and misleading statements and omissions concerning the Company's accounting practices and policies, and by engaging in a scheme to oversell the power capacity in the Company's data center facilities. Lead Plaintiff alleged that Defendants made false and misleading statements and omissions concerning the classification and characterization of the Company's CapEx and calculation of its "lighthouse" metric, AFFO.  ¶¶12-15, 75-77, 114, 177.  In 2015, Equinix transitioned to a REIT and used that opportunity to modify its methodology for classifying CapEx and to establish AFFO and AFFO per share as its primary non-GAAP accounting metrics.  ¶6.  However, Defendants repeatedly violated the accounting policies they explained to investors by systemically misclassifying maintenance expenses (*i.e.*, recurring CapEx) for items like batteries, chillers and lightbulbs, as growth expenses (*i.e.*, non-recurring CapEx).  ¶¶7, 19, 49-54.  This misclassification scheme artificially increased AFFO and improved the Company's AFFO per share metric, which ensured that Equinix met or beat its AFFO guidance provided to investors and, because Defendants' bonus

compensation was also tied to AFFO per share, cleared the way for Meyers and Taylor to receive stock bonus awards of $150 million. ¶¶16, 195-199. Defendants Meyers and Taylor further capitalized on the manipulation of AFFO, and the resulting inflated stock price, by selling more than $146 million in Equinix stock during the Class Period, with Meyers unloading more than 90% of his total holdings in Equinix. ¶200.

24. The Complaint also alleged that Defendants engaged in a scheme to defraud, including making false and misleading statements and omissions in furtherance of that scheme, regarding the Company's available power capacity, and concealed from the market the significant risk created by overselling the power available at their data centers. Defendants spoke positively about power and cabinet utilization with analysts and investors on multiple occasions, telling the market in October 2023 that "[Equinix's] power utilization is actually meaningfully lower than our cabinet utilization." ¶136. But this statement, and others like it, was false: Equinix's reported cabinet utilization was approximately 80% while Defendants oversold power capacity by as much as 150%. ¶¶37-39, 147(c), 160-162, 166. By allowing the usage of power to substantially exceed the cabinet utilization rate, Defendants increased the Company's revenues but placed increased stress on the Company's infrastructure and materially increased the risk that it would be unable to provide the contractually obligated services to its customers. In addition to escalating their near-term risk, Defendants' scheme limited the Company's future growth and falsely conveyed to investors that Equinix had sufficient infrastructure (*i.e.*, cabinet space and power) to support growth of approximately 20%, when in fact the Company had already contractually engaged to sell as much as 150% of its power capacity. *See, e.g.*, ¶¶138, 162. The Complaint further explains how Defendants misled the market by repeatedly identifying an increasing demand for artificial intelligence ("AI") as a key factor fueling Equinix's growth, while omitting that the Company's limited and oversold power capacity could not realistically support AI's power-intensive computing needs. ¶¶88, 89, 96, 125-126,160-162.

25. The Complaint alleged that the market learned the truth about Equinix through multiple partial disclosures. On September 23, 2022, for example, Barclays published a report in

DECL. OF DANIEL J. PFEFFERBAUM ISO FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF PLAN OF ALLOCATION; AND AN AWARD OF ATTYS.' FEES AND EXPENSES - 3:24-cv-02656-VC
4923-8507-1473.v1

which it inferred from Equinix's publicly reported financial results that the Company was likely inflating AFFO by up to 15%, noting that there was "no plausible reason" for the Company to change its methodology for classifying CapEx after 2015 other than to inflate AFFO. ¶¶108-110. On March 20, 2024, Hindenburg Research published a report titled "Equinix Exposed: Major Accounting Manipulation, Core Business Decay and Selling an AI Pipe Dream as Insiders Cashed Out Hundreds of Millions" ("Hindenburg Report"), which included numerous statements from former employees detailing the prevalence of accounting manipulation, and laid out in detail Defendants' scheme to oversell power.  In particular, the Hindenburg Report informed the market that Equinix's financial results were the result of the Company's manipulation of AFFO, which was achieved by improperly categorizing maintenance costs as spending on growth.  ¶¶153-154.  The Hindenburg Report estimated this accounting manipulation resulted in an overstatement of AFFO by 19% in 2015 and by at least 22% in 2023.  ¶155.  The Hindenburg Report also detailed Equinix's practice of overselling the power capacity in its data centers by as much as 150%.  ¶160.  This, the report noted, created a reputational risk for the Company and prevented Defendants from capitalizing on the significant opportunity presented by AI.  ¶¶161-162.  After Hindenburg Research disclosed this information to the market, Equinix's stock price declined from a close of $844.58 on March 19, 2024, to a close of $824.88 on March 20, 2024.  ¶167.

26.    On March 21, 2024, analysts reported additional new negative information about Equinix which corroborated and expanded on the Hindenburg Report, including that Equinix management had confirmed to analysts the accuracy of certain elements of the Hindenburg Report. Then on March 25, 2024, Equinix announced that its Audit Committee was launching an investigation into the Hindenburg Report and that the Company had received a subpoena from the Department of Justice.  ¶168.  The stock price declined again from $800.97 on March 22, 2024, to $792.52 on March 25, 2024 (the next trading day).  ¶170.

27.    After the Class Period, Equinix continued to disclose information related to the Company's accounting practices.  For example, on May 8, 2024, the Company announced that it had recently received a subpoena from the SEC.  ¶171.  On May 9, 2024, Equinix announced that it was

changing its methodology for classifying certain expenditures, further confirming that the Company's treatment of CapEx violated its own stated policies, as well as SEC Rules and Regulations. ¶172. Following this announcement, analysts published reports noting that the accounting changes announced by the Company appeared inconsistent with previous representations about CapEx classification. ¶¶173-174.

28. Lead Counsel invested a significant amount of time and resources into conducting a thorough investigation into the facts, eventually filing a comprehensive Amended Complaint that pled each claim potentially available to Lead Plaintiff and the eventual Class. Indeed, the vast majority of the allegations, including the identified misrepresentations and omissions during the Class Period, the reasons why those statements and omissions were false and misleading, and the serial partial disclosures of the truth, were all newly alleged in the Amended Complaint.

29. On October 10, 2024, Defendants filed a motion to dismiss the Amended Complaint, contending, among other things, that: (a) Lead Plaintiff's allegations regarding Equinix's accounting policies were inactionable statements of opinion; (b) the alleged misstatements were not false or misleading; (c) Lead Plaintiff failed to plead a strong inference of scienter; and (d) Lead Plaintiff failed to plead loss causation; and, therefore, because Lead Plaintiff failed to plead a primary violation, there could be no control person liability pursuant to §20(a). ECF 54. Defendants concurrently filed a request for judicial notice in support of their motion to dismiss. ECF 55.

30. On October 31, 2024, Lead Plaintiff filed its opposition to Defendants' motion to dismiss and the request for judicial notice, providing both legal and factual analysis demonstrating that the Amended Complaint alleged each element of Defendants' scheme to defraud and Rule 10b-5 violations with sufficient particularity to meet the heightened pleading standards under the PSLRA, and that, when the Court properly credited the information in the Hindenburg Report and drew all inferences in favor of Lead Plaintiff as required, the Court should deny the motion to dismiss. ECF 56-57. In particular, Lead Plaintiff argued, *inter alia*, that: (a) Defendants routinely overstated AFFO and violated their own stated accounting policies that they provided to investors; (b) Defendants concealed their practice of overselling power capacity and misled investors by stating

DECL. OF DANIEL J. PFEFFERBAUM ISO FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF PLAN OF ALLOCATION; AND AN AWARD OF ATTYS.' FEES AND EXPENSES - 3:24-cv-02656-VC                                                                                                                     - 11 -
4923-8507-1473.v1

that the Company's power utilization was below its cabinet utilization; (c) the allegations drawn from the Hindenburg Report were plausible and sufficiently reliable, including because they were corroborated by a former employee witness; (d) the inference of scienter is supported by the Defendants' actual knowledge of the accounting manipulation, the core operations doctrine, and Equinix's executive bonus compensation structure; and (e) loss causation was sufficiently pled as each corrective disclosure was causally connected to the alleged fraud. On November 19, 2024, Defendants filed their reply briefs in support of their respective motions to dismiss and for judicial notice. ECF 58-59.

31.     On December 5, 2024, the Court heard oral argument on Defendants' motions and then took the matter under submission. On January 6, 2025, the Court issued an order denying in part and granting in part the motion to dismiss. ECF 67 ("Order"). Specifically, the Court found that: (a) the allegations in the Hindenburg Report were specific, reliable, and were corroborated by the former employee witness identified by Lead Plaintiff; (b) Defendants' statements regarding the classification of capital expenses and their AFFO metric conflicted with their statements about how AFFO would be calculated and materially misled investors; (c) the prominent nature of the AFFO per share metric combined with Defendants' actual access to the disputed information created a strong inference of scienter under the core operations doctrine; and (d) loss causation was sufficiently pled for the series of partial disclosures. The Court granted the motion to dismiss with respect to the allegations concerning the overselling of power capacity, finding that, without more specific allegations as to the importance of the power capacity allegations, the statements were not materially misleading. ECF 67. The Court dismissed the power capacity allegations with leave to amend but otherwise allowed Lead Plaintiff to immediately begin discovery. *Id.*

### C.     Lead Plaintiff's Discovery Demanded from Defendants and Nonparties

32.     Following the Court's Order on the motion to dismiss, Lead Plaintiff promptly commenced fact discovery, including serving document requests and interrogatories directed to Defendants, and subpoenas *duces tecum* directed to nonparties, including the Company's auditors, accountants, consultants, and the securities analysts which followed the Company.

### 1.    Lead Plaintiff's Discovery Directed at Equinix

33.    The parties engaged in fact discovery from January 2025 until the Settlement in June 2025.  Discovery began on January 14, 2025, when the Parties, through counsel, participated in the Rule 26 conference.  Three days later, Lead Plaintiff and Defendants submitted the Joint Case Management Statement, which, *inter alia*, set forth a summary of the factual allegations, described the principal legal issues in dispute, and detailed the Parties' competing views over the anticipated scope of discovery.  ECF 70.  On January 24, 2025, the Parties participated in the Court's Case Management Conference.  Based on the Court's instructions, Lead Plaintiff and Defendants filed a revised proposed case schedule on February 3, 2025.  ECF 75.  After amending it slightly, the Court adopted the case schedule on February 4, 2025.  ECF 76.

34.    On February 10, 2025, Lead Plaintiff served its initial disclosures, which identified 24 current and former directors, executives, and employees of Equinix, and 16 nonparties that Lead Plaintiff believed to have discoverable information.

35.    Lead Plaintiff and Defendants engaged in lengthy negotiations concerning a protective order covering claims of confidentiality with respect to documents produced in this Action.  Due to the sensitive nature of the documents expected to be produced in discovery, multiple meet-and-confers were required to address, *inter alia*, the scope of the protection, the process for challenging confidentiality designations, protecting confidentiality during depositions and when dealing with nonparties, and protocols for addressing inadvertent disclosures.  On March 5, 2025, the Parties submitted to the Court the Stipulated Protective Order that governed production of all documents in this case.  ECF 80.  The Court entered the Stipulated Protective Order on March 6, 2025.  ECF 81.

36.    Lead Plaintiff and Defendants also negotiated an Electronic Discovery Agreement to govern how the Parties would search for and produce electronically stored information (ESI) over the course of the Action.  The Parties engaged in considerable negotiations, including participating in several meet-and-confers, concerning, *inter alia*, document retention issues, the format of production, and the production of metadata, before an agreement was reached as to the terms of

electronic production.  The Parties filed a Stipulation and Order Re: Electronic Discovery Agreement on April 9, 2025.  ECF 88.  The Court entered the agreement on April 15, 2025.  ECF 89.

### a.   Discovery Requests

37.   On January 24, 2025, pursuant to Fed. R. Civ. P. 34, Lead Plaintiff served Lead Plaintiff's First Set of Requests for Production of Documents ("Lead Plaintiff's RFPs") on Defendants, containing 35 requests seeking documents related to all aspects of Lead Plaintiff's claims.  Lead Plaintiff sought documents concerning, *inter alia*: (i) Equinix's accounting policies and procedures related to CapEx, AFFO, operating expenses, and revenue recognition; (ii) Defendants' executive compensation and the role of AFFO per share targets in determining executive bonuses; (iii) the SEC investigation into Equinix's reporting of AFFO and classification of CapEx; and (iv) documents concerning the Hindenburg Report, including those concerning the Defendants' investigation into the accuracy of the Hindenburg Report and its findings, the internal Company response and the market's reaction.  On February 24, 2025, Defendants served their objections and responses to Lead Plaintiff's RFPs, in which they objected to every request and entirely refused to produce any documents in response to nine requests.

38.   Shortly after receiving Defendants' responses and objections to Lead Plaintiff's RFPs, in February 2025, counsel for the Parties engaged in a series of meet-and-confers to negotiate multiple issues regarding Defendants' objections and the pending document production.  These negotiations were memorialized in extensive correspondence exchanged between the Parties.  The issues in dispute centered on the relevance of the documents sought, including disputes concerning the appropriate temporal scope concerning Equinix's conversion to a REIT and its establishment of AFFO as its lighthouse metric, documents detailing Defendants' investigation into the Hindenburg Report, documents concerning Equinix's stock price movement during the Class Period, documents concerning Equinix's executive compensation and bonus structure, and documents related to the ongoing investigation conducted by the SEC.  These negotiations resulted in Defendants agreeing to produce categories of documents to which they had initially objected.

39.    At the time of the Settlement, Defendants had produced 3,229 documents to Lead Plaintiff, constituting more than 50,000 pages of material.  This production was a result of the Parties' ongoing negotiations, including multiple meet-and-confer sessions, concerning search terms and related hit reports, and an appropriate list of custodians whose documents should be searched.

40.    On March 19, 2025, pursuant to Fed. R. Civ. P. 33, Lead Plaintiff served Lead Plaintiff's First Set of Interrogatories to Defendant Equinix ("Interrogatories").  Lead Plaintiff propounded eight interrogatories on Equinix seeking information concerning the Affirmative Defenses asserted in Defendants' Answer.  The Interrogatories also sought information identifying individuals, internal committees, and third-party entities relevant to Equinix's investigation into and assessment of the allegations contained in the Hindenburg Report.  On April 21, 2025, Equinix served objections and responses to the Interrogatories.  At the time of the Settlement, the Parties were continuing to negotiate the sufficiency of Defendants' responses.

### b.    Deposition of Equinix

41.    On April 4, 2025, pursuant to Fed. R. Civ. P. 30(b)(6), Lead Plaintiff propounded its Notice of Deposition of Defendant Equinix, Inc., which contained nine deposition subject matters.  On April 24, 2025, Defendants served objections and responses to Lead Plaintiff's Notice of Deposition of Defendant Equinix, Inc., making general objections regarding the scope of the topics, but agreeing to produce a deponent to provide corporate testimony on eight of the nine noticed deposition topics.

42.    On May 8, 2025, Lead Plaintiff took a Rule 30(b)(6) deposition of corporate representative Equinix employee Yemi Omo-Ettu ("Omo-Ettu"), the current Vice President of Corporate Financial Planning & Analysis.  Omo-Ettu testified as to the Company's processes and procedures related to AFFO and AFFO per share, including its definition, calculation, determination, forecasting, and reporting.  Due to the technical nature of the deposition topic, Lead Counsel worked closely with in-house forensic accounting professionals to help prepare lines of inquiry specifically related to the alleged accounting scheme.  Lead Plaintiff also used Omo-Ettu's deposition to glean additional information about Equinix's accounting policies and practices, and relied on that

information while drafting and negotiating the appropriate search terms and custodians for discovery.  The deposition lasted approximately six hours, reviewed multiple exhibits, and provided insight into Equinix's accounting practices and internal management structure.

### 2.   Lead Plaintiff's Discovery Directed at Nonparties

43.   Lead Counsel expended substantial time and effort obtaining relevant evidence from 16 nonparties, including those described below.  Although negotiations were ongoing, by the time the Settlement was reached, Lead Plaintiff had received 4,812 documents spanning 24,718 pages from nonparties.

### a.   Hindenburg Research

44.   On February 12, 2025, Lead Plaintiff noticed and served a subpoena *duces tecum* on Hindenburg Research, LLC ("Hindenburg"), a forensic financial research firm that published the short report on Equinix on March 20, 2024 titled "Equinix Exposed: Major Accounting Manipulation, Core Business Decay and Selling an AI Pipe Dream as Insiders Cashed Out Hundreds of Millions" plead in the Complaint.  ¶153 n.8.  The subpoena sought all documents and communications concerning the Equinix short report, including Hindenburg's investigative communications with former and current Equinix employees.  On March 12, 2025, Hindenburg produced more than 2,400 documents, including 43 transcripts from its interviews with the former Equinix employees relied upon, or not relied upon, in publishing the short report.  Lead Counsel closely reviewed each of these documents in assessing the strengths and weaknesses of Lead Plaintiff's claims and the accuracy of the public reporting concerning Equinix's Class Period conduct.

### b.   Securities Analyst Firms

45.   On February 14, 2025, Lead Plaintiff began serving subpoenas *duces tecum* on the securities analyst firms that published reports on Equinix during the Class Period.  In total, Lead Plaintiff served 11 such subpoenas, and engaged in active negotiations with each analyst firm, conducting multiple meet-and-confers in an effort to reach agreements concerning the scope of

requested discovery.[3]  In order to facilitate these negotiations, Lead Plaintiff identified custodians and cultivated a list of relevant search terms to aid the analyst firms in their search for relevant documents.  At the time the Settlement was reached, nonparty analyst firms had produced over 500 documents, totaling 19,333 pages, pursuant to Lead Plaintiff's subpoenas *duces tecum*.  At the time of the mediation, significant negotiations with these firms were still underway and additional productions were imminent.

### c.    PricewaterhouseCoopers

46.    On February 21, 2025, Lead Plaintiff served a subpoena *duces tecum* on Equinix's outside auditor PricewaterhouseCoopers LLP ("PwC").  PwC sent its responses and objections on March 7, 2025, prompting multiple meet-and-confer meetings with Lead Plaintiff and related correspondence.  The documents and discovery requested from PwC were critical to proving Lead Plaintiff's claims regarding Equinix's alleged manipulation and fraud, including because Defendants sought to rely on a purported clean audit from its Audit Committee investigation as part of their defense against Lead Plaintiff's allegations.  ECF 54.  At the time of the settlement agreement, PwC had produced more than 450 documents, totaling 2,863 pages.  Lead Plaintiff, through Lead Counsel, had begun a careful analysis of PwC's production and, with assistance from Lead Plaintiff's in-house forensic accountants (*see infra* §III.B), used this information in connection with the Rule 30(b)(6) deposition of Equinix.

### d.    Additional Nonparties

47.    On March 24, 2025, Lead Plaintiff served a subpoena *duces tecum* on Compensia Inc., a consulting firm that worked with Equinix to develop its executive compensation structure. The subpoena requested documents regarding the relationship between Equinix and Compensia and any recommendations Compensia provided to the Company, especially those that pertained to the compensation and bonus structure of the Defendants.  Compensia served its objections and responses on May 23, 2025.

---

[3]    The securities analyst firms subpoenaed by Lead Plaintiff include Barclays, TD Securities, Wells Fargo, BMO Capital Markets, Deutsche Bank, Evercore Group, HSBC Securities, Oppenheimer, BNP Paribas Securities, Keybanc, and Morgan Stanley.

DECL. OF DANIEL J. PFEFFERBAUM ISO FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF PLAN OF ALLOCATION; AND AN AWARD OF ATTYS.' FEES AND EXPENSES - 3:24-cv-02656-VC
4923-8507-1473.v1

- 17 -

48.     On April 22, 2025, Lead Plaintiff served a subpoena *duces tecum* on AlixPartners, a management consultant company retained by Equinix in the wake of the Hindenburg Report's release.   The subpoena sought documents and information concerning AlixPartners' role in Equinix's Audit Committee investigation into the allegations of fraud, as announced by the Company on March 25, 2024.   ¶168.   AlixPartners served its objections and responses to the subpoena on May 6, 2025, in which they raised numerous arguments for refusing to produce responsive documents based on an assertion of work product privilege by Equinix.   Lead Counsel and AlixPartners engaged in multiple meet-and-confers in an effort to reach a resolution regarding the requested documents, and at the time of the Settlement the negotiations were ongoing.

### D.     Defendants' Discovery Directed at Lead Plaintiff

49.     On March 10, 2025, pursuant to Fed. R. Civ. P. 34, Defendants served Lead Plaintiff with 50 requests for the production of documents ("Defendants' RFPs"), seeking discovery concerning Lead Plaintiff's suitability to represent a class of Equinix investors, including demands for Lead Plaintiff's trading records, monthly and annual account statements, investment management agreements, documents summarizing any due diligence conducted by Lead Plaintiff prior to purchasing securities, documents that evidenced Lead Plaintiff's awareness of and reliance on the alleged misleading statements, and numerous other categories of requests.   Defendants also sought documents concerning Lead Plaintiff's investigation into its allegations, including documents sufficient to identify any witness or former employee relied upon by Lead Plaintiff, documents reflecting communications with any federal agency regarding Equinix, and all documents supporting the tables detailing the inflation of AFFO that were included in the Complaint.   On April 9, 2025, Lead Plaintiff served its objections and responses to Defendants' RFPs.   The Parties engaged in numerous meet-and-confers regarding the expansive requests to negotiate the scope of Lead Plaintiff's production and, ultimately, reached a compromise regarding the initial set of documents to be produced.   Following these negotiations, Lead Plaintiff conducted a thorough search of its materials and then made an initial production of documents responsive to Defendants' RFPs, totaling 2,383 pages, on April 17, 2025.

50.     On March 13, 2025, pursuant to Fed. R. Civ. P. 33, Defendants served their First Set of Interrogatories to Lead Plaintiff, requesting information about Lead Plaintiff's trades in Equinix securities, Lead Plaintiff's reliance on the alleged false or misleading statements, and Lead Plaintiff's investigation into the allegations in the Complaint, including requesting the identity of any former employees of Equinix with whom Lead Plaintiff communicated prior to filing. Lead Plaintiff served its objections and responses to this initial set of interrogatories on April 14, 2025. Lead Plaintiff engaged in meet-and-confers with Defendants about the sufficiency of these responses, and at the time of the Settlement the negotiations were ongoing.

### E.     Lead Plaintiff's Class Certification Motion

51.     On April 17, 2025, Lead Plaintiff filed a motion to certify a class of purchasers of Equinix common stock, appoint the Accrual Fund as Class Representative, and appoint Robbins Geller as Class Counsel pursuant to Fed. R. Civ. P. 23. ECF 90. The motion detailed why this action satisfies the requirements of Rule 23(a) (*i.e.*, numerosity, typicality, adequacy, and commonality) as well as Rule 23(b)(3) (*i.e.*, predominance). The motion was supported by the expert report of Steven P. Feinstein, Ph.D., CFA, who opined that the market for Equinix common stock was efficient and set forth a methodology to calculate damages on a class-wide basis. *See infra* §III.C.

52.     Defendants opposed Lead Plaintiff's class certification motion, asserting that the Accrual Fund did not meet the typicality requirement under Fed. R. Civ. P. 23(a) due to the timing of its purchases and the alleged disclosures, that a "truth on the market" defense was sufficient to rebut the presumption of reliance, and that Lead Plaintiff was in conflict with members of the putative class due to the purported unique defense asserted by Defendants. ECF 94. In particular, the opposition contended that another short-seller, Jim Chanos ("Chanos"), had publicly commented on the data center industry's treatment of AFFO in or around June, 2022, prior to the time that Lead Plaintiff purchased its Equinix stock. The Parties reached the proposed settlement agreement before Lead Plaintiff filed its Reply brief responding to these arguments, which was due to be filed on July 10, 2025.

## III.    EXPERT WITNESSES AND CONSULTANTS

### A.    Investigator

53.    In support of its efforts to draft the Amended Complaint, Lead Plaintiff retained the services of L.R. Hodges & Associates, Ltd. ("LRH&A"), an investigative consulting firm.  LRH&A identified and located potential witnesses to the allegations, including former Equinix employees, contacted and interviewed select individuals, and thereafter provided Lead Counsel with comprehensive interview summaries to aid in the drafting of the Complaint.  LRH&A's assistance supported Lead Plaintiff's ability to plead the falsity of the surviving alleged misrepresentation, as the Court found that the former employee alleged in the Complaint corroborated – and therefore bolstered the credibility of – the Hindenburg Report.

### B.    In-House Forensic Accountants

54.    In order to comprehensively analyze the accounting misrepresentations alleged in the Amended Complaint, Lead Counsel utilized in-house forensic accounting professionals to provide investigative accounting, auditing, and financial expertise.  In particular, Andrew Rudolph ("Mr. Rudolph") worked alongside Lead Counsel in investigating, evaluating, and prosecuting the case. Mr. Rudolph is the National Director of Lead Counsel's forensic accounting department.  He is a Certified Public Accountant (CPA) licensed to practice in California and has been designated by the American Institute of Certified Public Accountants ("AICPA") as Certified in Financial Forensics (CFF).  He is also a Certified Fraud Examiner (CFE).  Mr. Rudolph has approximately 40 years of public accounting and consulting experience, including extensive experience in forensic accounting and fraud investigations of national and foreign companies, and began his career as an auditor for the public accounting firm of PwC.  Mr. Rudolph has over 30 years of forensic accounting experience related to the investigation of securities fraud.

55.    Mr. Rudolph assisted Lead Counsel by reviewing and analyzing public documents and discovery material obtained from Defendants and nonparties, assisted with the drafting of allegations of violations of the applicable accounting rules and regulations, and assisted with

discovery requests to both Defendants and PwC. Mr. Rudolph also assisted Lead Counsel with preparing for the deposition of Equinix.

### C. Crowninshield Financial Research

56. Lead Plaintiff retained the services of the highly-regarded economic consulting firm Crowninshield Financial Research, Inc. ("Crowninshield") to provide opinions in support of Lead Plaintiff's class certification motion and to assist in the preparation of the Plan of Allocation. Dr. Steven P. Feinstein is an Associate Professor of Finance at Babson College, and the founder and president of Crowninshield. Dr. Feinstein holds a Ph.D. in Economics from Yale University. In support of Lead Plaintiff's motion for class certification, Dr. Feinstein's April 17, 2025 expert report set forth his opinions that the market for Equinix common stock was efficient during the Class Period and that class-wide damages could be calculated with a common methodology. ECF 90-3. After the Parties agreed to the proposed Settlement, Crowninshield also assisted Lead Counsel in the preparation of the Plan of Allocation, including by assessing the amount of inflation in Equinix's stock price caused by the alleged false and misleading statements.

## IV. THE SETTLEMENT

### A. Reaching the Settlement

57. During the January 24, 2025 case management conference, the Court directed the Parties to complete a mediation session prior to June 6, 2025. ECF 82 at 4:13-15. The Parties agreed to an in-person mediation with Mr. Ruthberg in Redwood City, California.

58. In advance of the mediation, the Parties prepared, exchanged, and submitted to Mr. Ruthberg, detailed mediation submissions, with each side discussing the strengths and weaknesses of their claims and defenses. On June 2, 2025, Lead Plaintiff, through Lead Counsel, engaged in a pre-mediation conference with Mr. Ruthberg to discuss the merits of the case and upcoming mediation.

59. On June 4, 2025, the Parties, their counsel, and representatives of Defendants' D&O insurance carriers attended an approximately ten-hour, in-person mediation with Mr. Ruthberg. Over the course of the mediation, the parties addressed numerous merits-related issues and negotiated extensively through Mr. Ruthberg. The result of these efforts was a mediator's proposal

of $41.5 million to resolve the Action, which both parties accepted the following day.  On June 12, 2025, the Parties executed a term sheet documenting their agreement in principle, and thereafter proceeded to formally document the proposed Settlement.

60.     Lead Counsel believes that the Settlement is fair, reasonable, and adequate.  Indeed, Lead Counsel believes the $41.5 million cash settlement is a strong result for Class Members, considering the risk of continued litigation through class certification, summary judgment, and trial (and the inevitable post-trial and appellate proceedings) or potentially, recovering nothing at all.

**B.      The Strengths and Weaknesses of the Case Favor Settlement**

61.     As outlined above, after significant investigation, thorough briefing at the motion to dismiss and class certification stages, and the collection and review of document discovery, Lead Counsel provided Lead Plaintiff with a comprehensive understanding of the strengths and weaknesses of its claims against Equinix and the potential for recovering a judgment should the surviving claims be successful through trial.  Based on the information and documents obtained through Lead Plaintiff's and Lead Counsel's investigation, interviews with former employees, publicly available documents, documents reviewed during discovery and mediation, and consultations with experts, Lead Plaintiff and Lead Counsel believe that the claims asserted in the Action have merit.  However, Lead Plaintiff and Lead Counsel recognize that Lead Plaintiff and Class Members faced considerable risks and defenses in continuing the Action.  Based on the risk factors discussed below, as well as the extensive experience of Lead Counsel in the litigation of securities class actions, Lead Counsel submits that the Settlement, which provides a very substantial recovery to the Class, is more beneficial than many of the potential alternatives offered by continued litigation, and therefore is fair, reasonable, and adequate.

62.     Although Lead Counsel drafted a thorough and compelling Amended Complaint, Defendants successfully obtained dismissal of Lead Plaintiff's claim that Equinix misled investors by engaging in a scheme to defraud by overselling power capacity at its datacenters. ECF 67 at 11. This theory of fraud represented a significant portion of Lead Plaintiff's claims against the Defendants but was dismissed for failure to adequately allege materiality.  Unlike the alleged

manipulation of AFFO, which had been questioned (but never confirmed) by skeptical analysts for years, the overselling of power capacity disclosed by the Hindenburg Report was new information and thus, was not subject to the same attacks or affirmative defenses.  Notably, following the release of the Hindenburg Report, multiple analysts expressed a stronger reaction to the overselling of power than the disclosures of questionable AFFO-related practices.  As such, the dismissal of Lead Plaintiff's power capacity allegations both substantially reduced the damages recoverable by this Action and created additional risks to proving the surviving claims related to AFFO manipulation.  In particular, proving loss causation and damages would require complicated expert analysis disaggregating the various fraud and non-fraud disclosures that caused Equinix stock price to decline upon certain dates where both power capacity and AFFO-related news was disclosed.  Defendants were already seeking to – and would continue to –attribute certain price declines to the inactionable power capacity disclosures as opposed to the AFFO allegations upheld by the Court.

63.     While Lead Plaintiff believed that it would ultimately prevail on its surviving allegations, Defendants were aggressively seeking to rebut them, and a successful outcome would require Lead Plaintiff to surmount significant hurdles at class certification, summary judgment, and ultimately at trial (and any subsequent appeals).  While multiple elements of Lead Plaintiff's surviving claim present a risk of failure, most importantly, to successfully litigate its claims, Lead Plaintiff must show that Defendants made material false and misleading statements concerning AFFO.  As a non-GAAP accounting metric, Equinix was free to define, re-define and calculate AFFO however it chose, so long as it sufficiently disclosed its methodology to investors.  ECF 58 at 1.  And, as argued at the motion to dismiss stage by both Lead Plaintiff and Defendants, Equinix provided investors with multiple, sometimes-conflicting, explanations of the Company's AFFO accounting policies.  In particular, the Parties engaged in a vigorous dispute about the accounting practices as they applied to the replacement cost of particular items – like batteries, chillers and light bulbs – when the replacement also served to upgrade or expand the Company's capabilities.  At the motion to dismiss stage, both Lead Plaintiff and Defendants were able to identify Company policies concerning AFFO accounting which supported their position.  Lead Plaintiff would then have to

DECL. OF DANIEL J. PFEFFERBAUM ISO FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF PLAN OF ALLOCATION; AND AN AWARD OF ATTYS.' FEES AND EXPENSES - 3:24-cv-02656-VC
4923-8507-1473.v1

- 23 -

prove that Defendants materially misled investors by determining AFFO in a manner inconsistent with the policies provided to investors through discovery of accounting records related to CapEx on a transaction-by-transaction basis.  Further still, Lead Plaintiff would be required to present these complex accounting metrics in a readily-digestible manner to a jury.  Moreover, the nature of the AFFO metric presented additional risks for Lead Plaintiff to contend with in litigation, for instance, because the alleged misclassified CapEx represented less than 5% of Equinix's total revenue, Lead Plaintiff faced additional risks that any misstatement could be deemed immaterial.  While Lead Plaintiff asserts that CapEx and AFFO are material accounting metrics, especially due to their centrality in the financial operation of Equinix, the common quantitative threshold for materiality under GAAP is 5% of pre-tax revenue.  Because CapEx and thus AFFO were close to or below that threshold, Lead Plaintiff faced additional challenges in prevailing on the issue of materiality.

64.     Lead Plaintiff also had to overcome Defendants' arguments that the information which it alleged was concealed from investors concerning manipulation of AFFO had in fact already been fully publicly disclosed during the Class Period.  Defendants contended that the Hindenburg Report did not contain any material new information that was not previously made available to the market by securities analysts or other short-sellers (in particular, Chanos), in social media posts, interviews and a (nonpublic) slide presentation during 2022.  Chanos took a short position on the datacenter industry and made statements which doubted the accuracy of Equinix's CapEx classification and AFFO reporting.  At class certification, Defendants contended that Lead Plaintiff purchased Equinix shares after Chanos had already revealed that Equinix was overstating AFFO, which precluded Lead Plaintiff from satisfying the adequacy and typicality requirements of Rule 23. At summary judgment and trial, Defendants would certainly characterize the same disclosures as a truth-on-the-market defense in an effort to rebut the elements of reliance, loss causation, and damages.  While Lead Plaintiff remains confident in its rebuttals to these arguments, including that the statements made by Chanos did not specifically disclose the extent, or accurately inform the market, of Equinix's accounting manipulation, Defendants' arguments still presented a significant hurdle.  Lead Plaintiff cannot guarantee a jury would view the facts similarly.

65.     The most difficult element that a private plaintiff who claims securities fraud must prove is that defendants acted with the required state of mind.  15 U.S.C. §78u-4(b)(2)(A).  Scienter can be proved "by raising a strong inference that the defendant possessed actual knowledge or acted with deliberate recklessness."  *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011).   At the motion to dismiss stage, Lead Plaintiff alleged that, based on Defendants' statements labelling the AFFO and AFFO per share their "lighthouse metric," the Court could infer that Defendants were aware of the accounting manipulation that shaped their core metric.  ECF 56 at 16-17.   Lead Plaintiff included additional particularized facts to support scienter, including that the Individual Defendants' compensation was inextricably linked to the AFFO per share metric, and the Company's Chief Accounting Officer in fact admitted that Defendants "put[] a ton of pressure" on the design team related to the classification of CapEx and AFFO accounting. ECF 56 at 17-18.  Defendants responded that Lead Plaintiff did not allege any particularized facts to support the executives' awareness or knowledge of "the minutia of accounting judgments."  ECF 58 at 8.  While discovery from the Company was still ongoing, Lead Plaintiff faced the significant hurdle at both summary judgment and trial of proving that Defendants had firsthand knowledge of the alleged accounting violations and their alleged impact on the Company's reported financials, and thus acted with the required state of mind.

66.     There was an additional and substantial risk that Lead Plaintiff might not be able to prove loss causation and damages at trial.  To establish loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the loss suffered by plaintiff.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-56 (2005).  Here, as discussed *supra*, Defendants argued that a series of disclosures made prior to and during the Class Period provided the market with true information regarding Equinix's accounting practices as it pertained to AFFO.  ECF 94.  Further, Defendants were expected to attribute the price decline that occurred in connection with the Hindenburg Report to non-fraud factors – like the overselling of power – as opposed to the fraud factors alleged by Lead Plaintiff to reduce or eliminate damages. Thus, even if Lead Plaintiff succeeded in establishing Defendants' liability for the alleged

misstatements and disclosures, Lead Plaintiff would likely face risks that could reduce the amount of damages if a jury were to find that other information on the alleged corrective disclosure dates caused Equinix's stock price to fall.

67.     Lead Plaintiff also faced challenges in conducting discovery.  For example, as discussed *supra*, Defendants disputed the scope of discovery.  The issues in dispute centered on the relevance of the documents sought, such as Defendants' resistance to producing documents that detailed Equinix's Audit Committee investigation into, and eventual exculpation of, the allegations contained in the Hindenburg Report.  Similar relevance arguments were repeated by a number of nonparties that Lead Plaintiff subpoenaed.  These discovery disputes were only exacerbated by the five-year Class Period in this Action, further complicating Lead Plaintiff's efforts to retrieve valuable and relevant information from Defendants and nonparties alike.  The inherent risk associated with the collection and analysis of the extensive and complex discovery necessary in this case weighed on the decision to reach the Settlement.

68.     Moreover, Lead Plaintiff faced imminent legal hurdles on the road to trial.  As discussed *supra*, Defendants vehemently opposed Lead Plaintiff's motion for class certification, and Lead Plaintiff cannot guarantee its endeavor to certify a class would be successful.  Likewise, significant legal challenges are inherent to litigating a motion for summary judgment, which requires Lead Plaintiff to show that there is not a genuine dispute as to any material fact, including that Defendants' process for classifying CapEx was materially different than their explanation to investors, thus rendering the numerous statements explaining the classification process to investors misleading.  Even if successful in establishing liability, Lead Plaintiff was not guaranteed to recover the entirety (or even a portion) of the alleged damages, especially given the movement in Equinix's stock price during and following the end of the Class Period.

69.     Even if Lead Plaintiff successfully litigated the case through discovery and to trial, there would still be a substantial risk that Defendants would appeal any verdict achieved in Lead Plaintiff's favor.  The appeals process could span years, during which time the Class would receive

no recovery. Any appeal would also create the risk of reversal, in which case the Class would receive nothing even after having prevailed on the claims at trial.

70. Having considered the foregoing and evaluated Defendants' defenses at the motion-to-dismiss stage, which they are likely to maintain throughout the case, it was the informed judgment of Lead Plaintiff and Lead Counsel, based upon proceedings to date and their extensive experience in litigating shareholder class actions, that the proposed Settlement of this matter for $41.5 million in exchange for a mutual release of all claims, and including the other terms set forth in the Stipulation, provides fair, reasonable, and adequate consideration, is in the best interests of the Class, and allows the parties to achieve early resolution of a complex and risky case.

### C.   The Plan of Allocation Is Fair and Reasonable

71. Lead Plaintiff has proposed a Plan of Allocation to govern the method by which Class Members' claims will be calculated, *i.e.*, how the proceeds of the Settlement will be allocated among Class Members who submit valid Proof of Claim forms and suffered economic losses as a result of the alleged fraud.  The Plan of Allocation provides that the Net Settlement Fund will be distributed to Class Members who submit timely, valid Proofs of Claim and whose claims for recovery have been permitted under the terms of the Stipulation ("Authorized Claimants").  The Plan of Allocation provides that Class Members will only be eligible to participate in the distribution of the Net Settlement Fund if they purchased or otherwise acquired Equinix common stock during the Class Period and have a Recognized Loss Amount as described in the Notice.

72. Lead Plaintiff developed the Plan of Allocation in consultation with Lead Plaintiff's damages expert.  In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the estimated amount of alleged artificial inflation in the price of Equinix common stock that was allegedly proximately caused by Defendants' alleged materially false and misleading statements and omissions that had survived Defendants' motion to dismiss.  In calculating the estimated inflationary impact of those misrepresentations and omissions, Lead Plaintiff's damages expert considered the price changes in Equinix common stock in reaction to the relevant alleged corrective disclosures, adjusting the price change for factors that were attributable to market or industry forces and other

non-fraud related factors.  *See* Declaration of Ross D. Murray Regarding: (A) Notice Dissemination; (B) Publication; (C) Establishment of Call Center Services and Website; (D) Proofs of Claim Received; and (E) Report on Exclusions and Objections, Ex. B (Notice), attached hereto as Exhibit B.

73.    Under the Plan of Allocation, for each Class Period purchase of Equinix common stock that is properly documented, a "Recognized Loss Amount" will be calculated according to the formulas described in the Notice.  In simple terms, the calculation of a claimant's Recognized Loss Amount is based on a formula that takes into account such information as: (a) when a claimant's share was purchased and sold; (b) the amount of the alleged artificial inflation per share at the time of purchase and sale; and (c) the purchase price of the share.  Because the alleged corrective disclosures reduced the artificial inflation in stages over the course of the Class Period, the Recognized Loss Amounts of claimants may vary.

74.    In sum, the Plan of Allocation represents a reliable and time-tested method by which to weigh, in a fair and equitable manner, the claims of Authorized Claimants against one another for the purpose of making *pro rata* allocations of the Net Settlement Fund.

### D.    Lead Counsel's Motion for Attorneys' Fees and Expenses Is Reasonable

75.    The successful prosecution of this Action required Lead Counsel and its para-professionals to perform 4,273.40 hours of work valued at $2,984,618.50 and incur $233,757.84 in expenses, as detailed in the accompanying declaration.

76.    Based on the extensive efforts on behalf of the Class, as described above, Lead Counsel is applying for compensation from the Settlement Fund on behalf of all Lead Plaintiff's counsel on a percentage basis, and has requested a benchmark fee in the amount of 25% of the Settlement Fund.  In light of the nature and extent of the Litigation, the diligent prosecution of the Litigation, the complexity of the factual and legal issues presented, and the other factors described above and in the accompanying motion for approval of the fee award, Lead Plaintiff and Lead Counsel believe that the requested benchmark fee of 25% of the Settlement Fund is fair and reasonable.

77.    A 25% fee award is a benchmark rate in the Ninth Circuit, and is justified by both the specific circumstances in this case and the substantial risks that Lead Plaintiff has overcome to date. The $41.5 million cash Settlement was achieved as a result of creative and vigorous prosecution of this Litigation and involved complex motion practice and substantial discovery efforts.

78.    The Settlement Amount of $41.5 million represents approximately 17% of the maximum estimated damages that Lead Plaintiff could reasonably expect to be recovered at trial.  If a jury were to reject some of Lead Plaintiff's allegations of fraud for reasons described above, or if the Court were to reject the proffered damages methodology, the amount of damages recovered would have been significantly less and the percentage recovery under the Settlement proportionally higher.

79.    This Litigation was prosecuted by Lead Counsel on an "at-risk" contingent fee basis. Lead Counsel fully assumed the risk of an unsuccessful result and has received no compensation for services rendered or the significant expenses incurred in litigating this Action for the benefit of the Class.  Any fees or expenses awarded to Lead Counsel have always been at risk and completely contingent on the result achieved.  Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result and that such a result would be realized only after a lengthy and difficult effort.

80.    To date, no written objections have been filed by any potential Class Member to the fee and expense request.

## V.    MISCELLANEOUS EXHIBITS

81.    Attached as Exhibit D hereto is a true and correct copy of Laarni Bulan and Eric Tam, *Securities Class Action Settlements; 2024 Review & Analysis* (Cornerstone Research 2025).

## VI.    CONCLUSION

82.    In light of the $41.5 million Settlement obtained by Lead Plaintiff and Lead Counsel, the substantial risks Lead Counsel faced, the exceptional quality of Lead Counsel's work, the contingent nature of the requested fee, and the substantial complexity of the case, Lead Plaintiff and Lead Counsel respectfully submit that the Court should approve the Settlement and Plan of

Allocation as fair, reasonable, and adequate and approve Lead Counsel's motion for an award of attorneys' fees and expenses.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 10, 2025, in San Francisco, California.

s/ Daniel J. Pfefferbaum
DANIEL J. PFEFFERBAUM